# MARY BETH BUSH

## vs.

# CITY OF GARDNER

---

# MARY BETH BUSH

*April 18, 2017*

---

Summary Judgment Exhibit

**6**

Esquire & Jester, P.G.



## CHRISTOPHER VIDEO & REPORTING

1100 Main Street, Suite 2190 - Kansas City, MO 64105
816.471.7800 www.christophervideo.com 816.471.7998 (Fax)

1                IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
2
MARY BETH BUSH,          )
3                        )
                         )
Plaintiff,               )
4                        )    Case No. 2:16-CV-02675-JWL-GEB
          vs.            )
5                        )
CITY OF GARDNER,         )
6                        )
Defendant.               )
7
              THE VIDEOTAPED DEPOSITION OF
8                       MARY BETH BUSH,

9    produced, sworn and examined on the part of the
     Defendant, pursuant to Notice on 18th day of
10   April, 2017, at Walters, Bender, Strobehn &
     Vaughan, P.C., City Center Square, 1100 Main
11   Street, Suite 2500, Kansas City, Missouri 64105,
     in the IN THE UNITED STATES DISTRICT COURT, FOR
12   THE DISTRICT OF KANSAS, before me,

13
                      MARIA L. TAYLOR
14                    CCR, CSR, RPR
                           of
15           CHRISTOPHER VIDEO & REPORTING

16
     a Registered Professional Reporter and Certified
17   Court Reporter in and for the States of Kansas,
     Missouri and Iowa.

18

19

20

21

22

23

24

25

1      A.   Yes.  Mary Beth Bush.

2      Q.   And how old are you, Ms. Bush?

3      A.   Fifty-nine.

4      Q.   And your birthday is when?

5      A.   ████/58.

6      Q.   Have you ever been deposed before?

7      A.   I have not.

8      Q.   Okay.  So you're familiar that it's just

9   like testifying under oath in court?

10     A.   I am.

11     Q.   Okay.  Are there any medications or

12  anything that you're on that might affect your

13  ability to testify truthfully?

14     A.   No, sir.

15     Q.   What about any medications that might

16  affect your memory?

17     A.   No, sir.

18     Q.   Okay.  I'm going to assume that if you

19  answer a question that I ask, that you understood

20  the question; is that fair?

21     A.   That's fair.

22     Q.   So if you don't understand, just ask me

23  to rephrase it.  All right?

24     A.   I will.  Thank you.

25     Q.   One benefit is -- of not being in court

1    is we can take breaks when you need to.  So if

2    you need a break, let your attorney or I know and

3    we'll be accommodating.  Okay?

4         A.    Thank you.

5         Q.    I want to start out with a little bit of

6    your background.  I've seen a resume that was

7    produced, but can you just walk us through your

8    work history?

9         A.    Sure.  From how long?

10        Q.    Well, I guess let me back up.

11        A.    Okay.

12        Q.    You graduated from high school when?

13        A.    1976.

14        Q.    And did you do any education after high

15   school?

16        A.    Not formal education.

17        Q.    When you say "not formal," what do you

18   mean?

19        A.    Not college.

20        Q.    Okay.  Any technical programs or

21   anything like that?

22        A.    No, sir.

23        Q.    Did you do any nonformal education?

24        A.    I don't know that I understand that.

25        Q.    Well, you said not formal, so I was

1    were doing restructuring and offered a number of

2    buyouts and I took that buyout.

3        Q.    Was the option to be bought out or laid

4    off?

5        A.    No.

6        Q.    So you were just tired of working in the

7    industry?

8        A.    Yeah.  It was a hard industry, and I was

9    traveling almost seven days a week.

10        Q.    At any of the previous employers that we

11   just discussed, were you ever disciplined?

12        A.    No, sir.

13        Q.    So tell me about your business that you

14   started.

15        A.    I had a home decor store.

16        Q.    There in Gardner, Kansas?

17        A.    Uh-huh.  In Gardner, Kansas.

18        Q.    Did you have any experience or history

19   in home decor?

20        A.    No, sir.  I liked design and I did it

21   and people always told me I was very good at it,

22   and so I tried something new.

23        Q.    How many employees did you have?

24        A.    I had four part time.

25        Q.    How long did you run your business?

1  A. A little over five years.

2  Q. Was the business profitable?

3  A. Somewhat.  We just continued to put

4 money into it, so profitability is probably

5 marginal.

6  Q. So do you not know if you netted income

7 out of it?

8  A. I did not take any income over that five

9 years myself.

10  Q. Now, I saw in some of the discovery that

11 you had at one point in time I think around that

12 same time that you were running your business,

13 you filed for bankruptcy?

14  A. When we closed the business, we did.  We

15 filed a consolidation to pay off the vendors,

16 yes.

17  Q. Okay.  So the bankruptcy was related to

18 the business?

19  A. Yes, sir.

20  Q. And that was a personal bankruptcy for

21 you and your husband?

22  A. Yes.

23  Q. Was the business --

24  A. It was a sole proprietor.

25  Q. And you said it was a liquidation

1    bankruptcy?

2        A.    Yes.

3        Q.    Okay.  And then it's after that that you

4    began working for Gardner?

5        A.    Actually, it was -- I still had the

6    store open when I went to work for Gardner.  I

7    had the store about a year while I was working at

8    the City.

9        Q.    How did you come to work for Gardner?

10       A.    Actually, the mayor and the assistant

11   city administrator -- at that time I was on the

12   board of directors for the chamber of commerce

13   and ambassador for the city and they knew I had

14   HR background and told me they had this position

15   open and was I interested.  And I thought about

16   it for a period of time and I then consequently

17   applied for the position, interviewed and I was

18   hired.

19       Q.    At the time the mayor was who?

20       A.    Carol Lehman.

21       Q.    And you knew her from your position on

22   the commerce committee?

23       A.    On the chamber of commerce.

24       Q.    Chamber?

25       A.    Uh-huh.

1       Q.    How long did you serve on the chamber of
2    commerce?
3       A.    Probably five years, four to five years.
4       Q.    Do you remember when you stopped
5    serving?
6       A.    When I went to work for the City.
7       Q.    Was that a conflict --
8       A.    I felt it was a conflict of interest, so
9    I just stepped down.
10      Q.    And at the time the position you applied
11   for was what?
12      A.    Human resource manager.
13      Q.    And so they asked you to apply, or the
14   mayor did, she asked you to apply?
15      A.    They didn't ask me to apply.  They told
16   me about the position.
17      Q.    Okay.
18      A.    And asked me if I was interested.  That
19   it was open and I should apply if I was
20   interested.
21      Q.    Okay.  So you filled out a formal
22   application?
23      A.    Yes, sir.
24      Q.    And that was in 2006?
25      A.    2006.

1      A.    No, sir.

2      Q.    Did you form any opinions about Cheryl

3  at that time?

4      A.    I thought she was very strong.  I

5  thought she was very articulate.  She had good

6  vision.

7      Q.    Anything else?

8      A.    I think she presented herself very well

9  to the council in her presentations.

10      Q.    So after she was hired -- I guess, do

11  you recall when exactly she was hired?

12      A.    It was July of -- I think it was '12.

13      Q.    She became your supervisor at that

14  point; correct?

15      A.    Yes, sir.

16      Q.    And how did you feel about her as a

17  supervisor for the first six months or so?

18      A.    I enjoyed working with her.  Helped her

19  get acquainted with the City and various people

20  and the other departments.  I was pretty much her

21  right-hand person.

22      Q.    Did you feel like you had a close

23  relationship with her?

24      A.    I felt like I had a good working

25  relationship with her, yes.

1      Q.   But you wouldn't socialize out of work

2  or anything like that?

3      A.   I did not socialize with her outside of

4  work.

5      Q.   And I think we mentioned this earlier,

6  but at some point you were promoted out of your

7  human resource manager position; correct?

8      A.   That's correct.

9      Q.   Do you recall when that was?

10     A.   January of -- I'm trying to remember if

11  it was '13 or '14.

12     Q.   Let me see if --

13     A.   I think it was '14.

14     (Exhibit 1 was marked for identification.)

15     Q.   I'm going to hand you what I've marked

16  as Exhibit 1.  If you'd take a quick peak at

17  that.

18          Have you seen this document before?

19     A.   Oh, yes.

20     Q.   Can you explain to us what it is?

21     A.   It's a payroll change notice that is

22  filled out when an employee has a change of pay,

23  position, title.  This was the one that was

24  changing my title and classification to

25  administrative services manager.

1    Q.   All right.  So if we kind of look down,

2    about a quarter of the way, there's some bold

3    words that say check property box, and then the

4    box change rate and change of title

5    classification are marked; correct?

6    A.   That's correct.

7    Q.   And under the change title

8    classification, it says it's changing to

9    administrative services manager; correct?

10   A.   That's correct.

11   Q.   And a little bit below it says the

12   effective date was in January -- January 21,

13   2013; correct?

14   A.   Correct.

15   Q.   We're done with that if you want to set

16   that aside.  Thank you.

17   A.   Uh-huh.

18   Q.   Now, when you became administrative

19   services manager, how did your responsibilities

20   change?

21   A.   Quite drastically.  I was over five

22   divisions.  Human resources, IT, risk management,

23   building maintenance, and the city clerk.

24   Q.   And as part of your oversight of the

25   city clerk, were you also sort of the de facto

1   was level five and above and Lisa took level five

2   and below.  We had to split them up because we

3   had so many interviews going on at that time.

4       Q.    So once you narrow it down, you call

5   them back for another set of interviews; correct?

6       A.    We would.

7       Q.    And after those were done, would it work

8   the same way as a telephone -- or first round of

9   interviews, you would discuss the candidates at

10  the end of the day?

11      A.    They would.

12      Q.    Would you typically make a decision at

13  that point in time or make a recommendation?

14      A.    They could or the director might say --

15  the manager/director might say we want to think

16  about this over the weekend or a couple days and

17  that was fine, we would allow that.

18      Q.    But generally would there always be a

19  discussion afterwards?

20      A.    There would.

21      Q.    After the interview process?

22      A.    Yes.

23      Q.    As administrative services manager being

24  over HR, are you familiar with the employee

25  demographics of Gardner at the time that you

1   worked there?

2       A.    I am.

3       Q.    Generally speaking, would you agree that

4   the employees at Gardner are predominately white?

5       A.    They are.

6       Q.    Do you know what percentage by chance

7   when you left?

8       A.    I don't.

9       Q.    Do you know the average age of the

10  employees at Gardner at the time you left?

11      A.    I don't.

12      Q.    In your role as supervising the clerk,

13  what did you have to do?

14      A.    The city clerk?

15      Q.    Uh-huh.

16      A.    City clerk, she would put together and

17  we would work with Cheryl on council packets.  We

18  would put together the council packets.  We had a

19  number of projects that we were working on.

20  Dealing with open records request, dealing with

21  various records, vehicle records.  She -- that

22  position is the holder of the city records, so...

23      Q.    And would you be involved in responding

24  to requests for information under the Kansas Open

25  Records Act?

1    Engineering degrees were checked through the

2    state.  Different certifications depending on

3    what they were would be checked by the various

4    organizations.

5         Q.   Okay.  And are you familiar with an

6    individual by the name of Travis Hulse?

7         A.   Travis Hulse, uh-huh.

8         Q.   Hulse.  Sorry.  And that is spelled

9    H-U-L-S-E; correct?

10        A.   Yes.

11        Q.   And can you agree with me that in the

12   fall of 2014, the City learned that the education

13   -- what he listed as having an education as a

14   master's degree, that that went unverified by

15   your department?

16        A.   Yes, sir.

17        Q.   How did that happen?

18        A.   I wish I had an answer for you.  It was

19   a mistake by the department.  I owned up to it.

20   I took responsibility for it.  I stood with the

21   assistant and we corrected what we felt was a

22   loop in our process.

23        Q.   And was it a reoccurring problem that

24   education was not being verified?

25        A.   No, sir.

1    to set it to the side.

2        A.   Okay.

3        Q.   So you indicated before we looked at

4    that document that as far as you knew, Travis

5    Hulse was the only individual's whose education

6    went unverified; true?

7        A.   That is correct.

8        Q.   After you realized that mistake had been

9    made, what did you do to audit whether or not all

10   of the education previously had been verified for

11   applicants?

12       A.   I --

13             MR. HUBBARD:   Object to form.

14        You may answer.

15       A.   I did not do an audit.

16       Q.   (By Mr. Napolitano)  So you didn't go

17   back to check to make sure it was the only

18   instance; correct?

19       A.   I did not.

20       Q.   When it -- how did it come to light that

21   Mr. Hulse's education credentials had not been

22   verified?

23       A.   We had a -- I believe it was Department

24   of Labor audit, and when he was interviewed --

25   they interviewed the salaried employees.  And

```
 1   when it was interviewed -- he was interviewed, he
 2   stated to -- it was the City's attorney that was
 3   representing us, Bill Robins, that he didn't have
 4   his master's.  And he share that had with Cheryl
 5   and I in a meeting, and we were both shocked.
 6        Q.   Do you remember when that was?
 7        A.   I don't.
 8        Q.   Was it in the fall of 2014 to the best
 9   of your memory?
10        A.   I can't -- I don't know.  It would be in
11   the records, but I don't -- I can't tell you off
12   the top of my head when that occurred.
13        Q.   But to the best of your recollection it
14   was around the same time of the Department of
15   Labor audit?
16        A.   It was during the Department of Labor
17   audit at the readout of that, yes.
18        Q.   All right.  What did you do when you
19   found out that he was not -- didn't have his
20   master's degree?
21        A.   Communicated with him when we found out
22   that his director knew that he didn't and didn't
23   report it to us.  I, then, consequently called
24   the University of Nebraska, because that's where
25   he went to school and got information that he had
```

1    indeed completed everything except turning in his

2    thesis, but he had not completed his master's.

3        Q.   Was he reprimanded?

4        A.   He was demoted to -- back to a planning

5    technician.  He had been promoted to a planner,

6    and he was demoted back to a planning technician.

7    And there was discussion whether he should be

8    terminated, but the ultimate decision was he was

9    demoted.

10       Q.   And was that your decision?

11       A.   No, that was Cheryl's.

12       Q.   Did you have an opinion as to what

13   should happen to Travis?

14       A.   I did have an opinion.

15       Q.   What was your opinion?

16       A.   My opinion was he should have been

17   demoted.

18       (Exhibit 4 was marked for identification.)

19       Q.   I'm handing you what's been marked

20   Exhibit 4.

21       A.   Thank you.

22       Q.   Do you recognize this document?

23       A.   I do.

24       Q.   Tell me what it is, please.

25       A.   This is a letter to Travis telling him

1     that we are placing him -- demoting him,

2     basically, back to the planning technician and

3     the change in his salary and how we were going to

4     go through reducing that salary over a period of

5     time.

6          Q.    And you agreed with this decision?

7          A.    I did.

8          Q.    Did you have to be convinced to agree

9     with it?

10         A.    Well, Cheryl wanted to terminate him.

11    The director and I wanted to keep him.  He was an

12    outstanding employee.  He sat in a meeting with

13    Cheryl and I and told us.  He apologized.  He

14    didn't know how it ended up that his resume

15    stated that.  That when he was applying for jobs,

16    he had several different resumes and he had made

17    one for when he completed his master's.  He took

18    ownership for it.  He was a top performer.  An

19    excellent -- just a truly excellent employee and

20    a good individual, and I felt like he should be

21    given a second chance.

22         Q.    Okay.  And this letter went out on or

23    about November 20th of 2014; correct?

24         A.    That's what it says.

25         Q.    Is that consistent with your memory?

1      Q.    So you sat her down, you said you made a

2    mistake.  We need to make sure we're doing this,

3    and that was it?

4      A.    Yes.

5      Q.    Did you have any conversations with your

6    superior, Cheryl, about this incident?

7      A.    I mean, we talked about it, and she was

8    quite upset, as I was.  I was very upset with

9    what had occurred, and she was also.  And very

10   upset with the fact that the director knew and

11   didn't bring it to our attention, and

12   consequently found out that two directors knew

13   and didn't bring it to our attention and we were

14   both very upset about that.

15     Q.    Was she upset with you?

16     A.    I think, yeah, of course.  And

17   rightfully so.

18     Q.    Did Cheryl verbally counsel you on this

19   issue?

20     A.    I think the verbal counseling I got was,

21   "When I had an employee who did this before, I

22   fired them."

23          "When I had an HR director who had done

24   this before, I fired them."

25     Q.    We talked earlier about your role in

1    press releases and Kansas Open Records Request.

2    Would Cheryl ever ask you to do a press release?

3        A.    She probably did.  Yeah.

4        Q.    And how would you go about doing that?

5        A.    Oh, we would write the release and begin

6    it -- all press releases were approved through

7    her.  I would write them, the city clerk would

8    write them, her administrative or executive

9    assistant would write them, but all press

10   releases were approved through her.

11       Q.    Do you recall in December of 2014 there

12   was an issue with you issuing a press release

13   that Cheryl was unhappy about?

14       A.    It wasn't a press release.  It was an

15   open records request, but yes.

16       Q.    I apologize.  Can you tell me about the

17   request?

18       A.    Yes.  It was in relation to the

19   information on our police chief recruiting on an

20   individual.  Judith Rogers requested information,

21   and it was a statement -- it was a statement,

22   basically.  And I had tried multiple times that

23   day to -- I had text Cheryl multiple times to try

24   to reach her to talk to her about a concern that

25   one of the committee members had in having their

1   name released.  We were on a time line, and it

2   was time to get that out and she was not

3   available and not responding, so I made a

4   decision to send it to this individual without

5   the committee member's name.

6       Q.   But prior to that she had given you an

7   instruction to release the information; correct?

8                MR. HUBBARD:   Object.

9       A.   I had no --

10               MR. HUBBARD:   Object to form.

11          You may answer.

12      A.   I didn't have prior instruction from her

13  on that.

14      Q.   (By Mr. Napolitano)  What did she tell

15  you about the request?

16      A.   I don't believe she told me anything

17  about the request prior.  We had gathered the

18  information to send out, but we hadn't sent it,

19  and we had not reserved information from her

20  back.

21      (Exhibit 5 was marked for identification.)

22      Q.   Okay.  I'm going to hand you what I've

23  marked as Exhibit 5.  It's kind of confusing

24  because it was previously used as an Exhibit 6,

25  but it's the 5 we're dealing with.

1          This is an e-mail from Cheryl
2    Harrison-Lee to yourself; correct?
3       A.   Yes, it is.
4       Q.   And it's dated December 23, 2014?
5       A.   It is.
6       Q.   Is this an e-mail in relation to the
7    open records request we were just talking about?
8       A.   Yes, I believe so.
9       Q.   And in it she says, "In the future,
10   please follow my instructions for press releases
11   to avoid the appearance that we are not
12   transparent."
13          Did I read that correctly?
14      A.   You did.
15      Q.   She went on to say I asked you to
16   provide the names of the citizens before it was
17   sent out and you decided not to without us
18   discussing it.
19          Did I read that correctly?
20      A.   You did.
21      Q.   Do you now recall the conversation you
22   with Cheryl where she told you to send it out
23   with the names of the citizens?
24      A.   I don't recall that conversation
25   happening.

1     Q.   But you're not denying it happening?

2     A.   What I'm saying is I don't recall her

3 giving me any instruction prior to sending this

4 out.

5     Q.   Are you saying it didn't happen or you

6 don't remember it happening?

7     A.   I don't recall her giving me any

8 instruction.

9     Q.   Okay.  But she could have and you don't

10 recall it?

11     A.   Perhaps, I do not recall.

12     Q.   But you do recall receiving this e-mail?

13     A.   Yes, I do.

14     Q.   Okay.  I want to talk now a little bit

15 about police chief recruitment.  How long is that

16 process?

17     A.   It was over a period of time.  We did

18 two different recruitments.  I can't tell you

19 start to end date.  I'm sure there's documents

20 that show that at the City.  The first

21 recruitment came through and the individual who

22 was the choice when we did background did not

23 pass and follow all the background, so we did a

24 second recruitment and a vendor was used in that

25 second recruitment as well.  It -- it was -- it

1    8:00 a.m."; is that right?

2         A.    It does say that, yes.

3         Q.    So did you prepare these scenarios or

4    did Lisa?

5         A.    The two possible scenarios for the chief

6    of police would have come from me.

7         Q.    Okay.  And you -- it looks like you

8    repurposed it from a communications manager/PIO

9    scenario?

10        A.    Yeah.  We did that on --

11              Excuse me.  Yes.  We did that a number

12   of times.  We would use ones we've had in the

13   past.

14        Q.    And so how long would it take to put

15   these together?

16        A.    The scenarios?

17        Q.    Yes.

18        A.    Thirty minutes, maybe an hour.  We had

19   -- we pretty much had a template of what types of

20   things were going to go on.  We visited about

21   what were the types of things we wanted to know

22   or have them present, so it wasn't a difficult

23   task.

24        Q.    Uh-huh.  Do you remember what you were

25   doing on January 22, 2015, prior to 4:00 p.m.?

1   last minute.  But I can't tell you if it was a

2   week or two weeks or a month.  I do not recall.

3       Q.   (By Mr. Napolitano)  And I think you

4   testified a moment ago that Cheryl had asked you

5   the day before to prepare the scenarios?

6               MR. HUBBARD:  Objection.  Misstates

7   her prior testimony.  Object to form.

8               You can answer that.

9               Totally different than what she said.

10      A.   That is not what I said.

11      Q.   (By Mr. Napolitano)  Okay.  At what

12  point did Cheryl ask you to do this?

13      A.   I don't recall.  We can go back.

14           This late hour was not uncommon for us

15  to do.  We were very busy doing a lot -- a lot of

16  tasks and a lot of things.  And for Cheryl to get

17  this the night before was not uncommon for many

18  things.  She and I worked on things in the

19  evening together over the phone a lot.  That was

20  common practice.  So this was not uncommon that

21  she would have received this the day of, the

22  night before.  We did that all the time, and she

23  and I may be on the phone at ten o'clock at night

24  working on things.

25      Q.   But my question was when did she ask you

1   to prepare them?

2        A.   I don't recall.

3        Q.   Was it -- so you don't know if it was

4   the same day?

5        A.   No, sir.

6        Q.   You don't know if it was the day before?

7        A.   Sir, I said I don't recall.

8        Q.   Okay.  Do you recall if it was a week

9   before?

10       A.   Sir, I'm not trying to be difficult.

11  But I feel like you're badgering me.  I said I do

12  not recall when she asked me.

13       Q.   Okay.  So just final question on this.

14  You have no idea when she asked you to do these?

15            MR. HUBBARD:  Object to form.

16       You can answer if you know.

17       A.   I do not know.

18       Q.   (By Mr. Napolitano)  Thank you.

19            What time does the City Hall generally

20  close each day?

21       A.   The windows close at 5:30.  Those that

22  worked inside, directors, managers, we would be

23  there well into the evening most nights.

24       Q.   And in the e-mail that Cheryl sent to

25  you on January 22, 2015, in response to your

1   e-mail, she indicated that she had a budget

2   workshop prep that evening; correct?

3       A.   She did.

4       Q.   And would you have had access to her

5   calendar?

6       A.   No, sir, I did not.

7       Q.   Would you have known that she had a prep

8   meeting that evening?

9       A.   I might have.

10      Q.   You don't recall though at this point in

11  time?

12      A.   I do not.

13      Q.   You had made reference earlier, I

14  believe when we were talking about Travis, to a

15  Department of Labor audit of some kind of

16  investigation; right?

17      A.   Uh-huh.

18      (Exhibit 7 was marked for identification.)

19      Q.   I'm handing you what's been marked as

20  Exhibit 7.

21           Have you seen this document before?

22      A.   I have.

23      Q.   Can you tell me what it is?

24      A.   Yes.  We had an employee who filed a

25  complaint with the Department of Labor and this

1    is from the investigator, Kathy Rodriguez, about

2    information that she was requesting when she came

3    to me with this.

4        Q.    Excuse me.

5            So this investigation by the Department

6    of Labor or this request for information that

7    they're sending was as the result of an employee

8    making a complaint to the Department of Labor?

9        A.    Yes, sir.

10       Q.    And who was that employee?

11       A.    Well, at the time it was not told to us,

12   but after the fact we knew it was Doreen Pesek.

13       Q.    The --

14       A.    But it was not told to us during the

15   investigation.

16       Q.    Okay.  And she was the clerk?

17       A.    The city clerk, yes.

18       Q.    And your subordinate; correct?

19       A.    Yes.

20       Q.    Okay.  And the date on this letter from

21   the Department of Labor is August 1, 2014?

22       A.    That's correct.

23       Q.    And it looks like they're requesting

24   records for a time frame from July 2012 through

25   July 2014; correct?

1     A.   I was.

2     Q.   What were their findings, Department of

3  Labor's?

4     A.   Their findings -- first of all, I will

5  say that she commended myself and Mr. Robins and

6  told him that this was the best audit she'd ever

7  been through with the City.  We were organized.

8  We were prepared.  We had the information.  But

9  usually when she does an audit of the City.  She

10  would have 900 findings and that this was the

11  best she had ever done in her career.  Also with

12  that she did find that there were some hours that

13  Ms. Pesek should be paid for.  It resulted in I

14  think about $400 in pay that we did consequently

15  go back and pay her.

16     Q.   But the Department of Labor did

17  determine that Ms. Pesek, the city clerk, was

18  misclassified under the Fair Labor Standards Act;

19  correct?

20     A.   For a small period of time.

21     Q.   And what was that period of time?

22     A.   Well, you'd have to read through here.

23  I can't --

24     Q.   Where are you reading?

25     A.   Ms. Pesek was classified -- was moved to

1    the clerk or the City of Gardner had to pay the

2    former clerk 4 or $500?

3         A.    Yeah.  Yes, excuse me.  Yeah.

4         Q.    Did you have any conversations with

5    Cheryl about the Department of Labor

6    investigation?

7         A.    Yes.  As I stated before, she and I met

8    with Mr. Robins, and he shared with her the

9    readings from Ms. Rodriguez.  And that was also

10   at the point in time that we learned about Travis

11   and his position.

12          I will also say she was quite pleased

13   with the findings because the information from

14   the investigator and telling us what a fine job

15   we did and how well our department was run and

16   put together, she was quite pleased with that.

17        Q.    What did I mark that as?

18        A.    Seven.

19        Q.    Thank you.

20          In 2014 did you begin doing a salary or

21   compensation study in preparation for budget

22   analysis for the next year?

23        A.    Yes.

24        Q.    Do you remember when you started doing

25   that?

1     A.   I don't recall when we started.  It
2  would have been in the spring, as we did every
3  year.  We did that every year.
4     Q.   You did a salary study every year?
5     A.   We did.
6     Q.   And when you say it would have started
7  in the spring, do you have any understanding of
8  what month it would have started?
9     A.   February-ish.
10     Q.   Okay.
11     A.   February-ish.
12     (Exhibit 8 was marked for identification.)
13     Q.   I'm handing you what I've marked as
14  Exhibit 8.
15     A.   Thank you.
16           MR. NAPOLITANO:  You may have
17  gotten a double copy, Dirk.  I'm not sure.
18     Q.   (By Mr. Napolitano)  Do you know what
19  this is?
20     A.   Yes.  This is the salary structure.
21     Q.   Okay.  And if you flip through the
22  document, is this a portion of or excepts from
23  your salary study that you did in 2014.
24     A.   No, I did not prepare this.  Whatever
25  this 2014 Market Compensation Salary Analysis --

1    tell you the exact time line.

2         Q.   Was it after you had completed your

3    study?

4         A.   I think it was like -- we were doing the

5    study unknowing that we were going to go ahead

6    and hire the -- the outside consultant had

7    already -- we were doing interviews with them,

8    interviewing them, and we were looking at other

9    things besides just pay, but benefits and other

10   kind of driving deeper, what could we find deeper

11   that someone that did this full-time could

12   provide to us.

13        Q.   So I'm just trying to understand, did

14   you start the study on your own, did Cheryl ask

15   you to?

16        A.   No.   Cheryl asked me.   We did it every

17   year as part of our budget.   The Mark Salary

18   Study.

19        Q.   But then at some point she decided not

20   to use that but to go with an outside consultant;

21   correct?

22        A.   Yes.   She wanted an outside consultant.

23        Q.   And you -- I'm sorry.   I might have

24   asked, did you say when that was when she

25   notified you?

1   A. I think it was the fall, late fall.

2   (Exhibit 9 was marked for identification.)

3   Q. I'm handing you what's been marked

4 Exhibit 9.

5   A. Okay.

6   Q. Do you recognize this?

7   A. I do.

8   Q. Can you tell us what it is?

9   A. This is July 25th to '14 [sic].  Sending

10 a notice out that we're going to do a

11 compensation study, have an outside consultant do

12 that.

13   Q. And you actually sent it out; correct?

14   A. I did, yes.

15   Q. Under Cheryl's signature?

16   A. Yes.  It says sent on behalf of Cheryl

17 Harrison-Lee.

18   Q. And the date on this e-mail was when?

19   A. As I stated, July 25, 2014.

20   Q. So at some point before this, you would

21 have then been notified by Cheryl that you're

22 using an outside consultant?

23   A. Yes.  Yes.

24   Q. Do you remember that conversation --

25   A. I don't.

1    this information to Cheryl?

2        A.    She was given documents.  She would have

3    them.

4        Q.    Was it in a notebook?

5        A.    I don't recall.

6        Q.    You don't remember how you compiled the

7    information and gave it to her?

8              MR. HUBBARD:  Asked and answered.

9    You can answer her again if --

10       A.    I don't recall.

11       Q.    (By Mr. Napolitano)  Okay.  Any

12   information you would have given her is just the

13   printouts from Mark?

14       A.    Printouts from Mark probably, yes.

15       Q.    With no analysis whatsoever?

16       A.    With no analysis.

17       Q.    Okay.  We had talked earlier about your

18   duties as overseeing the IT functions of the

19   City.  And I think I'm summarizing here, but

20   largely you said that you were more about process

21   managing outside consultants.  Is that pretty

22   fair?

23              MR. HUBBARD:  Object to form.

24       Q.    (By Mr. Napolitano)  You can answer.

25       A.    Management.  Management overseeing.

1    Q.    No technical?

2    A.    No technical.  Yes, sir.

3          Sorry.

4    Q.    And you also indicated that you had

5    began to prepare a request for proposal for IT

6    services; is that correct?

7    A.    We did prepare a request for proposal to

8    redo the network, to redo the server room.  That

9    was -- that was prepared, yes.

10   Q.    Do you remember when that was?

11   A.    No, sir.

12   Q.    Do you remember about how long it took

13   to complete that project?

14   A.    The proposal or the project?

15   Q.    From start to finish, creating the

16   proposal to having it -- getting the bids and

17   hiring a consultant?

18        MR. HUBBARD:  Object to form.

19        You can answer.

20   A.    It was a very long time.  Yes.  It was a

21   very long time.

22   (Exhibit 10 was marked for identification.)

23   Q.    (By Mr. Napolitano)  I'm handing you

24   what I've marked as Exhibit 10.

25   A.    Uh-huh.

1       Q.   Do you recognize that document?

2       A.   Well, I recognize that we did a request

3    for proposal.  From looking at this, I would have

4    to spend time reading this because we sent one

5    out and then another one was sent out, so I can't

6    tell you this was the document that I sent out

7    without knowing where this came from and what

8    this second document is.

9       Q.   Okay.  Can you tell me about this RFP

10   process?  You said there was one and then a

11   second one.  Can you tell me about that?

12      A.   Yeah.  There was request for proposal

13   sent out.  No decision was made on the vendor,

14   and so the project was put on hold and then

15   another proposal was sent out.  At that point in

16   time, we had hired a network administrator and

17   convened a committee of other IT people in

18   various cities, I think Olathe, Overland Park, I

19   can't remember for Lenexa.  There were three or

20   four cities involved that came and reviewed it as

21   well when a second proposal was sent out.

22           I can't tell you which was which from

23   looking at this.

24      Q.   Okay.  If you look at page 229 -- or

25   1229, I'm sorry.  At the top there it's -- are

1     Q.    Okay.  How did you prepare the first

2  request for proposal, not having a technical IT

3  background?

4     A.    We asked AOS to help us.

5     Q.    How much involvement did you have in

6  actually preparing the request for proposal after

7  you asked AOS to help you?

8     A.    Not --

9           MR. HUBBARD:  Object to form.

10          You may answer.

11    A.    Not much.  They went through with us

12  what it was they thought we needed.  They did the

13  assessment.  Based on the assessment, here's what

14  they thought we needed.

15          They were our consultant, and I took

16  their information to be factual.  They had great

17  references and were well-respected and we had

18  seen good work.

19    Q.    (By Mr. Napolitano)  Prior to having AOS

20  work on the request for proposal, did you consult

21  any other area, municipalities or anything about

22  their IT systems or consultants?

23    A.    No, sir.

24    Q.    Do you recall having any conversations

25  with Cheryl about the first RFP you prepared?

1    A.    Showed her the prior RFP prior to it

2  going out and she approved it going out.

3    Q.    Do you remember having any conversations

4  with Cheryl after the proposals were received?

5    A.    Yes.   We were disappointed that we --

6  the first time we didn't get more.   And again,

7  I'm sorry, I don't recall the number, but we were

8  disappointed that we didn't get more than what we

9  got.

10    Q.    And again, I know you don't remember the

11  number.   Do you remember if it was more than one?

12    A.    I don't remember.   I'm sorry.

13    Q.    And so because you were disappointed

14  with the amount of responses, it was put on hold?

15    A.    It was put on hold, yes.   And Cheryl had

16  a counterpart in Florida, I believe it was, that

17  she wanted to talk to and she was going to send

18  the proposal off to them and have them look at it

19  and provide us some feedback on how we could move

20  forward.

21    Q.    Do you recall what happened next after

22  that?

23    A.    Well, it sat for quite a while and then

24  it kept coming up in one-on-ones, what are we

25  going to do with this?   We need to get this done,

1   what are we going to do?  And this was determined

2   we would try to get this group together.  I can't

3   tell you if her counterpart in Florida got back

4   to her, I don't know.  And then we came up with a

5   plan to include these other cities.  Johnson

6   County IT director led that at the time.  We also

7   had hired our IT administrator which had IT

8   technical background to assist us as well.  So we

9   moved forward with this committee approach.

10      Q.   Do you remember when the IT person was

11   hired at Gardner?

12      A.   I don't recall the date.

13      Q.   But it's your recollection that it was

14   before the next request for proposal went out?

15      A.   That's -- yes.

16      Q.   What was that IT person's name that was

17   hired?

18      A.   Greg, but I don't remember his last

19   name.

20      Q.   Okay.

21      A.   Greg.

22      Q.   Etcherson, does that sound right?

23      A.   I just don't recall his last name.

24      Q.   Okay.

25           So we talked about pages 1262 through

1   the end of the document.  I'm speaking now about

2   pages 1217 to 1229.  And as we talked about

3   earlier on 1229, it says the submissions for this

4   RFP were due December 12, 2014.

5        Is that due date consistent with your

6   memory for when the second request for proposal

7   submissions were due?

8        A.   I don't recall.  I do not recall if this

9   is the actual document that went out.  It's one

10  we prepared, but because Greg was on board and

11  this committee, I was not involved in that.  So I

12  can't tell you if this was the one we sent out.

13       Q.   So you weren't involved in preparing the

14  second request for proposal?

15       A.   I prepared one but I can't tell you if

16  that's the one we sent out because Greg did that

17  and this committee.  So I can't tell you if they

18  sent out this proposal that has my name on it or

19  another proposal.  I don't know.  Because he was

20  not reporting direct to me at that time.  He was

21  reporting direct to Cheryl.

22       Q.   Okay.  And I'm just trying to make sure

23  I understand.  In total you prepared two requests

24  for proposal; is that right?

25       A.   That's correct.

1    Q.   But you're not sure if the second one

2    you prepared was used or if the new IT guy, Greg,

3    prepared one that they then submitted?

4    A.   That's correct.  That's what I'm saying,

5    yes.

6    Q.   After it was put on hold and this

7    committee was formed, do you remember who all was

8    on the committee?

9    A.   As I stated earlier, it was the IT

10   director for Johnson County.  I know the IT

11   director from Overland Park was there.  I believe

12   Lenexa.  I don't recall who else.  Greg for the

13   City.  There might have been another city.  I

14   don't recall.

15   Q.   After you prepared your second request

16   for proposal, did you have any more involvement

17   with the process?

18   A.   I did not have any involvement with

19   that, no.

20   Q.   And you didn't sit on the committee?

21   A.   No, sir.

22   Q.   Did you help form the committee?

23   A.   No, sir.

24   Q.   Who did that?

25   A.   I don't know.

1     Q.    Okay.

2     A.    I don't know who formed it.

3     Q.    Do you remember when it was -- you might

4   have answered that, but do you remember when it

5   was formed?

6     A.    I don't.

7     Q.    Were you asked to create a second

8   request for proposal or had you just done that

9   because you'd previously been involved?

10    A.    You know, I don't recall if I was asked

11  to or if we just did it.  I don't recall.

12    Q.    But you didn't make any contact with the

13  IT director of Johnson County?

14    A.    Not that I recall talking -- I mean, I

15  knew who he was.  He came in, they had their

16  meeting.  I -- I'm not sure if I made the contact

17  or if Greg did.  I don't recall.  That was during

18  the transition handing off from me to him, so I

19  don't remember.

20    Q.    Okay.  And it's your recollection that

21  would have been in the fall going to winter of

22  2014?

23    A.    I would imagine.

24    Q.    Okay.

25    A.    I don't know.

1    Q.    Okay.

2    A.    I don't know.

3    Q.    And I'm just -- because you listed them,

4  I'm going to probably just ask the same question

5  about each one.

6         Do you recall having any contact about

7  the request for proposal for IT services with the

8  director of IT from Overland Park?

9    A.    I know Cheryl had conversations with the

10  IT director of Overland Park.  She had talked to

11  her multiple times, so I don't know what their

12  conversations were, but I know that she had

13  visited with the IT director from Overland Park.

14    Q.    And same question for Lenexa, did you

15  have any contact with the IT person from Lenexa

16  about this request for proposal?

17    A.    No, sir.

18    Q.    Did you ever speak with the new hire,

19  Greg, about it?

20    A.    I'm sure I did, yes.

21    Q.    Do you remember the substance of those

22  conversations?

23    A.    Most likely from what I can recall, it

24  was, here's the first proposal, here's where we

25  are, and he kind of -- he just took over.  There

1  reasons for payroll change, it says, 4 percent
2  merit increase due to 2013 evaluation score.
3          Did I read that correctly?
4      A.   You did.
5      (Exhibit 13 was marked for identification.)
6      Q.   I'm handing you what I've marked as
7  Exhibit 13.  If you would, thumb through the
8  document to familiarize yourself with it if you
9  need to.
10     A.   I am familiar with this document.
11     Q.   Okay.  And what is this document?
12     A.   This is my performance appraisal from
13 2013, the annual appraisal form.
14     Q.   And when you say you were evaluated as a
15 top performer, this would be the document to
16 which you're referring?
17     A.   Yes, sir.
18     Q.   And as far as you know, is this your
19 last evaluation or appraisal before your
20 employment ended?
21     A.   Yes, sir.
22     Q.   And if we look up at the top under
23 review period, what is the review period?
24     A.   It says 2013.
25     Q.   So is it your understanding, then, that

1   this -- the information contained in this form

2   and the evaluation resulting was from your

3   performance from January 1, 2013, to the end of

4   that year?

5              MR. HUBBARD:  Object to form.

6        Q.   (By Mr. Napolitano)  You can answer.

7        A.   Yes, sir.

8        Q.   And I see here that it's signed, I

9   believe that's by Cheryl, on October 6th of 2014

10  and signed by you on September 18, 2014; is that

11  right?

12       A.   Yes, sir.

13       Q.   When was the first time that your

14  performance for 2013 was evaluated?

15       A.   Well, this was September 18, 2014.

16       Q.   I know what the document says.

17       A.   Well, they're signed -- but they're

18  signed on the day we get the evaluation.

19       Q.   Did you previously -- let me rephrase

20  that.

21            Did the HR department misplace some

22  evaluations from 2013?

23       A.   No, sir.  No.  The evaluations were in

24  Cheryl's office and her executive assistant,

25  Leslie Quillen, found them.  They were not in the

1       Q.   (By Mr. Napolitano)  You may answer.

2       A.   You read it correctly.  Yes, you read it

3   correctly.

4       Q.   And then on the next page, there's an

5   area for comments, and the comments say, "This is

6   an area that needs additional effort.  In spite

7   of the very tasks, I expect Mary to take

8   advantage of training opportunities to expand her

9   skill set."

10          Did I read that correctly?

11      A.   You did.

12          MR. HUBBARD:  Object to form.

13      Q.   (By Mr. Napolitano)  Do you recall going

14   through that item with Cheryl during your

15   meeting?

16      A.   I did.

17      Q.   Aside from what's contained in the

18   document, what was the discussion about?

19      A.   Really very little discussion.  She

20   wanted me to perhaps go and take some classes at

21   KU, look for some additional training in the

22   various areas that I was over.  My -- my job

23   duties and the level of work did not allow for me

24   to be gone.  I was working about 80 hours a week.

25          So we had that discussion about when

1    should I go do this because I had a huge job.

2    And that was basically it, was to look for some

3    training opportunities.

4        Q.   And if you look at the last page,

5    page 42, there's goals.  And it says, Mary Bush,

6    and then goals for 2014.

7             Do you see where I'm at?

8        A.   I do.

9        Q.   Were these created by you or by Cheryl?

10       A.   These were created by me.

11       Q.   Okay.  And the first one is attend HR

12   conference; is that right?

13       A.   That's correct.

14       Q.   Did you attend an HR conference?

15       A.   I did.

16       Q.   When did you attend it?

17       A.   Summer of 2014, Cheryl and I went to a

18   SHRM conference in Florida, the national SHRM

19   conference.

20       Q.   I'm sorry.  You said summer of '14?

21       A.   Summer of '14.

22       Q.   You don't remember the date?

23       A.   No, sir.

24       Q.   When did you provide this page to

25   Cheryl?

```
 1        A.    Would have been provided on my -- during
 2    my evaluation.
 3        Q.    The day you went through it?
 4        A.    Yes.
 5        Q.    So on goals for 2014, you put something
 6    you had already done; correct?
 7        A.    Yes.  Because we were already working
 8    through a number of these.
 9        Q.    Okay.
10              MR. HUBBARD:  If we're at a good
11    breaking point, this is at a good point --
12              MR. NAPOLITANO:  I'm just about
13    done.  Couple more questions on this and then
14    break.
15              MR. HUBBARD:  Did you need a break?
16              THE WITNESS:  I'm okay.
17              MR. HUBBARD:  I wasn't saying lunch
18    break.  We can discuss that in a second.  I just
19    needed a break.  I'm hoping we may be able to go
20    another hour without lunch hopefully.  Oh, okay.
21    Maybe not.
22        Q.    (By Mr. Napolitano)  So despite that
23    this was signed, on or about September 18, 2014,
24    by you, you're not denying that evaluation period
25    was for 2013; correct?
```

1          MR. HUBBARD:  Objection.  Asked and

2    answered.

3      A.   It was for 2013.

4      Q.   (By Mr. Napolitano)  So not anything

5    that was done or discovered in 2014; correct?

6          MR. HUBBARD:  Same objection.

7    Object to form also.

8      A.   I will say this:  If evaluations were

9    done late and employees were having issues, we

10   would have supplements added to this on areas of

11   concern to address when you'd talk to your

12   employee.

13     Q.   (By Mr. Napolitano)  And that's

14   something that you would do?

15     A.   All the directors would do that.

16     Q.   Were you a director?

17     A.   No, I was not.

18     Q.   Okay.  Did you meet with Cheryl on or

19   about April 2, 2014, to go over your performance

20   from 2013?

21     A.   I don't recall.

22     (Exhibit 14 was marked for identification.)

23     Q.   I'm handing you what I've marked

24   Exhibit 14.

25     A.   Uh-huh.

1          It was pretty fluid.  It might be July.

2    I mean, the budget had to be approved by August.

3    So it was one of the last things that they

4    presented to the council were the personnel

5    changes, but it would have been done in

6    July/August.

7          Q.   In preparing the 2015 budget, if I

8    understand you right, that would have been

9    approved around August of 2014; correct?

10         A.   That's correct.  Yes.

11         Q.   And do you recall in that budget, was

12   there a position for a network administrator?

13         A.   Yes.  Well, actually, the network

14   administrator, I believe, came in on '14.

15         Q.   Okay.

16         A.   It was on the '14 salary structure.

17         (Exhibit 16 was marked for identification.)

18         Q.   I'm handing you what I've marked as

19   Exhibit 16.

20              MR. HUBBARD:   Thanks.

21         Q.   (By Mr. Napolitano)  I believe this is a

22   document that was -- that you've produced in this

23   lawsuit.  Do you recognize this document?

24         A.   I do.

25         Q.   Can you tell me what it is?

1      A.   As it states at the top, it's a

2  recruitment 2013 applicant summary.  This was a

3  document that was kept by the HR specialist and

4  then provided to myself and Cheryl.

5      Q.   And it's not just 2013; correct?  It

6  goes through --

7      A.   Yes, sir.  There's '14 and there's also

8  '15 in there.

9      Q.   Okay.  I just want to ask you generally

10  about the columns here.  I know it's kind of

11  difficult to read.

12          The first column on the left is

13  position; correct?

14      A.   Correct.

15      Q.   And then the next column from the left

16  is new position or replacement; is that right?

17      A.   Yes, sir.

18      Q.   Would an entry for a new position be

19  entered on here if it hadn't already been

20  approved in a budget?

21      A.   What -- I'm sorry.  Would you repeat

22  that?  I apologize.

23      Q.   Sure.

24          Would a position make it to this

25  recruitment spreadsheet in the HR department if

1  2015, with Gregory Eytcheson, E-Y-T-C-H-E-S-O-N;

2  is that correct?

3      A.    That's correct.

4      Q.    And based on this sheet -- sorry I'm

5  having you go back and forth here.  It looks like

6  the second time or I guess the first time in 2014

7  when that administrator -- network administrator

8  position was posted would have been in September

9  of 2014?

10             MR. HUBBARD:  Object to form.

11     Q.    (By Mr. Napolitano)  Am I reading that

12  right?

13     A.    I'm sorry.  What page are you on?

14     Q.    I'm on 1,500, and if you go five columns

15  from the left, there's a date there.

16     A.    And your question was?

17     Q.    Would that be the first time it was --

18  I'm sorry.

19             Would that be the first time the network

20  administrator position was advertised in 2014?

21             MR. HUBBARD:  Object to form.

22  Three pages earlier states an earlier date of

23  January 6, 2014.

24             You can answer if you know.

25     A.    I don't know.  I can look on the report,

1    but I don't know.

2         Q.    (By Mr. Napolitano)  Okay.

3         A.    The report does show that it was posted

4    on January 6, 2014.

5         Q.    Okay.  So it looks like it was posted

6    twice in 2014, once on January 6th and once on

7    September 2nd; is that correct?

8              MR. HUBBARD:  Same -- object to

9    form.

10        A.    That's what the report shows, yes.

11        Q.    (By Mr. Napolitano)  And you have no

12   reason to believe that the report's inaccurate?

13        A.    I have no reason to believe it's not.

14        Q.    Do you know if Gregory Eytcheson, what

15   his race is?

16        A.    I don't.  I believe he's a white male.

17        Q.    Do you know how old he was when he was

18   hired?

19        A.    I do not.

20        Q.    Were you involved in the recruitment of

21   his position?

22        A.    I was.

23        Q.    Did you sit in on the interviews?

24        A.    I did.

25        Q.    How many interviews were there?

1     A.   I don't recall.

2     Q.   Do you remember if it was the typical

3   two sets, first round, second round?

4     A.   Yes, sir.  That's how most of them were.

5     Q.   Did you provide a recommendation as to

6   who to hire?

7     A.   I don't recall if I did on the network

8   administrator.  Cheryl was involved in interviews

9   as well, so I'm sorry, I don't recall.

10    Q.   But this was sort of your area of

11  management; correct?

12    A.   It was.  It was.

13    Q.   Did it bother you that they were looking

14  elsewhere for their IT needs as opposed to your

15  leadership?

16    A.   No.  Because my understanding was he was

17  going to report to me and build my IT team, so I

18  was excited about getting someone of that

19  quality.

20    Q.   At what point did you learn that he was

21  going to be a direct report to the City

22  administrator?

23    A.   When his payroll change notice came

24  across my desk with the pay rate higher than what

25  I was making.  And I went in and asked Cheryl if

1    could do an offer letter?

2         A.    Yes.  We would have to note -- yes, we

3    would have to be provided with what the pay was

4    for his offer letter.

5         Q.    And I understand you don't know as of

6    your memory whether the start date for Greg was

7    January 6, 2015, but if it was, you would have

8    known that he was reporting to Cheryl before that

9    date; correct?

10        A.    Yes, sir.  Correct.

11        Q.    Thank you.

12              After you learned that, did you ask

13   Cheryl why that was -- that part of your

14   portfolio of duties was being removed?

15        A.    She said that she wanted to have more

16   hands-on with IT.

17        Q.    All right.  And also, then, in the 2015

18   budget, so which would have been prepared in all

19   of 2014, there was a position for a human

20   resource supervisor; correct?

21        A.    Correct.

22        Q.    When did you first learn of that

23   position being created?

24        A.    During that budget process it was my

25   request --

1      Q.   Your --

2      A.   --to -- sorry.  It was my request to add

3   that position.  So in the beginning when -- when

4   we were filling out our requests, our position

5   hire requests, it was part of that process.

6      Q.   Did you talk to Cheryl about it before

7   you submitted the request?

8      A.   I don't recall.  Cheryl and I had lots

9   of conversations, so I can't tell you did I talk

10  to her before or after I presented it.  We had a

11  lot of conversations.

12     Q.   And again, the request would have been

13  submitted around what time?

14     A.   It was early on in the budget process,

15  so probably February/March time frame.

16     Q.   Now, if we look back at Exhibit 16, I

17  think it's on page 1501, a little more than

18  halfway down.  It says, "Human resources

19  supervisor"; correct?

20     A.   Correct.

21     Q.   And it looks like -- sorry.  I keep

22  forgetting what these columns mean.

23          It was posted on or about November 26,

24  2014?

25     A.   Correct.

1      Q.    Does that match your memory?

2      A.    Yes.  Because we were trying to post,

3   recruit, have that position in the first part of

4   the year, so we began our recruitment process

5   right after Thanksgiving.

6      Q.    Do you remember about how many

7   applications you received for that position?

8      A.    I think this says 9 -- or excuse me, 29.

9   Number of applicants received, 29.

10     Q.    Okay.  And in that December 22nd date is

11  the date that application closes?

12     A.    That is correct.  That's what this says.

13     (Exhibit 17 was marked for identification.)

14     Q.    Okay.  I'm going to mark this as

15  Exhibit 17.  And I'll represent to you what this

16  is, I'm going to use it for demonstrative

17  purposes to maybe have us write down some dates

18  so we can take this with us.  You can write on

19  this, and if you want to talk about it with your

20  attorney, make sure the calendar is what it

21  purports to be, you're welcome to do that.

22             MR. NAPOLITANO:  Dirk, do you have

23  any problem with that?

24             MR. HUBBARD:  I'm not sure what

25  you're asking her to write on the calendar.  If

1      Q.   All right.  And at the bottom there it
2    says Mary Bush on the left side; right?
3      A.   Yes, it does.
4      Q.   And on the right side it says 1/22/2015?
5      A.   Well, you put the label over the date.
6      Q.   Oh, gosh.  I'm so sorry.
7      A.   I see 22, 2015, but I don't see the
8    month.
9              MR. NAPOLITANO:  Counsel, can we
10   stipulate that it says --
11     A.   May I scoot this over?
12     Q.   (By Mr. Napolitano)  You may.
13     A.   There we go.  1/22/15.
14     Q.   My apologies.  Okay.
15          So it does say 1/22/2015; right?
16     A.   Yes, sir.
17     Q.   All righty.  And then on it looks like
18   on looks like Thursday, January 15th, there's an
19   entry from 9 to 12:30.  Can you read what that
20   says there?
21     A.   Well, I think it says, "Confirm HR soup
22   enter" -- I think it's supposed to be "interview.
23   Admin conference room, Mary Bush."
24     Q.   Do you recall if the first round of
25   interviews for the human resource supervisor

1  position was on January 15, 2015?

2      A.    That was a round of interviews, but I

3  can't tell you unless I look back at the other

4  calendars that was the first round.   It clearly

5  states we're doing interviews, but without

6  looking at the others, I wouldn't be able to tell

7  you that.

8      (Exhibit 19 was marked for identification.)

9      Q.    Let me see if I can add some more

10  clarity.   I'm handing you what I've marked as

11  Exhibit 19.   And this appears to be an e-mail

12  from Lisa Wilms who is your subordinate; correct?

13      A.    Yes.

14      Q.    And subject is "City of Gardner

15  telephone interview"?

16      A.    It is.

17      Q.    And it says, "Alan congratulations on

18  being selected for a telephone interview for a

19  human resources position.   You are scheduled to

20  be interviewed on Thursday, January 15th at 10

21  a.m."

22          Did I read that correctly?

23      A.    You did.

24      Q.    Seeing that, are you comfortable saying

25  that the first round of interviews for the human

1    resource supervisor position were on January 15,
2    2015?
3         A.   Yes.  Thank you.
4         Q.   Would you mind terribly indicating that
5    on the calendar for January, it's the third page
6    back, that on the 15th were first round of
7    interviews for the HR supervisor position?
8              MR. HUBBARD:  I'm going to object
9    to incompleteness unless we're going to put all
10   sorts of other dates on this document.  So I'll
11   object to Exhibit 17, but you can write on there
12   as he requests or he can write on there and you
13   can verify, whichever way, but we object to lack
14   of completeness on there.
15        A.   I'll let you write on there.
16        Q.   (By Mr. Napolitano)  My penmanship is
17   not great, but you can confirm I've written first
18   round of HR supervisor interviews on
19   January 15th?
20        A.   Yes, sir.
21        Q.   Thank you.
22             Do you recall how the interviews went?
23        A.   They were telephone interviews.  There
24   was a number, several of them, that I think went
25   well.

1    Q.    Were you on the call?

2    A.    Yes, sir.

3    Q.    Who else was on the call?

4    A.    I believe it was just Cheryl and I.

5    Q.    All right.  Do you remember Alan's

6    interview in particular?

7    A.    I remember -- I mean, I just remember

8    that we did a phone interview, yes.

9    Q.    You don't remember any comments made by

10   Cheryl or yourself?

11   A.    I believe that she made a comment about

12   wanting some additional expertise in HR.

13   Q.    What did you take her to mean by that?

14   A.    Initially, I took her to mean just what

15   we talked about with the IT is that we were going

16   to build my team.  We were building my team up to

17   -- so that I could more broadly manage five

18   divisions.  And you know, one of the things she

19   always told me was that I had innate ability to

20   think strategically and she needed that big

21   overarching thinker.  So that was my thought

22   going into this process.  It became pretty clear

23   quickly it wasn't.

24   Q.    And why do you say that?

25   A.    She began become being very curt with

1   me, very rude, not answering questions, not

2   following up on me with items that I needed

3   follow up to do my work.  That was all occurring

4   during this time period as well.

5       Q.   And when you say "this time period,"

6   around January 15, 2016?

7       A.   The November, December, January time

8   period.

9       Q.   So she began being curt, rude, not

10  responding in the November to December time

11  frame?

12           MR. HUBBARD:  Objection.  Asked and

13  answered.

14       You can answer again.

15       A.   I said November, December, and January

16  time frame.

17       Q.   (By Mr. Napolitano)  What -- I could go

18  look it up but what do you mean by curt?

19       A.   She was extremely rude, made snide

20  unsubstantiated comments, that just off the cuff

21  comments.  She would walk up and -- to talk to my

22  assistant and turn her back to me or wait until I

23  was gone.  She was being very sneaky about

24  working with my staff.  And when I would try to

25  visit with her about it, she -- you would get the

1   look and you better get out of the office.  So

2   yes, she had no time for me at all, which is how

3   she did with other employees that she was trying

4   to work out of the organization.

5       Q.    So you thought at that point she was

6   trying to work you out of the organization?

7       A.    I thought she was up to something.  I

8   didn't think she'd work me out because I worked

9   too hard for her and I was too good of a

10  performer, but I knew she was up to something.

11      Q.    You mentioned other people that you had

12  witnessed this happen with.  Or that you

13  perceived it to happen with.  Who were those

14  people?

15      A.    Mike Hall, community development

16  director.  I think I listed all of those in our

17  responses that we gave.  Our police chief, Gerald

18  Cullumber, city clerk, her executive assistant,

19  Leslie Quillen.  She was doing the same, you

20  know, same thing.  Dave Green, our public works

21  director, that's why he retired because he just

22  didn't want to deal with her.  Bill Krawczyk, the

23  utility director, they just got tired of dealing

24  with her.  She wouldn't respond to them.  They

25  would send e-mails, try to meet with her, and she

1   after you, after your employment was ended with

2   Gardner.

3        A.    Before.

4        Q.    And do you know how old Kim or Donnie

5   were?

6        A.    Did you say Donnie?

7        Q.    Doreen.  I'm sorry.

8        A.    I don't know their ages.

9        Q.    What about Leslie Quillen, do you know

10  her age?

11       A.    I don't.

12       Q.    And Dave Green, do you know his age?

13       A.    I don't.

14       Q.    Did you guys narrow down the pool of

15  applicants on January 15, 2015, after the phone

16  interviews?

17       A.    On or about.  I can't testify that it

18  was on the 15th because I don't know what

19  Cheryl's schedule was that day, but we would have

20  gone through the applicants again and then

21  determined who we wanted to bring in for

22  interviews.

23       Q.    Did you get a feeling or a sense one way

24  or the other from her if she preferred one

25  candidate over the others?

1        A.    I did.

2        Q.    And who do you think she preferred?

3        A.    I think she preferred Alan.

4              THE WITNESS:   No offense,

5   Mr. Abrams [sic].

6        A.    But there were several candidates that

7   had years of experience in governmental HR, and I

8   was interested in at least interviewing some of

9   those candidates and seeing what they had to

10  offer.

11       Q.    (By Mr. Napolitano)  And did you express

12  that to Cheryl?

13       A.    I did.

14       Q.    And what was her response?

15       A.    She wasn't very interested in it.

16       Q.    Do you recall when the in-person

17  interviews were --

18       A.    I don't.

19       Q.    -- for that position?

20       A.    I'm sorry.

21             I don't.

22       (Exhibit 20 was marked for identification.)

23       Q.    I'm handing you what I've marked as

24  Exhibit 20.

25             Have you seen this document before?

1       A.    You did.

2       Q.    Seeing this, do you have any doubt that

3   the in-person interviews or the second round of

4   interviews for the human resource supervisor

5   position occurred on January 26, 2015?

6               MR. HUBBARD:  Object to form.

7   Asked and answered.

8               You can answer again.

9       A.    No.  Most likely it occurred on

10  January 26, 2015.

11      Q.    (By Mr. Napolitano)  Okay.  Do you

12  remember sitting in on the in-person interviews?

13      A.    I do.

14      Q.    About how long did they last?

15      A.    Oh, probably an hour.  Around an hour.

16  There was a presentation and then the in-person

17  interview was 30 minutes to an hour.

18      Q.    What kind of presentation did you do?

19      A.    I didn't do a presentation.  The

20  candidates did the presentation.

21      Q.    Can you explain what the presentation

22  was?

23      A.    I don't recall what it was.

24      Q.    Okay.  And at the end of that interview

25  day, did you and Cheryl make a decision as to who

1    be put on there.

2              But subject to that you can answer.

3         A.   Yes, sir.

4         Q.   (By Mr. Napolitano)   Thank you.

5              Are you doing okay.   Need a break?

6         A.   I'm doing okay.   Thank you.

7         Q.   So I want to talk now about the

8    complaint letter that you submitted.

9         A.   Yes, sir.

10        Q.   On January 26, 2015.

11        A.   Uh-huh.

12        (Exhibit 22 was marked for identification.)

13        Q.   And just so you have it, let me get it

14   out.

15             I'm handing you what I've marked as

16   Exhibit 22.

17             So this is an e-mail that was sent by

18   Chris Morrow to Shelly Freeman or

19   SFreeman@freemanKeller.com on January 29, 2015,

20   but if you look down about a quarter of the way

21   there's something that says original message from

22   Mary Bush, Monday, January 26, 2015.

23             Do you see where I'm at?

24        A.   I do.

25        Q.   And that was sent at 8:14 a.m.; is that

1        Q.    And I'm not trying to be difficult,

2    generally, morning, afternoon, evening?

3        A.    I don't recall.

4        Q.    So it could have been any time of the

5    day?

6        A.    Could have been any time.

7        Q.    Did you have an opportunity when you

8    were involved in the police chief interviews to

9    speak with the mayor?

10       A.    I would not have used that time for

11   this.  If I was in on an interview, I would have

12   been focused on doing my job with the interview

13   process, not my personal concerns.

14       Q.    When you tried to speak with the major,

15   had you already drafted this --

16       A.    No, sir.

17       Q.    -- complaint?

18       A.    I was trying to -- I just wanted to

19   visit with him about concerns I had.

20       Q.    When did you begin drafting this

21   complaint that's identified as 1832 through 1834?

22       A.    I believe -- I believe it was that

23   weekend before.

24       Q.    And just to be clear, the weekend before

25   January 26th?

```
 1        A.    Yes.  If I recall correctly, it was
 2   right before that.
 3        Q.    Where did you draft this?
 4        A.    In my office.
 5        Q.    At City Hall?
 6        A.    Yes, sir.
 7        Q.    Did you use a City computer?
 8        A.    I believe I did.
 9        Q.    How sure are you?
10        A.    I believe that I did it in my office at
11   City Hall.
12        Q.    But you don't remember bringing in like
13   a personal laptop in your office?
14        A.    No.  No.  The only laptop I had was the
15   City Surface Tablet that they gave me, and it
16   would have been in my office, but it would have
17   been on the same network as my computer.
18        Q.    The tablet would have been?
19        A.    On my desk.  Uh-huh.
20        Q.    Do you remember if you used a desktop or
21   the surface?
22        A.    I probably used my desktop.
23        Q.    And you said the weekend before.  Do you
24   remember it was Saturday or Sunday?
25        A.    I don't.
```

1      Q.   Could have been late Friday?

2      A.   Could have been late Friday.

3      Q.   So just absolutely no idea?

4      A.   I don't know.  I'm sorry.  I don't know.

5      Q.   Was anybody else in the office when you

6    drafted the complaint?

7      A.   No, sir.

8      Q.   Why not do it at home?

9      A.   Because -- because this was, I felt,

10   city business.  I was going to do it at my office

11   because this was a City issue that I was going to

12   do in my office.

13     Q.   Never work from home before?

14     A.   I worked from home all the time.

15     Q.   Where'd you save this document?

16     A.   I don't recall.

17     Q.   Did you save it?

18     A.   I don't recall.

19     Q.   Where did you typically save documents?

20     A.   Either on the hard drive of my PC or on

21   the network, the HR -- would have been under the

22   HR folder somewhere.

23     Q.   Given that this was maybe a sensitive

24   topic, would you have saved it on the network

25   accessible to everybody or on your PC?

1   sent to Mayor Morrow and Kristy Harrison?

2       A.   I don't believe I did.  According to

3   this document, I did not.

4       Q.   Did you blind copy yourself?

5       A.   No.

6       Q.   Did you make any effort to preserve the

7   original form of this document?

8               MR. HUBBARD:  Object to form.

9   Other than printing it out?

10      Q.   (By Mr. Napolitano)  The electronic

11  form.

12      A.   Not that I recall, no.

13      Q.   Did you do it on Microsoft Word?  I'm

14  sorry.  Let me rephrase.  Did you draft this

15  letter on Microsoft Word?

16      A.   I would imagine yes, that's what I had

17  on my computer.

18      Q.   Can I see that calendar, please?

19           Can you confirm that on January 26th

20  I've entered at 8:14 you e-mailed the complaint?

21      A.   Yes, sir.

22               MR. HUBBARD:  Same objection.  This

23  document in that it's incomplete.

24      Q.   (By Mr. Napolitano)  Now, around this

25  time frame you had some vacation and sick days;

1  federal discrimination laws under which is

2  prohibited to create a hostile work environment."

3  And then you list Title 7 of the Civil Rights Act

4  of 1964, Age Discrimination of Employment Act of

5  1967; correct?

6      A.   I do.

7      Q.   Now, again, I'm not asking for any

8  information you obtained from an attorney, so I'm

9  going to ask this very narrowly.

10          MR. HUBBARD:   She hadn't talked t

11  an attorney before that.

12     Q.   (By Mr. Napolitano)  Okay.  How did you

13  get those two laws?  Where'd you learn of those?

14     A.   Through trainings that I went to.

15  Through various trainings through the years.

16          I believed -- and I believed at this

17  time and I still believe, had I been young or

18  African-American, I wouldn't have had any of

19  these issues, which was very prevailing in some

20  of the items that we listed in our -- in our

21  interrogatories.

22     (Exhibit 24 was marked for identification.)

23     Q.   I'll hand you what I marked as

24  Exhibit 24.

25     A.   Uh-huh.

1    that they were asked about in these.

2        A.    I think the one that I was thinking of

3    is number 5.

4        Q.    (By Mr. Napolitano)  And I'm sorry,

5    ma'am, which document are you on?

6        A.    Twenty-four.

7        Q.    So silent treatment, you believe was

8    clearly because of your race and age?

9        A.    I do.  And I also believe that there

10   were people who were hired and several instances

11   -- a young lady for her executive assistant who

12   was not -- did not score well, did not interview

13   well.  She was an African-American, young woman.

14   Cheryl was adamant she was going to hire her, and

15   Lisa Wilms went to her and said, you can't hire

16   her.  Everybody else is more clearly qualified

17   than her.

18       Q.    Who was that person that was hired?

19       A.    The person that was hired is -- well,

20   ultimately was Ann Forrester, now but I think

21   she's gone too.  And that individual didn't end

22   up being hired, but she was pushing towards that.

23       Q.    So the African-American woman whom you

24   believe was unqualified --

25       A.    Yes.

```
 1        Q.    -- Cheryl didn't hire?
 2               MR. HUBBARD:  Objection.  Asked and
 3   answered.
 4          You can answer again with a full
 5   explanation.
 6        A.    Cheryl was going to hire her and we had
 7   to go in -- Lisa went in and had to show her
 8   again and again and again her test scores and her
 9   interviews that she did not meet the
10   qualifications of the other candidates.  It was
11   going to be an unlawful hiring practice had we
12   brought this young lady on.  She finally
13   conceded, but that is when a lot of this started
14   where she decided she was not going to work with
15   me.
16               Our communication manager, we had
17   numerous people who were qualified to do that
18   position.  This young African-American woman was
19   hired and brought in at about $40,000 higher than
20   what she was previously making and well into the
21   salary range, which we didn't normally do.
22               The same with the engineering
23   technician, they were young African-Americans who
24   were brought in at higher wages than the other
25   employees and other prevalent hiring practices
```

1      A.    She didn't have to physically threaten
2  anybody.
3      Q.    Well, I guess what were you scared of?
4      A.    Threaten you with your job, to lose your
5  job.
6      Q.    You weren't in physical fear?
7      A.    I didn't say physical fear.  Fear and
8  intimidation of keeping your job --
9      Q.    Well, I'm just trying to understand what
10 you meant.
11     A.    -- and enduring a horrible environment.
12     Q.    But we can dispel no physical fear;
13 right?
14             MR. HUBBARD:  Been asked and
15 answered twice.
16     A.    Only thing I would add to that is the
17 time she told me she wanted to punch me in the
18 nose, I took that as fear and intimidation on the
19 physical side.  Not necessarily from her but
20 through her.  You don't tell employees that.  You
21 don't share somebody is going to punch you in the
22 nose when you're a city leer.
23     Q.    (By Mr. Napolitano)  Okay.  You've said
24 she on numerous occasions belittled and
25 confronted you in front of staff members.  By

1   confront you in front of staff members, what do

2   you mean there?  What would she confront you

3   about?

4        A.   For example, the police chief -- I'm

5   sorry the word escaped me -- scenarios, excuse me

6   -- police chief scenarios, what she stated to

7   Lisa was, well, she doesn't know what she's

8   doing.  That's belittling, and it's embarrassing

9   and you should not do that to your subordinate

10  staff members.

11       Q.   And you -- I think you indicated before,

12  and correct me if I'm wrong, that really at the

13  beginning, you were the only person she was nice

14  to?

15       A.   Yeah.  Pretty much and I was the only

16  one who really had her back.  Had her back.

17       Q.   And she would act as you've described in

18  this letter to all the other staff another way?

19       A.   Yes.  Most of them have had some type of

20  this or numerous treated towards them.

21       Q.   At the bottom here of this the first

22  page, you said, "Then there will be the silent

23  treatment where she will not speak to you for

24  days."

25            When did that start?

1      A.    Probably November-ish time frame.

2      Q.    Of 2014?

3      A.    '14.

4      Q.    So when she started, she being Cheryl,

5   things between you and her were pretty good;

6   correct?

7            When did they start to deteriorate?

8      A.    Probably about October/November 15th.

9   I'm sorry.  '14.  I said '15.  '14.

10     Q.    And on the second page you say that in

11   August before budget session, she said that you

12   need to be prepared that the council was going to

13   demote you?

14     A.    Uh-huh.

15     Q.    Can you tell me about that conversation?

16     A.    That's it right there.  That's what I

17   got.  Right as we were walking into a council

18   meeting, she said, "You need to be prepared I

19   think council is going to demote you and she

20   walked off."  That was the end of the

21   conversation.  And when I tried to bring it up

22   again, she wouldn't walk about it.  That's it.

23   Right there.  That's all the conversation there

24   is and there was no discussion in the council

25   meeting at all about that.

1   like that document produced?  I don't think I've

2   seen that in production.

3       Q.   (By Mr. Napolitano)  Do you remember

4   when it was?

5       A.   No.  But I'm sure Cheryl has it.  It was

6   sent to the council.  And it was sent to the

7   mayor and her, I believe, to all the council.

8   Would have been after his retirement.

9       Q.   How do you spell his last name if you

10  know?

11      A.   I do.  CRA -- I'm sorry K-R-A-C -- I

12  think it's E-C-K or A-C-K, Kraceck [sic].

13              MR. HUBBARD:  I was thinking there

14  was a Y in there.

15      A.   Oh, it's C-R-A-Z-Y-C-K [sic].  It's like

16  all -- yeah.

17              THE COURT REPORTER:  Did you say

18  C-R-A or K-R-A.

19              THE WITNESS:  K-R-A.

20      Q.   (By Mr. Napolitano)  You say, we have

21  already lost one excellent administration

22  employee due to this exact situation.

23          Who is that?

24      A.   Leslie Quillen.

25      Q.   You make reference to the fact that

1  Cheryl knew you didn't have a college degree when

2  she promoted you from human resource manager to

3  administrative services manager.

4          Why did you feel that was important to

5  include that in here?

6      A.   Because then she began talking about

7  staff with degrees, everybody needing master's

8  degrees.  It was very prevalent in her mind about

9  that.  Even people in mid level positions, she

10  wanted master's degrees on a lot of those

11  positions.  And I was very up front with her when

12  she wanted to promote me that I do not have -- I

13  do not have this degree, and I want you to know

14  that, and I'm okay with it if you don't want to

15  promote me.  And she's like, it didn't matter.

16  Because you are a top performer, you set the

17  standard for everybody, you do exactly what I

18  need to be done.

19          And so that was important to me that she

20  knew that.

21      Q.   At what point in time did she start

22  talking about the importance of college degrees

23  to the best of your memory?

24      A.   Oh, probably the spring or fall of '13.

25  We had a 30-year police captain, 30-year police

1    here.  The other thing that was used was "Gardner

2    is the trailer park of Johnson County."  Those

3    are demeaning comments to people.

4        Q.   Is there a lot of farming around

5    Gardner?

6        A.   I mean, it's a rural area.  Has a

7    rural -- there's not much left any more with the

8    intermodal, but there was some.  It's mostly

9    warehouses now.

10       Q.   But you didn't take the farm league

11   comment to be about age or race, did you?

12       A.   I took the farm league comment to be we

13   weren't good enough.  We weren't good enough.

14   And that could be age.  It could also be race.

15       Q.   Or it just be that not a lot of people

16   go work in Gardner so the town pulls less;

17   correct?

18       A.   I can't answer that.  I don't know what

19   she meant.

20       Q.   I feel like I got kind of conflicting

21   answers from you.  Do you believe it was age or

22   race motivated?

23       A.   I believe that's part of it.

24       Q.   Farm league is age or race motivation?

25       A.   I'm sorry?