1      IN THE UNITED STATES DISTRICT COUNTY FOR THE
                    DISTRICT OF KANSAS
2

MARY BETH BUSH,
3
            Plaintiff,
4
-vs-                    CASE NO: 2:16-CV-02675-JWL-GEB
5
CITY OF GARDNER,
6
            Defendant.
7

       THE CONTINUED VIDEOTAPED DEPOSITION OF
8            MARY BETH BUSH (VOL. II),

9  produced, sworn and examined on the part of the
   Defendant, pursuant to Notice of Deposition on
10 May 11, 2017, at Walters Bender Strohbehn &
   Vaughan, 1100 Main Street, Suite 2500, in the
11 City of Kansas City, in the County of Jackson,
   and State of Missouri, before me,
12

13                 BRENT W. CHRISTOPHER
           (Mo) CCR NO. 883 - (Ks) CCR NO. 1193
14                        of
               CHRISTOPHER VIDEO & REPORTING
15

16 a Certified Court Reporter in and for the States
   of Missouri and Kansas.
17

18

19

20

21

22                              Summary Judgment Exhibit

23                                    7

24

25

**CHRISTOPHER VIDEO & REPORTING**
**816.471.7800  www.christophervideo.com  816.471.7998 (Fax)**



Page 205

1          APPEARANCES:
2  For Plaintiff:
3      WALTERS, BENDER, STROHBEHN & VAUGHAN, P.C.
       2500 City Center Square
4      1100 Main Street
       Kansas City, Missouri 64105
5      816-421-6620
       dhubbard@wbsvalw.com
6      By:  Mr. Dirk L. Hubbard
7  For Defendant:
8      ENSZ & JESTER, P.C.
       2121 City Center Square
9      1100 Main Street
       Kansas City, Missouri  64105
10     816.474.8010
       cnapolitano@enszjester.com
11     By:  Mr. Christopher M. Napolitano
12  Videographer:
13     CHRISTOPHER VIDEO & REPORTING
       City Center Square
14     1100 Main Street, Suite 2190
       Kansas City, Missouri  64105
15     816.471.7800
       scheduling@christophervideo.com
16
    Also present:
17
       Mr. Alan Abramovitz
18
19            ***
20
21
22
23
24
25

Page 206

1                I N D E X
2                                    Page
3   Examination by Mr. Napolitano     208
    Signature Page                    429
4   Reporter's Certificate            431
5              ***
6
7        Exhibit No.    Idfd
8        28   -      210
9        29   -      222
10       30   -      230
         31   -      251
11       33   -      261
         34   -      264
12       35   -      307
         36   -      311
13       37   -      316
         38   -      326
14       39   -      326
         40   -      329
15       41   -      331
         42   -      333
16       43   -      340
         44   -      346
17       45   -      357
         46   -      358
18       47   -      378
         48   -      381
19       49   -      383
         50   -      391
20       51   -      391
         52   -      393
21       53   -      395
         54   -      399
22       55   -      399
         56   -      400
23       57   -      402
         58   -      403
24       59   -      406
25            (CONTINUED)

Page 207

1     Exhibit No.     Idfd
2       60   -      412
        61   -      414
3       62   -      416
        63   -      417
4       64   -      421
        65   -      426
5
    (Exhibits are attached.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 208

1    (The deposition commenced at 9:34 a.m.)
2         MARY BETH BUSH (VOL. II),
3   of lawful age, after having been first duly sworn
4   to tell the truth, the whole truth, and nothing
5   but the truth, testified as follows:
6              EXAMINATION
7   BY MR. NAPOLITANO:
8     Q.  Good morning, Mary, how are you?
9     A.  I'm okay.
10    Q.  Thank you for coming back.  We are
11  restarting the deposition from I think April
12  18th.  I think last time we left we were talking
13  about your complaint that you made on January
14  26th, do you recall that?
15    A.  I do.
16    Q.  Okay.  Before we get back into that
17  stuff I want to kind of ask you some background
18  information since we've had a little break here.
19  What did you do to prepare for today's
20  deposition?
21    A.  I met with my attorney this morning for
22  about 30 minutes.
23    Q.  Okay.  Did you speak -- other than with
24  your attorney, did you speak with anybody about
25  your case since your last deposition?

Page 209

1    A.  I have not.
2    Q.  And I think I might have forgot to ask
3  at your first depo, what did you do to prepare
4  for that one?
5    A.  I met with my attorney and we did review
6  some of the documents.  I read over some of the
7  documents.
8    Q.  Do you remember which documents you
9  reviewed?
10    A.  I'm sorry, I don't.
11    Q.  Did you meet with anybody other than
12  your attorney in preparation for your first
13  deposition?
14    A.  I did not.
15    Q.  And you understand he just gave you the
16  oath again, you're still under oath like you were
17  the first time?
18    A.  I do.
19    Q.  And we went through it the first time,
20  but again if you don't understand a question, you
21  need to let me know because if you provide an
22  answer I'm going to assume you understood, okay?
23    A.  Yes, sir.
24    Q.  All right.  There were a couple things I
25  wanted to follow up on that we talked about

Page 210

1  before your complaint.  In the first one was the
2  Department of Labor audit we talked about where I
3  think it was Ms. Pesek who was the Department of
4  Labor was wrongfully classified for a period of
5  time.  Do you recall that?
6    A.  I do.
7    Q.  Do you remember what period of time she
8  was wrongfully classified for?
9    A.  I do not remember the exact dates, but
10  it was about a 6-month period that the Department
11  of Labor looked at, if I recall correctly.
12    Q.  Okay.  I'm going to mark this as Exhibit
13  27.
14      (Deposition Exhibit Number 27 was marked
15  for identification.)
16  BY MR. NAPOLITANO:
17    Q.  I'm handing you what I've marked as
18  Exhibit 27.  Do you recognize that document?
19    A.  It's my writing.
20    Q.  Okay.  So it's something that you
21  prepared?
22    A.  Yes, it does appear so.
23    Q.  Okay.  And then down toward the middle,
24  there's something circled, "Denied-City Clerk
25  (Pesek)."  Do you see where I'm at?

Page 211

1    A.  I do.
2    Q.  And then under there, it says,
3  "Exemption," and then "Duties/clerical".  Do you
4  see that?
5    A.  I do.
6    Q.  And then to the right of that, it says,
7  "8/12" and then "1/13."  Do you see that?
8    A.  I do.
9    Q.  Can you tell me what that means?
10    A.  I think, if I recall this correctly,
11  that I would be looking at a time frame from
12  August 2012 to January of '13.
13    Q.  Okay.
14    A.  That's how I would read that.
15    Q.  And during the DOL process you had, or
16  the City had rather, an attorney helping you
17  through that?
18    A.  Yes.
19    Q.  And that was William Robbins?
20    A.  Yes.
21    Q.  From Polsinelli?
22    A.  That's correct.
23      (Deposition Exhibit Number 28 was marked
24  for identification.)
25  BY MR. NAPOLITANO:

Page 212

1    Q.  I'm going to hand you what I've marked
2  as Exhibit 28.
3    A.  Okay.
4    Q.  Have you seen this letter?
5    A.  I have.
6    Q.  And you were actually copied on it,
7  correct?
8    A.  That is correct.
9    Q.  Can you tell us what it is?
10    A.  This is a letter that the employment
11  attorney sent Ms. Wisdom about the findings of
12  the Department of Labor audit and that we were
13  paying her $471.68.
14    Q.  And who is Ms. Wisdom?
15    A.  She was the -- a former City Clerk.
16    Q.  So was her former last name Pesek?
17    A.  Her former last fame was Pesek, yes,
18  that is correct.
19    Q.  And then if you look to the numbers at
20  the bottom, Number CITY004149, it's the last page
21  of that exhibit.
22    A.  Okay.  Yes, sir.
23    Q.  Have you seen that before?
24    A.  I have.
25    Q.  Do you know what this is?

Page 213

1    A.  This is the document that was provided
2  to the City from the Department of Labor.
3    Q.  All right.  And on it does it indicate
4  that the period for which she was entitled to
5  overtime wages was August 4, 2012 to January
6  19th, 2013?
7    A.  Yes.
8    Q.  And that would comport with your notes
9  of 8/12 to 1/13, correct?
10   A.  It does.
11   Q.  Okay.  Now, I think at your last or at
12  the first part of your deposition you testified
13  that Mr. Fairburn was the final say in
14  determining who would classify employees despite
15  that being a HR function.  Do you recall that?
16   A.  That is correct.
17   Q.  So did he overrule your decision to
18  classify Ms. Pesek as unclassified?
19   A.  Um...
20   Q.  Or I'm sorry, exempt?
21   A.  I can't really say overruled.  He made
22  the determination on the -- he was making the
23  determinations on the classifications of the
24  employees at that time.
25   Q.  Did you provide him your opinion?

Page 214

1    A.  I don't recall, sir.
2    Q.  You would agree with me, though, that
3  classifying employees under the Fair Labor
4  Standards Act is an HR function, correct?
5    A.  It is.
6         MR. HUBBARD:  Object to form.
7         THE WITNESS:  Excuse me.
8         MR. HUBBARD:  That's fine.
9  BY MR. NAPOLITANO:
10   Q.  And is there a reason or why didn't
11  Mr. Fairburn, if you know, allow you to do that?
12   A.  I don't know.
13   Q.  Did he do a lot of HR functions?
14   A.  He did a lot of HR functions.
15   Q.  So when Mr. Fairburn was there, and
16  again can you remind me of the time frame?
17   A.  I don't know when he was first hired.
18  He was there about I think 10 or 12 years, he was
19  there quite a period of time before I came.  I
20  don't recall the exact time period -- time period
21  that he was there.
22   Q.  Do you remember when he left?
23   A.  I don't.  I'm sorry.
24   Q.  And there was an interim between
25  Fairburn and Ms. Harrison-Lee, correct?

Page 215

1    A.  There were two.  There were two, Melissa
2  Mout served as the interim City Administrator for
3  a period of time and then Mike Press was hired to
4  serve as the -- as a consultant, as an interim
5  administrator, as well, an outside consultant.
6    Q.  So how did Mr. Fairburn utilize you as
7  HR manager when you were there?
8         MR. HUBBARD:  Object to form.  You
9  may answer.
10   A.  Thank you.  I was in charge of
11  recruiting and benefits, day-to-day activities,
12  but Mr. Fairburn was very involved as well in HR
13  functions.
14  BY MR. NAPOLITANO:
15   Q.  What would he do?
16   A.  He would --
17        MR. HUBBARD:  Same objection.
18  Object to form, you may answer.
19   A.  He would look at -- he would look at the
20  structure of the organization, he worked a great
21  deal on what he wanted the organization to look
22  like at the -- and then looking at where he
23  wanted positions classified, he did a lot of that
24  himself.  He had worked in HR, I understand, in
25  the past, so he was involved a great deal in

Page 216

1  making those kind of decisions.  So I worked a
2  lot on benefits and recruiting, hiring, that type
3  of activity.
4  BY MR. NAPOLITANO:
5    Q.  How many years would you say from the
6  time Mr. Fairburn left, or if not years, whatever
7  measure of time, until August of 2012?
8    A.  I'm sorry, I don't understand.  I didn't
9  understand the question.
10   Q.  Sure.  How much time elapsed to the best
11  of your memory from the time Mr. Fairburn left
12  the City of Gardner as City Administrator until
13  August of 2012?
14   A.  I don't recall.
15   Q.  Was it several months, several years?
16        MR. HUBBARD:  Objection.
17  Speculation.  You can answer if you know.
18   A.  I don't know.
19  BY MR. NAPOLITANO:
20   Q.  You have no ballpark idea?
21   A.  I could guess, but I'm trying to give
22  you factual information.  I mean, he was gone a
23  period of time because Ms. Mout was there for a
24  period of time and then Mr. Press came in, but I
25  can't tell you.  I don't -- I don't recall if it

Page 217

1 was eight months or a year. It was a period of
2 time but I just do not recall the exact period.
3    Q.   Okay. But before August of 2012, Cheryl
4 had been there for a couple of months, correct?
5    A.   That's correct.
6    Q.   And before that, Ms. Mout had been there
7 for a period of time?
8    A.   That's correct.
9    Q.   So all of that period of time you could
10 have reclassified Ms. Pesek prior to August of
11 2012, correct?
12        MR. HUBBARD:  Object to form.
13    A.   I mean, I could have requested that.
14 BY MR. NAPOLITANO:
15    Q.   Okay. In looking at Exhibit -- what did
16 I mark that as, 27, your notes?
17    A.   28 -- oh, my notes, okay. Yes, 27.
18    Q.   Did you write anywhere on there that the
19 Department of Labor said this was the best audit
20 they'd ever seen?
21    A.   No, I don't see that on here.
22    Q.   Okay.
23    A.   That information was provided to
24 Mr. Robbins and I in a readout from Kathy
25 Rodriguez.

Page 218

1    Q.   Was that an in-person meeting?
2    A.   Yes, it was an in-person meeting.
3    Q.   If look up at the top of Exhibit 27, at
4 the top right corner it says, "Kathy/Dan DOL."
5 Is that what that says?
6    A.   It does.
7    Q.   Who's Dan?
8    A.   Dan was a gentleman that came had her,
9 kind of as an assistant. I don't recall his last
10 name.
11    Q.   Is there a reason you didn't put Bill up
12 there?
13    A.   I don't recall.
14    Q.   But it's your memory that he was in that
15 meeting, Bill Robbins?
16    A.   He was in the readout meeting with Ms.
17 Rodriguez provided us the findings.
18    Q.   Is the readout meeting different than
19 this meeting?
20        MR. HUBBARD:  Object to form.
21    A.   I don't recall. I -- I don't recall
22 exactly when this is. I met with her a number of
23 times going through the audit and providing
24 information. I do not -- I do not recall exactly
25 when this was written.

Page 219

1 BY MR. NAPOLITANO:
2    Q.   And just to clarify, Dan was the
3 Department of Labor employee?
4    A.   Department of Labor employee, yes, sir.
5    Q.   Thanks. We also talked about an issue
6 where there was a core request for individuals
7 who were at a police chief on a police chief
8 committee or something, do you remember that?
9    A.   I do.
10    Q.   And there was an individual that
11 requested the names of all those people who were
12 on that, in that public meeting, correct?
13    A.   Yes.
14    Q.   But that someone came to you and asked
15 that their name not be released, is that what
16 happened?
17    A.   In a -- when we did our final meeting of
18 -- with the committee, afterwards I was talking
19 to a couple of the committee members and the one
20 member was concerned about their name being in
21 the -- being in the paper or being released.
22    Q.   And they came to you with that or you
23 asked them?
24    A.   No, we were just standing in
25 conversation and they shared that with me.

Page 220

1    Q.   Was the meeting they were a part of open
2 to the public?
3    A.   No.
4    Q.   What kind of meeting was it?
5    A.   It was a meeting with the committee and
6 reviewing the applicant for police chief and some
7 background information that was provided to them,
8 and at that point it was determined that they
9 would not move forward with that applicant.
10    Q.   And who was the person who said that
11 they didn't want their name released?
12        MR. HUBBARD:  Object to form.
13 Misstates prior testimony. You can answer.
14    A.   And her -- and she had concern about her
15 name being released and it was Jenny Lively.
16 BY MR. NAPOLITANO:
17    Q.   Do you know Jenny Lively personally?
18    A.   I know her through the community and
19 working on various boards and committees. She's
20 not a personal friend, but I do know her.
21    Q.   Do you socialize with her?
22    A.   I do not.
23    Q.   So she didn't even say, "I don't want my
24 name released," she just said, "I have concerns"?
25    A.   She did.

Page 221

1    Q.   What were her concerns?
2    A.   Of having to answer personal questions
3 that she wasn't equipped to answer.  She didn't
4 feel like she was equipped to answer those
5 questions.
6    Q.   Was she being asked questions?
7    A.   I think she thought she was going to be
8 asked questions.
9    Q.   And so how long from the time you
10 received the request to when you responded
11 without disclosing her name?
12         MR. HUBBARD:  Object to form.  You
13 may answer.
14    A.   Well, we work within the three-day time
15 period for Kansas Open Records, that's a
16 three-day time period so it would have been
17 within a three-day time period, sometime during
18 that.
19 BY MR. NAPOLITANO:
20    Q.   Because I believe your prior testimony
21 was that you had to get the answer out and Cheryl
22 hadn't gotten back with you; is that correct?
23    A.   That's correct.
24    Q.   You understand, though, that under the
25 Kansas Open Records Act you just have to

Page 222

1 acknowledge receipt of the request within three
2 days and provide a timeline to respond?
3    A.   I do understand that.
4    Q.   So you could have said, "We will get
5 back to you within a certain amount of time," and
6 waited for Cheryl's response, correct?
7    A.   We could have done that.  That's
8 correct.
9    Q.   I want to talk a bit again about the
10 salary study.  I'm sorry.  Let me reorient myself
11 here.
12         (Deposition Exhibit Number 29 was marked
13 for identification.)
14 BY MR. NAPOLITANO:
15    Q.   I'm handing you what I've marked as
16 Exhibit 29.  Do you recognize this?
17    A.   I do not.  I do not recognize this
18 document.
19    Q.   Do you recognize parts of it?
20    A.   I do recognize parts of it.  Yes.
21    Q.   Which parts?
22    A.   I recognize the salary structure, that
23 is the format that we use for salary structure;
24 the spreadsheet with the hourly rate and then
25 these are -- there's a number of organizational

Page 223

1 charts.
2    Q.   So you recognize the org charts?
3    A.   Yes, sir.
4    Q.   Anything else within that document that
5 you recognize?
6    A.   I don't recall the SHRM survey, I don't
7 recall seeing this.  There is a document that --
8 I'll have to read this, but it appears was done
9 by myself.  There's more spread -- this other
10 spreadsheet, whatever this was called.
11    Q.   Do you recognize that?
12    A.   I do recognize that, that's just a City
13 average and then the City of Gardner averages on
14 the difference.  I don't recall this Johnson
15 County.
16    Q.   I'm sorry, you do or you don't?
17    A.   I do not recall this Budget Message.
18 Then there's a '14 Salary Structure, and
19 additional spreadsheets, I recognize those, and
20 then additional org charts.
21    Q.   So just so I can try and clarify, and
22 please correct me if I'm wrong, you don't
23 recognize the front page?
24    A.   I didn't recognize this as like handed
25 as a complete document, like something that was

Page 224

1 handed to myself or you, I -- I didn't recognize
2 this package but there's documents in the package
3 that I do recognize.
4    Q.   Okay.  And the only ones you didn't
5 recognize, if I'm understanding you, would be the
6 Budget Message from Johnson County?
7    A.   Uh-huh.  That's correct.
8    Q.   And everything else you've seen or are
9 familiar with?
10    A.   And then the SHRM information.
11    Q.   Oh, I'm sorry.
12    A.   The SHRM information, I don't recall
13 that.
14    Q.   And this was, if you look at the bottom,
15 the Bates numbers say MBB then a series of
16 numbers.
17    A.   Uh-huh.
18    Q.   So this document was produced by or on
19 behalf of you by your attorney.
20    A.   Uh-huh.
21    Q.   How did you obtain this in your
22 possession to be able to produce it?
23    A.   Well, the -- these are all -- this is a
24 public record, just salary, this would have been
25 probably in work documents that I had.  Again,

Page 229

1    A.  Usually either --
2        MR. HUBBARD:  Object to form.  You
3    can answer.
4    A.  Excuse me.  Either someone from finance,
5    which would have been the finance director's
6    assistant, or my assistant most of the time would
7    make these.
8    BY MR. NAPOLITANO:
9    Q.  Who was the finance director's assistant
10   in January of 2015?
11   A.  I'm going to say Kim Garrison, but I'm
12   not 100% sure that she was there at that time.
13   Q.  Okay.  Is there somebody else that it
14   might be, if it weren't Kim?
15   A.  I don't know who she would have had.
16   She has a number of staff people that might have
17   at that point done some work for her.  So I don't
18   know that.
19   Q.  And then you also mentioned that an HR
20   specialist might have contributed to that.  Would
21   that have been Lisa Wilms?
22   A.  The Administrative Services Assistant,
23   which was Katie Asbury.
24   Q.  Okay.
25   A.  Could have done that.

Page 230

1    Q.  Would you have participated in the
2    creation of the org charts?
3    A.  The physical creation of them, no.  In
4    how and what things we're going to look at, yes,
5    I may have.
6    Q.  Okay.  But not the actual documentation?
7    A.  No.
8    Q.  If you look at this one, it says
9    "Effective January 1, 2015," correct?
10   A.  Yes.
11   Q.  And had you seen this around that time
12   frame?
13   A.  I'm sorry, I don't recall if I did or
14   not.
15   Q.  And this org chart, effective January 1,
16   2015, shows that the Network Administrator
17   reports directly to the City Administrator,
18   correct?
19   A.  That's correct.
20   Q.  And that was a position that had
21   previously reported to you, correct?
22   A.  That's correct.
23       (Deposition Exhibit Number 30 was marked
24   for identification.)
25   BY MR. NAPOLITANO:

Page 231

1    Q.  I'm handing you what I've marked as
2    Exhibit 30.  And if you'll turn to the last page
3    of this exhibit, there's some handwriting toward
4    the right-hand side if you are looking at it in a
5    landscape view, do you see that?
6    A.  I do.
7    Q.  Do you know whose handwriting that is?
8    A.  I do not.  I don't recognize that
9    handwriting.
10   Q.  And do you recognize this document?
11   A.  No, I don't.  I don't.  I'm looking at
12   it, I don't recall this.
13   Q.  Would you agree that the first or I
14   guess the farthest left four columns are the --
15   is the same information that we saw on that
16   previous Exhibit 29 on Pages 390 and 391?
17       MR. HUBBARD:  Object to the form.
18   Documents speak for themselves, but you can
19   answer.
20   A.  It does appear to be the same
21   information, except for the Engineer 1 in that
22   information is different.
23   BY MR. NAPOLITANO:
24   Q.  And that's under Level 5?
25   A.  Yes.

Page 232

1    Q.  And if we look at your position,
2    Administrative Services Manager, Level 7.
3    A.  Uh-huh.
4    Q.  The City average appears to be the same
5    on both documents, correct?
6    A.  It does.
7    Q.  And the COG average is the same on both
8    documents, correct?
9    A.  That's correct.
10   Q.  And then obviously the difference is the
11   same as well, correct?
12   A.  That's correct.
13   Q.  Okay.  But you remember seeing Page 390
14   and 391, but not Exhibit 30; is that accurate?
15       MR. HUBBARD:  Object to form.
16   Asked and answered.  You can answer.
17   A.  That's correct.  I do not recall this
18   document.
19   BY MR. NAPOLITANO:
20   Q.  I'm going to hand you these just in case
21   we reference multiple.
22   A.  Okay.
23   Q.  I'm going to reference one right now, if
24   you would turn to Exhibit 8.
25   A.  Yes, sir.  Sorry.  I finally got there.

Page 233

1    Q.   You're fine.  And we looked at this last
2  time a little bit, and I think we looked at -- if
3  you go to Page 939.
4    A.   Yes, sir.
5    Q.   I think your testimony last time was
6  that you hadn't recognized that, correct?
7    A.   I do not -- I do not recall this
8  document.
9    Q.   Okay.  And I believe that you explained
10  to me last time that what you would do for the
11  salary study each year would be to print off the
12  Mark data and just give that to Cheryl, correct?
13    A.   Yes.  We would look at -- there were
14  years that we would input our data and then it
15  would print out; and then there were years that
16  we just would print out the initial data and give
17  it to her.  So it could have been one or the
18  other, so I can't -- it would depend which one or
19  how it was done.
20    Q.   Can you explain to me what you mean by
21  "Initial data"?
22    A.   The data that would go into the Mark
23  Salary, that program, you can go in and input
24  City of Gardner and you can input all of your
25  data for each position.  There were some times

Page 234

1  that we did this, if it was asked by the
2  Administrator, "I want to see our data in there,"
3  we would put it in, and then there were some
4  times it would be, "Just print out what's in the
5  Mark data and let me look at it," so depending
6  what they would request.
7    Q.   But you would do the salary studies or
8  surveys every year, right?
9    A.   Yes.
10    Q.   And did you have a standard of what you
11  would present to the City Administrator, a
12  standard packet?
13    A.   You know, I don't know that I could say
14  that every year was exactly the same.  I mean,
15  there was information that would be provided to
16  them every year, you know, our current salaries
17  and then what other cities were -- what their
18  salaries were as well.
19    Q.   And do you remember in 2014 what you
20  gave to Cheryl Harrison-Lee for the salary study?
21    A.   I don't.  I don't.
22    Q.   If you look to Page 944 in that exhibit.
23    A.   Uh-huh.  Uh-huh.
24    Q.   Is this what you would print off for
25  Mark?

Page 235

1    A.   This is the Mark data, yes.
2    Q.   So if you are going to give something
3  to Cheryl from the Mark Salary Study, this is the
4  type of document she would receive?
5        MR. HUBBARD:  Object to form.
6  Misstates prior testimony.  You can answer again.
7    A.   Could have been.  Yes, could have been
8  this.
9  BY MR. NAPOLITANO:
10    Q.   Okay.  And then on the left-hand side or
11  I guess the top, depending upon how you're
12  looking at it, there are several entities.  Do
13  you see those?
14    A.   I do.
15    Q.   When you go in to print this type of
16  document, do you select which entities you want
17  to see?
18    A.   You can.  Yes.
19    Q.   What are the other options?
20    A.   Print all.  Print everything that's in
21  there, all cities or county jurisdictions that
22  supply data.
23    Q.   And do you know what all counties or
24  cities supply data to Mark?
25    A.   I don't.

Page 236

1    Q.   Is it just the metro area?
2    A.   It's the Kansas City metro.
3    Q.   So it's not statewide or nationwide?
4    A.   You know, I don't -- they may have a
5  component that's nationwide, we -- we didn't use
6  that so I don't want to say there isn't
7  nationwide data.  We just didn't use that, so
8  they may supply nationwide.  I don't believe we
9  ever pulled that data.
10    Q.   Okay.  And this one that we're looking
11  at 944 looks to have been printed on May 28,
12  2014; is that correct?
13    A.   That's correct.
14    Q.   And it did include Olathe and Overland
15  Park, correct?
16    A.   It did.
17    Q.   And the next page, 945, it's another
18  printout from the Mark Salary survey?
19    A.   That's correct.
20    Q.   And this one looks to have been printed
21  on May 19th, 2014?
22    A.   That's correct.
23    Q.   And again it includes Overland Park and
24  Olathe?
25    A.   It does.

Page 237

1    Q. Page 946. Is this also a Mark Salary
2 survey printout?
3    A. It is.
4    Q. And what date is it from?
5    A. 5-14-2014.
6    Q. And it also includes Overland Park and
7 Olathe?
8    A. It does.
9    Q. Next one, 947, again is it a Mark Salary
10 survey printout?
11    A. Yes, sir.
12    Q. From what date?
13    A. 5-19 of '14.
14    Q. And it includes Overland Park and
15 Olathe?
16    A. It does.
17    Q. Page 948, please. What date is this one
18 from?
19    A. 5-19-2014.
20    Q. And is this a Mark Salary survey
21 printout?
22    A. It is.
23    Q. And does it include Overland Park and
24 Olathe?
25    A. It does include Overland Park and

Page 238

1 Olathe. Olathe has no data.
2    Q. Do you recognize those question marks
3 next to "No match" by Olathe?
4    A. I do not.
5    Q. Could they have been put there by you?
6    A. They could have. Could have.
7    Q. Page 949, what date is on this one?
8    A. 5-19-2014.
9    Q. And again, it's a Mark survey --
10    A. It is.
11    Q. -- printout? Sorry. And does it
12 include Olathe?
13    A. It does.
14    Q. And Overland Park?
15    A. It does.
16    Q. Page 951. Sorry, are you there?
17    A. I'm there. Thank you.
18    Q. Is this a Mark Salary survey printout?
19    A. Yes, sir.
20    Q. And what position is it for?
21    A. Assistant City Manager, Administrator.
22    Q. And what date was it printed?
23    A. 6-13 of '14.
24    Q. Did the City of Gardner have Assistant
25 City Manager?

Page 239

1    A. No, sir.
2    Q. Do you know why this would have been
3 printed?
4    A. Yes. Because when I was doing the
5 survey, I talked -- had a conversation with
6 Cheryl about how she wanted to look at the
7 Administrative Services position, because a lot
8 of cities didn't have that. And we made a
9 determination that we would look at an assistant,
10 we would look at various director positions and
11 then she would make it a determination how we
12 were going to pull that together to look at how
13 to create an Administrative Services. So we
14 looked at multiple positions, because there
15 really isn't Administrative Services in a lot of
16 these cities.
17    Q. So this would have been a proposed
18 comparable to your position?
19       MR. HUBBARD: Object to form.
20 Misstates prior testimony.
21    A. It was part of what I presented to have
22 her look at how she wanted to put that together.
23 BY MR. NAPOLITANO:
24    Q. One of several other director level
25 positions?

Page 240

1    A. That's correct.
2    Q. And what date was this printed?
3    A. 6-13 of '14.
4    Q. And is Olathe included on this printout?
5    A. Yes, it is.
6    Q. And Overland Park?
7    A. It is.
8    Q. The next page is 952, is this another
9 Mark Survey printout?
10    A. Yes, sir.
11    Q. And again, on -- well, I don't know
12 about again. But it was printed on 6-13-2014?
13    A. That is correct.
14    Q. For a job position called Human Resource
15 Director?
16    A. That's correct.
17    Q. Is this another one of those positions
18 that you would have been looking to to ascertain
19 the appropriate salary for your position?
20       MR. HUBBARD: Object to form.
21    A. For the Administrative Services
22 position, yes.
23 BY MR. NAPOLITANO:
24    Q. Okay. And is Olathe included on this
25 printout?

Page 241

1   A.  Yes.
2   Q.  And Overland Park?
3   A.  Yes, sir.
4   Q.  Do you know the number of employees that
5   Johnson County has?
6   A.  I have no idea.  Sorry.  Don't know.
7   Q.  Okay.  Do you recall about when you
8   submitted whatever it was you submitted for the
9   salary study to Cheryl Harrison-Lee in 2014?
10          MR. HUBBARD:  Object to form.
11   A.  I do not -- I don't recall the exact
12   time.
13   BY MR. NAPOLITANO:
14   Q.  Could it have been in May or June of
15   2014?
16   A.  It would --
17          MR. HUBBARD:  Object to form.  Go
18   ahead and answer.
19   A.  I would imagine that it's sometime
20   during this time period.
21   BY MR. NAPOLITANO:
22   Q.  Do you recall printing these ones we
23   just looked at off?
24   A.  I don't know that I recall physically
25   printing them off, but I -- I do recall that

Page 242

1   these are the type of reports that would have
2   been printed and provided for data to her, yes.
3   Q.  Okay.  Thank you.  We also talked about
4   an IT request for proposal, do you recall that?
5   A.  I do.
6   Q.  I think you had told me that you
7   yourself had prepared two requests for proposal,
8   but you weren't sure if the last one you prepared
9   was ever actually proposed or submitted or put
10   out to bid, do you remember that?
11          MR. HUBBARD:  Object to form.
12   A.  I recall that we looked at two documents
13   and that we talked about, I know that one went
14   out and I did not know about the second one, if
15   it actually went out.  I didn't recall.
16   BY MR. NAPOLITANO:
17   Q.  And with respect to the first one, you
18   didn't get very many bids, correct?
19   A.  That's correct.
20   Q.  And I know it's been a while, do you
21   recall now how many bids you got?
22   A.  I don't recall.  I still don't recall.
23   I know it was very few.
24   Q.  But AOS was one of them, correct?
25   A.  I do -- yes, AOS was one of them.

Page 243

1   Q.  And that was the entity that helped put
2   the proposal together, correct?
3   A.  Yes.
4   Q.  And did you want to move forward with
5   using AOS after they had bid on that first one?
6   A.  For the proposal, to accept the
7   proposal?  I guess I want to make sure I
8   understand your question.
9   Q.  Sure.
10   A.  I'm sorry.
11   Q.  So you put on the the RFP?
12   A.  Yes.
13   Q.  They were one of the respondents
14   providing a proposal, correct?
15   A.  Correct.
16   Q.  Was it your recommendation to move
17   forward and give them the contract?
18   A.  No, I -- no, my conversation with Cheryl
19   was I was concerned that the number of people
20   that we had respond and that since AOS had helped
21   write that, was there -- was there a problem with
22   that, should we move forward or not?  My
23   recommendation was to not move forward.  I was
24   seeking guidance on should we move forward or
25   should we do something else?

Page 244

1   Q.  So you asked Cheryl what to do?
2   A.  I visited with her about it, yes.
3   Q.  Okay.
4          MR. NAPOLITANO:  Dirk, you don't
5   happen to remember what exhibit the complaint
6   was, do you?
7          MR. HUBBARD:  Oh, the letter?
8          MR. NAPOLITANO:  Uh-huh.
9          MR. HUBBARD:  I don't think the
10   formal complaint had been marked, but the letter
11   definitely was.
12          MR. NAPOLITANO:  Oh, wait.  I think
13   we're at 22.  Yeah, 22.
14          MR. HUBBARD:  It's hidden behind 23
15   in mine.
16          MR. NAPOLITANO:  Which is actually
17   26?
18          MR. HUBBARD:  Yeah.  It's all
19   confusing.
20   Q.  Okay.
21   BY MR. NAPOLITANO:
22   Q.  So we went through kind of line by line
23   your complaint, and one follow-up question I had
24   was I think that you had indicated that you
25   thought the farm league comment could be

Page 257

1   would make a complaint.  I don't recall that.
2        (Deposition Exhibit Number 32 was marked
3   for identification.)
4   BY MR. NAPOLITANO:
5        Q.   I'm handing you what I've marked as
6   Exhibit 32.
7        A.   Uh-huh.
8        Q.   Do you recognize this?
9        A.   I do.
10        Q.   What is it?
11        A.   It is a memo from Mayor Morrow about my
12   complaint from the 26th.
13        Q.   And how were you delivered this?
14        A.   I think he brought it into my office.  I
15   think he just walked it into my office and handed
16   it to me.
17        Q.   What else was said at the time he handed
18   this to you?
19        A.   Sir, I don't recall any other
20   conversation really, just what kind of what's in
21   this letter.
22        Q.   He just said, "Hey, Mary, here's a
23   notification"?
24        A.   Yeah, and just -- well, I mean, my
25   recollection is just we're going to -- you know,

Page 258

1   as we talked about we're going to do an outside
2   investigation and this is just your formal --
3   it's really the formal response to my complaint.
4        Q.   Did you think that you couldn't be fired
5   if you filed a complaint?
6        A.   No, sir.  But our policies do state that
7   we have a non-retaliation for employees have a
8   right to file complaints and areas of concern.
9   There's a portion in our policy that addresses
10   that, so I didn't think I would be fired for
11   filing a complaint, but I -- I wouldn't say that
12   it wouldn't happen.  I didn't think it would.
13        Q.   But I mean, if someone was going to --
14   and this is hypothetically speaking based on your
15   understanding of the City's policies.
16        A.   Uh-huh.
17        Q.   If someone thought they were going to be
18   fired for performance issues.
19        A.   Uh-huh.
20        Q.   And then filed a complaint, is it your
21   understanding that the policies would prohibit
22   the continuation of that termination?
23        MR. HUBBARD:  Object to form.
24        A.   Well, that's a pretty generic vague
25   question.  I mean, it would depend a lot on the

Page 259

1   circumstances and what -- who was it, is the
2   employee in good standing, what was going on,
3   what of his the complaint?  So it's hard to
4   answer that because I think there's a lot of
5   factors that would go into that type of scenario.
6   BY MR. NAPOLITANO:
7        Q.   Well, you don't have to have cause to
8   fire anybody at the City of Gardner, correct?
9        MR. HUBBARD:  Object to form.
10        A.   You don't have to have cause but you
11   should have good reason and documentation before
12   you terminate someone.
13   BY MR. NAPOLITANO:
14        Q.   It's an at-will employment relationship
15   in the City of Gardner?
16        A.   It is at-will.  The state of Kansas is
17   at-will.
18        Q.   So after you met or you received Exhibit
19   32 from the Mayor, and that was on January 27th,
20   2015, to the best of your recollection?
21        A.   Yes.  My birthday.
22        Q.   Oh, very good.
23        A.   He told me happy birthday, too.
24        Q.   Did you guys have a party or anything?
25        A.   No.  I didn't get a party.  No actually

Page 260

1   they had cake and goodies and things for me, as
2   we did for everybody else so yeah, I guess we had
3   a little reception.
4        Q.   What time was this delivered to you?
5        A.   I do not recall what time he came in.
6        Q.   Do you know if it was before or after
7   your birthday reception?
8        A.   I don't recall.
9        Q.   Did Cheryl attend your birthday
10   reception?
11        A.   I don't know if she was there or not.  I
12   don't remember.
13        Q.   Did she bring you flowers?
14        A.   I don't know if I got flowers.  I don't
15   remember.
16        Q.   Okay.  So after January 27th when the
17   Mayor delivered this to you, what was your next
18   interaction or communication regarding your
19   complaint?
20        A.   There was a little period of time before
21   I heard -- heard from, and I don't recall if it
22   was the Mayor or Ryan or -- but someone contacted
23   me about that an investigator had been hired and
24   would be coming in to meet privately with myself
25   and others and a number of those would be held

Page 261

1  offsite to protect the employees. And I -- I
2  know it's in the document sitting here, I just
3  can't remember if it was Mayor or Ryan Denk, but
4  someone told me that that was going to occur.
5  **Q. Okay. And you did indeed meet with**
6  **Shelly Freeman, correct?**
7  A. I did.
8  **Q. And she was the investigator hired by**
9  **the City?**
10  A. That's correct.
11  **Q. Okay. Do you remember what date you met**
12  **with her?**
13  A. I don't. I know it's in the documents.
14  I...
15  **Q. I'm going to hand you what I've marked**
16  **as Exhibit 33.**
17  (Deposition Exhibit Number 33 was marked
18  for identification.)
19  BY MR. NAPOLITANO:
20  **Q. Would you agree with me that this is a**
21  **calendar appointment in Outlook?**
22  A. Yes, sir. I do agree.
23  **Q. And it's for Monday, February 2nd, 2015**
24  **from 1:00 to 4:00 p.m.?**
25  A. Yes, sir.

Page 262

1  **Q. And the subject line is "Shelly -**
2  **Freeman & Foster"?**
3  A. Yes.
4  **Q. Does this refresh your memory as to when**
5  **you met with Shelly Freeman?**
6  A. It appears I met with her on Monday,
7  February the 2nd.
8  **Q. Okay.**
9  MR. NAPOLITANO: We'll take a break
10  now if that's okay with you.
11  THE WITNESS: Sure.
12  (Recess taken.)
13  BY MR. NAPOLITANO:
14  **Q. So I think we were talking about when**
15  **your meeting with Shelly Freeman was and you told**
16  **me it was on February 2nd, 2015, correct?**
17  A. As shown on the document, yes.
18  **Q. And that's consistent with your memory?**
19  A. Sure.
20  **Q. No reason to dispute that it didn't --**
21  A. No reason to dispute.
22  **Q. Why don't you just tell me about how**
23  **that meeting went.**
24  MR. HUBBARD: Object to form. You
25  may answer.

Page 263

1  A. Okay. I met with Ms. Freeman, and she
2  -- we did meet onsite. Cheryl was out that day,
3  I believe, so she thought that was okay that we
4  would meet at the Parks and Rec conference room.
5  It was a private room, she did introduce herself
6  and tell me a little bit about herself and what
7  she did, and that she had been hired by the City
8  to do an independent investigation. And we just
9  -- she kind of went -- she went through my
10  letter, my complaint letter, and we just -- we
11  talked through just kind of walked through that
12  letter.
13  And then she explained to me that she
14  would meet with a number of employees, that she
15  would be in contact with me and that she would do
16  a final readout to the Mayor. At that point n
17  time, when she was done, she would do a formal
18  readout, and during -- during this investigation
19  time period the best thing to do was just go back
20  and do my job.
21  BY MR. NAPOLITANO:
22  **Q. About how long did that meeting last?**
23  A. You know, this says 1:00 to 4:00. I
24  don't believe we were in the meeting that long,
25  but I -- I can't tell you exactly how long that

Page 264

1  it was. But when I saw 1:00 to 4:00, I thought
2  "Wow, that was a long time." I don't remember it
3  being that long.
4  **Q. Well, could that be that you just wanted**
5  **to block the conference room off for the**
6  **afternoon?**
7  A. Sure. Absolutely.
8  **Q. Do you recall if your meeting with**
9  **Shelly was more than an hour?**
10  A. To the best of my recollection, I would
11  say it's probably about an hour, around an hour.
12  **Q. Okay. And did you provide her any**
13  **additional information, other than your January**
14  **26th, 2015 complaint letter?**
15  A. I did have just kind of a document that
16  was kind of talking notes that I just wanted -- I
17  wrote down to make sure that we kind of talked
18  about, and I wanted to share with her, and I did
19  -- she asked for a copy of that and I did provide
20  that to her.
21  **Q. I'm going to hand you what I've marked**
22  **-- I did it again.**
23  (Deposition Exhibit Number 34 was marked
24  for identification.)
25  BY MR. NAPOLITANO:

Page 265

1     Q.   Exhibit 34.  Do you recognize this?
2     A.   I do.
3     Q.   And this was the Charge of
4  Discrimination that you submitted to the EEOC and
5  Kansas Human Rights Commission?
6     A.   That is correct.
7     Q.   And attached to it is your January 26th,
8  2015 complaint letter, correct?
9     A.   That's correct.
10    Q.   And there is also an Appendix B, it's
11  MBB0000007, the last page of the exhibit.  Do you
12  see that?
13    A.   Yes, sir.
14    Q.   What is Appendix B?
15    A.   That is the talking points that I
16  provided to Ms. Freeman.
17    Q.   At what point did you create this
18  document?
19    A.   Well, I wish I could tell you.  I feel
20  bad, I wish I could tell you the exact timing but
21  most likely either the Friday or the Monday prior
22  to meeting with her, just right prior to meeting
23  with her.  I mean, we have the 26th, 27th, 28th,
24  so it's sometime during that time period when I
25  knew she was coming in, I prepared this.

Page 266

1     Q.   Did you make or save a copy anywhere?
2     A.   I don't -- I don't recall saving a copy
3  anywhere.
4     Q.   Did you e-mail this to yourself?
5     A.   I don't recall e-mailing it to myself.
6  If I did, I don't recall doing that.
7     Q.   To the best of your memory, what did you
8  do with this document when you created it to be
9  able to print it?
10    A.   I just printed it off, just printed it.
11  I had a printer in my office and I printed it.
12    Q.   And then did you just delete the draft
13  e-mail?
14    A.   I don't recall what I did.  I just used
15  this as -- and I know this was on an e-mail
16  format, I recognize the heading, but I just
17  honestly do not recall what I did with the draft.
18  I don't believe I kept it, but I -- if I saved it
19  on my desktop or somewhere at the City, I don't
20  recall where.
21    Q.   But you don't recall taking any steps to
22  preserve it?
23    A.   I do not.
24    Q.   Did you verbally go over each one of
25  these items with Shelly Freeman in your February

Page 267

1  2nd meeting?
2     A.   You know, I believe we -- I kind of
3  reviewed all of these areas.  Did I go through
4  with her word by word?  I -- I don't recall if I
5  said "I am blah, blah, blah."  But I do know that
6  we reviewed this document.
7     Q.   Okay.  Under the first set of numbers
8  I'm sorry, where it says, "A few things that I
9  would like to make clear prior to starting our
10  investigation."
11    A.   Uh-huh.
12    Q.   Do you see where I'm at?
13    A.   I do.
14    Q.   Item 4 says, "I am extremely concerned
15  about the current culture at the City and how
16  employees are treated."  Can you explain to me
17  what you meant by "Current culture"?
18         MR. HUBBARD:  Object to form.
19    A.   I was concerned about how Cheryl
20  Harrison-Lee was treating a number of the
21  employees at the City of Gardner and the number
22  -- the amount of turnover that we had based on
23  that.  It was very concerning, it was very
24  discouraging.
25  BY MR. NAPOLITANO:

Page 268

1     Q.   And I know that you've kind of broadly
2  said that you're concerned about the way they
3  were treated, but how was she treating them that
4  made you concerned?
5         MR. HUBBARD:  Object to form.  Also
6  object as asked and answered in prior deposition.
7  You may answer further.
8     A.   I know that we discussed that she was
9  not available and wasn't there when people had
10  had questions and needed to work with her.  A
11  gentleman, Mike Hall, that was put on a
12  performance plan, would come over all the time to
13  try to meet with her and see if he was on track
14  and what he was doing and what -- and she just
15  wouldn't meet with him.  Bill Krawczyk was
16  another director who would try to set up meetings
17  to come in to visit with her and she just
18  wouldn't -- she just flat wouldn't meet with him.
19  So they were trying to determine and work on
20  their performance that she says they had, but she
21  couldn't give them the time to do that, and that
22  was very concerning for me as well.  And then --
23  and then you can put myself in the same situation
24  where all of a sudden she starts, you know,
25  excluding me from projects and meetings that I

Page 269

1  would have been involved in with no communication
2  about it, so there -- there was a great number of
3  things like that. Our police chief at the time,
4  the same thing. I mean, she was on him all the
5  time, but she would never meet with him. She
6  would never take the time to sit and work with
7  people and meet with them about what their issues
8  were and to try to solve them. She was just
9  never available.
10 BY MR. NAPOLITANO:
11     Q. So when you say the current culture that
12 you were worried about, it was her leadership
13 style, not trying to help people improve?
14         MR. HUBBARD: Object to form.
15     A. Yep.
16         MR. HUBBARD: Misstates prior
17 testimony. You may answer.
18     A. That's part of it. That's part of it.
19 And it also, you know, she was saying things
20 about myself and others that weren't true,
21 weren't substantive. It was an unbelievable form
22 of intimidation.
23 BY MR. NAPOLITANO:
24     Q. What was she saying about you that
25 wasn't true or substantive?

Page 270

1         MR. HUBBARD: Object to form. Also
2  asked and answered in prior deposition. You can
3  answer further.
4     A. Okay. I mean, it's the same things
5  we've talked about in the past, but also you
6  know, I didn't know what I was doing, that she
7  would -- she lied about the police chief
8  interview scenarios about what her role in that
9  was. There were -- back through all of my
10 testimony, I think I've shared a number of those.
11 BY MR. NAPOLITANO:
12     Q. Well, those questions were geared toward
13 your complaint letter; this is toward your
14 February 2nd meeting so I want to know what you
15 told Shelly Freeman.
16     A. Well, I don't know --
17         MR. HUBBARD: Object to form. Is
18 the question what you told Shelly Freeman?
19         MR. NAPOLITANO: Well, I'm asking
20 what she meant by this which is based on her
21 testimony what she would have explained to Shelly
22 Freeman, so I think it -- the two are
23 interrelated.
24     A. Well, I --
25         MR. HUBBARD: Same objection.

Page 271

1  Object to form. I believe it's asked and
2  answered. You can answer further if you have
3  further.
4     A. Well -- oh, I'd like to clarify because
5  as I was talking to you about how employees were
6  treated, my understanding was that how did I feel
7  employees were treated? That's -- that was what
8  I was answering. Exactly what I told Shelly
9  Freeman, I -- I don't know the exact conversation
10 with Shelly. I was sharing with you the things
11 that were going on and my concern. I can't tell
12 you specifically I told Shelly Freeman every
13 single one of those details.
14 BY MR. NAPOLITANO:
15     Q. Okay. What things about other
16 individuals did Cheryl say that were untrue?
17         MR. HUBBARD: Object to form.
18 Already asked and answered in prior deposition,
19 and today. You may answer further.
20     A. All of the items that I just shared with
21 you.
22 BY MR. NAPOLITANO:
23     Q. Nothing more?
24     A. If I think --
25         MR. HUBBARD: Same objection.

Page 272

1  Object to form. You can answer further if you
2  have further to answer.
3     A. At this time, I don't have others. I
4  may think of other things, but at -- that's all I
5  can think of at this time.
6  BY MR. NAPOLITANO:
7     Q. Under this column "Previous Staff," why
8  did you list these people?
9     A. Those were people that I had concerns
10 with how they had been treated by Cheryl.
11     Q. And under "Current Staff," why did you
12 list those people?
13     A. Those were people that I believed could
14 substantiate and had -- and shared the same
15 concerns that I did.
16     Q. And why did you believe that?
17     A. Because they all kind of said the same
18 thing I just told you.
19     Q. So is it fair to say all the individuals
20 on this list felt that they were being treated
21 the same way that you felt?
22     A. They felt like she was treating them
23 unfairly and hostile.
24     Q. And you told me about Mike Hall, that he
25 was on an improvement plan and that she wouldn't

Page 289

1  she is all that!!!"  That's something that you
2  are saying that Cheryl said to you about Jeanne?
3      A.  That is correct.
4      Q.  When was that comment made?
5      A.  Sometime shortly after Jeanne was hired
6  and she -- she's a very skilled, very educated
7  young woman who came in and she was pretty
8  gung-ho and, you know, she -- she kind of rubbed
9  Cheryl the wrong way a couple times, so -- as
10  everybody did.
11      Q.  With respect to the previous staff that
12  we talked about, let's go one by one here.
13      A.  Uh-huh.
14      Q.  Mike Hall.  Any age-related comments
15  that you attribute to Cheryl making toward Mike
16  Hall?
17          MR. HUBBARD:  Object to form.
18      A.  No age-related comments to me.  I don't
19  -- again, I don't know what all conversations she
20  had with him, but not to me.
21  BY MR. NAPOLITANO:
22      Q.  With respect to all these individuals, 1
23  through 6, Mike Hall, Gerald Cullumber, Leslie
24  Quillen, Amy Kynard, James Moore, did you ever
25  hear any age-related comments from Cheryl to any

Page 290

1  of these individuals?
2      A.  I did --
3          MR. HUBBARD:  Object to form.
4      A.  I did not.
5  BY MR. NAPOLITANO:
6      Q.  For the same individuals, did you ever
7  hear any race-related comments --
8          MR. HUBBARD:  Object to form.
9  BY MR. NAPOLITANO:
10      Q.  -- from Cheryl?
11      A.  From -- to me?  Her comments to me?  Is
12  that what you're asking me?
13      Q.  Did you ever hear her say anything you
14  perceived to be discriminatory based on race to
15  any of these individuals?
16      A.  She did not say anything to me.  I don't
17  know what her conversations with them were.
18      Q.  Did any of them tell you of any
19  comments?
20      A.  No, they were -- they were all pretty
21  frustrated about trying to get their jobs done.
22      Q.  The next thing you write is,
23  "Retaliation due to Travis issue."  What are you
24  talking about there?
25      A.  That was the planner that we discussed

Page 291

1  in my previous testimony that we had the air on
2  checking his background.
3      Q.  And it's Travis Hulse?
4      A.  Travis Hulse.
5      Q.  And so he was the individual that your
6  department failed to verify that he had the
7  degree he allegedly said he had?
8      A.  That's correct.
9      Q.  And what did you mean by "retaliation"?
10      A.  Instead of sitting down and talking to
11  me about it and working through it, she just
12  became very closed and just wouldn't give you the
13  time of day and that was her mode.  That's how
14  she did -- that's how she treated people.  If you
15  had made an error or you hadn't done something
16  that she wanted, instead of addressing you and
17  talking to you to try to correct the -- her
18  perceived performance issues, or if there was a
19  performance issue, she just wouldn't talk to you
20      Q.  So the employees were basically on a
21  pretty short rope, you didn't do something right
22  and she was done with you?
23      A.  Yes, sir.
24      Q.  And what all did you -- I'm just trying
25  to understand what you mean by retaliation when

Page 292

1  you --
2      A.  Uh-huh.
3      Q.  -- wrote that there.
4      A.  Uh-huh.
5      Q.  What all acts toward you or statements
6  toward you did you encompass in that word
7  retaliation there?
8          MR. HUBBARD:  Objection.  That's
9  been asked and answered.  If you have anything
10  further that what you just said, you can add to
11  it.
12      A.  Yeah, I don't.  And are you asking
13  specifically about my conversation with Shelly
14  Freeman still or just in general?  I just want to
15  make sure I'm answering what you're asking me.
16  BY MR. NAPOLITANO:
17      Q.  Broadly speaking, you've identified that
18  because of this Travis issue, you were retaliated
19  against, correct?
20      A.  That's --
21          MR. HUBBARD:  Objection.  Object to
22  form.
23          THE WITNESS:  Excuse me.
24          MR. HUBBARD:  Also object as asked
25  and answered.

Page 293

1    A.  Yes.
2  BY MR. NAPOLITANO:
3    **Q.  Okay.  And I want to know, not limited**
4  **to Shelly Freeman.**
5    A.  Uh-huh.
6    **Q.  As a result of the Travis issue, what --**
7  **how did that retaliation present itself in your**
8  **mind?**
9         MR. HUBBARD:  Same objections,
10  object to form.  I also object as asked and
11  answered just a couple minutes ago.  If you have
12  anything else to add, you can do so.
13    A.  Sir, I don't.
14  BY MR. NAPOLITANO:
15    **Q.  I think we talked last time she stopped**
16  **talking to you?**
17    A.  Yes, sir.
18    **Q.  Is that included in the retaliation you**
19  **are referencing on that form?**
20    A.  Yes.
21         MR. HUBBARD:  Object to form.
22  BY MR. NAPOLITANO:
23    **Q.  Taking away duties, is that included in**
24  **retaliation?**
25         MR. HUBBARD:  Object to form.

Page 294

1    A.  Those type of things, yes, began and
2  then escalated after my complaint letter.
3  BY MR. NAPOLITANO:
4    **Q.  But they started after the Travis issue?**
5    A.  Yes.
6         MR. HUBBARD:  Object to form.
7    A.  I'm sorry, can you -- I'm not sure I
8  answered that correctly.  Can you ask me that
9  again?
10         MR. NAPOLITANO:  Can you read back
11  the question, Brent?
12         (Whereupon, the following portion of the
13  record was read by the reporter:
14         "Question:  But they started after
15  the Travis issue?"
16    A.  The retaliation where she would quit
17  talking to me and began taking various things
18  away, yes, I believe that was part of the
19  beginning of that.
20  BY MR. NAPOLITANO:
21    Q.  And correct me if I'm wrong, but she had
22  actually contracted out the salary study which is
23  something you started before the Travis issue,
24  correct?
25    A.  I can't answer that without looking at

Page 295

1  the document of the timeline.  If you have that,
2  I'm happy to look at it.
3    **Q.  I think we've addressed it previously so**
4  **I'm not going to belabor the point.**
5    A.  Okay, I'm sorry.
6    **Q.  No, you're fine.  Under "Other areas of**
7  **concern," you wrote, "Recruiting and projects**
8  **removed and no conversation with HR."  I think**
9  **that kind of goes to what we were talking about**
10  **but I just want to make sure I'm clear:  This is**
11  **all under retaliation due to Travis issue, these**
12  **items here?**
13         MR. HUBBARD:  Object to form.
14  Misstates what the document says.  You can
15  answer.
16    A.  No.  There's retaliation and then there
17  these are other areas of concern that this is --
18  my recollection of this is now I have other areas
19  of concern and these were the items of concern.
20  BY MR. NAPOLITANO:
21    **Q.  Okay.  But recruiting and projects were**
22  **removed from you, correct?**
23    A.  Uh-huh.
24    **Q.  Did you believe that was because of the**
25  **Travis issue?**

Page 296

1    A.  I didn't --
2         MR. HUBBARD:  Same objection.
3         THE WITNESS:  No, I'm sorry.
4         MR. HUBBARD:  No, go ahead.
5    A.  I didn't know why.
6         MR. NAPOLITANO:  Are you getting
7  his laughter on the record?  Why are you
8  laughing?  You're laughing at every question.
9         MR. HUBBARD:  You're misreading
10  clearly the document.  I just --
11         MR. NAPOLITANO:  She's the one that
12  wrote the document.  I'd like to understand what
13  she meant by it.
14         MR. HUBBARD:  She just said that
15  that did not, but go ahead and ask your question.
16  It's just a pretty blatant misreading of what's
17  here, counsel.  That's all.  I didn't -- you can
18  answer.  The question was whether the areas of
19  concern are due to retaliation due to the Travis
20  issue.
21    A.  No, I -- those are -- I grouped together
22  areas that I wanted to be sure to talk to Shelly
23  about; one of them was retaliation due to the
24  Travis issue, then there's other areas of concern
25  and those things fall in that other areas of

Page 301
1  the project any longer.
2      **Q.  When did Matt start taking over?**
3      A.  It was several weeks into the project.
4  I don't have the exact -- I don't have the exact
5  timing, but it was several weeks.  I had had
6  initial meetings with Ms. Merriweather, we had
7  gone through and talked about kind of what the
8  plan would be and the timelines and what she
9  would be doing.  And then Matt was going to be
10  involved to be that person to kind of gather the
11  data, be the data gatherer, and then like I said,
12  I -- I don't know, all of a sudden it's just
13  meetings were happening and I wasn't included.
14      **Q.  So it was a few weeks after the project**
15  **started that Matt began to take over?**
16      A.  I would say it was, yeah, a few weeks,
17  several maybe.
18      **Q.  When did the project start?**
19      A.  I'm sorry, I don't recall the exact
20  time.  We could --
21      **Q.  Was it in 2014?**
22      A.  I would have to go back and -- we could
23  look at our document.  I don't -- I don't recall
24  exactly.
25      **Q.  If you look at Exhibit 9.**

Page 302
1      A.  Okay.  Okay.
2      **Q.  Are you there?**
3      A.  Yes, I am.  I'm sorry, yes, I have
4  Exhibit 9.  Thank you.
5      **Q.  This is an e-mail from you on behalf of**
6  **Cheryl Harrison-Lee sent July 25th, 2014,**
7  **correct?**
8      A.  That is correct.
9      **Q.  And this is where you informed the**
10  **employees I guess that you're going to be hiring**
11  **a consultant to perform a salary and compensation**
12  **study, correct?**
13      A.  Yes, sir.
14      **Q.  So seeing this, would you say that the**
15  **project started in 2014?**
16      A.  Yes, it does.
17      **Q.  So then -- go ahead.**
18      A.  Oh, I'm sorry.  The letter also says
19  that we expect this process to begin in September
20  and complete around the first of the year.
21      **Q.  Okay.  So you would have -- Matt would**
22  **have started taking over before your complaint on**
23  **January 26th, 2015, correct?**
24      A.  Yes.  I do believe so.
25      **Q.  Why did you put down "employment**

Page 303
1  **engagement survey"?**
2      A.  The same thing, that was a survey that
3  was pending and a project that we were working --
4  we were going to actually try to get working on
5  and it was trying to get her to sit down to go
6  through approving it and making sure that this
7  was what you were wanting.  The same type of --
8  the same type of concern.
9      **Q.  And were you informed that they were**
10  **going to wait until the HR supervisor was hired**
11  **to do the employment engagement survey?**
12      A.  I was by Matt, when I -- I sent an
13  e-mail to Matt asking him some information and he
14  said he'd been told by Cheryl that we were going
15  to wait until the HR supervisor was hired to do
16  that.  It was kind of surprising since I reported
17  direct to her, but...
18      **Q.  What's "Gardner U"?**
19      A.  Gardner U was a program that I started
20  for employees, top performer employees that we
21  would bring in and we did -- you got into the
22  program if you were a top performer.  We worked
23  through the year, we had various speakers come
24  in, we met, we had lunch, we did different
25  scenarios.  It was continuing development of

Page 304
1  employees.
2      **Q.  And why did you put it down?**
3      A.  Because I couldn't get it off the
4  ground.
5      **Q.  Okay.**
6      A.  Same thing.
7      **Q.  On Number 5 you say, "Since complaint**
8  **she has not spoken to you or Lisa Wilms," but**
9  **isn't it true that she stopped -- started stopped**
10  **talking to you after the Travis issue?**
11      A.  On and off.  But after my complaint,
12  there was absolutely no conversation.  Zero.
13      **Q.  Down here at the bottom you say, "HR**
14  **manager - 6 phone interviews - listen to how she**
15  **did not have a professional HR staff and needed**
16  **to update the department."**
17      A.  Uh-huh.
18      **Q.  Why'd you put that down?**
19      A.  Because that was an area I wanted to
20  share with Shelly that I thought again was
21  retaliatory, I thought it was belittling.  And
22  harassing and I felt like again, it's very
23  unprofessional and if you have an issue with a
24  staff member, you need to sit down and do it in a
25  professional manner and let them know what your

Page 305

1 expectations are and give them an opportunity to
2 meet your expectations, and you just don't quit
3 talking to them.
4 **Q. So during the phone interviews for the**
5 **HR, was it supervisor or manager?**
6 A. It was initially a supervisor.
7 **Q. At what point did it change to manager?**
8 A. I don't know, after I left.
9 **Q. But you put manager here on February**
10 **2nd, right?**
11 A. I did. I did. I believe it actually
12 was a supervisor, I'd have to go back and look at
13 the titles change back and forth. So how it
14 actually went out, I'd have to go back and look
15 at the document.
16 **Q. Okay. But during those phone**
17 **interviews, you remember Cheryl saying how she**
18 **didn't have a professional HR staff?**
19 A. Yes, sir.
20 **Q. How she needed to update the department?**
21 A. Yes, sir.
22 **Q. Did that give you concern for your job?**
23 A. I wasn't concerned about my job. I
24 thought it was very rude and belittling but, you
25 know, that's how she worked. That's how she is.

Page 306

1     And, you know, we talked at the last
2 deposition and I also shared with my
3 understanding of bringing on these other people
4 is that we were -- we were molding, bringing up
5 the departments, we were adding to the
6 departments to be able to do more. Not that I
7 wasn't doing my job, that we were adding to the
8 departments.
9     MR. NAPOLITANO: I'm sorry, I need
10 to take a bathroom break. Can we go off the
11 record for a minute?
12     (Recess taken.)
13 BY MR. NAPOLITANO:
14 **Q. Okay. After you met with Shelly on**
15 **February 2nd of 2015, you made several follow-up**
16 **complaints, correct?**
17 A. Follow-up e-mails of concern, yes, sir.
18 **Q. And you made those to Ryan Denk; is that**
19 **correct?**
20 A. I did.
21 **Q. Okay. I just want to go through some of**
22 **those.**
23 A. Okay.
24     MR. NAPOLITANO: I'm handing you
25 what I've marked Exhibit 35.

Page 307

1     (Deposition Exhibit Number 35 was marked
2 for identification.)
3 BY MR. NAPOLITANO:
4 **Q. Was this the first continual concern**
5 **e-mail you sent to Ryan Denk?**
6 A. I do believe it was, sir.
7 **Q. And in it you complained that "She**
8 **continues to not speak or work with you,"**
9 **correct?**
10 A. That is, yes, correct.
11 **Q. And that she's working directly with the**
12 **staff that reports to you, correct?**
13 A. That is correct.
14 **Q. Other than those two complaints, were**
15 **there any other specific ones you had in this**
16 **e-mail?**
17     MR. HUBBARD: Object to form.
18 A. I believe that I stated as well that she
19 was intentionally making it impossible for me to
20 function in my capacity.
21 BY MR. NAPOLITANO:
22 **Q. And was that by not talking to you and**
23 **going directly to your staff?**
24 A. Yes.
25 **Q. Which she had started to do in the fall**

Page 308

1 of 2014, correct?
2     MR. HUBBARD: Object to form.
3 A. On and off.
4 BY MR. NAPOLITANO:
5 **Q. I'm sorry, what was your answer?**
6 A. On and off.
7 **Q. On the second page you tell Ryan that**
8 **it's "A huge liability for the City of Gardner."**
9 **What did you mean by that?**
10 A. I believe that her retaliatory behavior
11 was a liability for the City, not only for myself
12 but all the other employees that I was
13 experiencing her treat this way, that -- that it
14 needed to be addressed and it needed to be
15 stopped. I also stated in this letter that this
16 very aggressive statement regarding Councilman
17 Shute, that he was going to hit me square in the
18 nose, that -- that's pretty brazen. That's
19 pretty hostile.
20 **Q. Did you know if Councilman Shute made**
21 **that statement?**
22 A. I did not know it at the time because
23 Cheryl -- Cheryl told me, but I have learned
24 since then that he says no, he did not say that.
25 **Q. And do you remember what the context was**

Page 345

1  forwarded on to her.  Are there any others that
2  you recall making other than the ones we looked
3  at?
4          MR. HUBBARD:  Object to form.  You
5  can answer.
6      A.  I believe we've produced everything that
7  I have.
8  BY MR. NAPOLITANO:
9      Q.  I'm sorry, that's not my question.
10     A.  Okay.
11     Q.  The ones we looked at, do you know if
12  there are any others?
13         MR. HUBBARD:  Same objection.
14  Object to form.
15     A.  No, I do not.
16  BY MR. NAPOLITANO:
17     Q.  Okay.  Do you recall specifically any
18  others that we didn't look at today?
19         MR. HUBBARD:  Same objection.
20     A.  I would have to go back.
21         MR. HUBBARD:  If you recall.
22     A.  I don't recall.  I would have to go back
23  and look at everything we produced to you.
24  BY MR. NAPOLITANO:
25     Q.  Now, I'm handing you what has been

Page 346

1  marked as Exhibit 44.
2      A.  Okay.
3         (Deposition Exhibit Number 44 was marked
4  for identification.)
5  BY MR. NAPOLITANO:
6      Q.  Did I hand you all of Exhibit 44?
7      A.  I think you handed those to me.
8      Q.  What are we looking at here, if you
9  know?
10     A.  Yes.  This is a recap that I wrote after
11  my meeting with Shelly Freeman and Mayor Morrow
12  on March the 6th.
13     Q.  Okay.  And so these are -- you authored
14  this, correct?
15     A.  Yes, sir.
16     Q.  And who all was present, just you, Mayor
17  and Shelly?
18     A.  That is correct.
19     Q.  How long did the meeting last?
20     A.  I'm going to say around an hour, if
21  that.  45 minutes.
22     Q.  Under 3, it's 3B, you say "Did not feel
23  she was out of line with reprimand."  What was
24  that in reference to?
25     A.  What Shelly stated was she did not hear

Page 347

1  that the City Administrator was unhappy with my
2  performance, and that she was out of line -- she
3  did not feel she was out of line with the
4  reprimand, and...
5      Q.  And I'm sorry, what reprimand?
6      A.  I believe that reprimand was in regard
7  to the conversation I told you she had with Katie
8  Asbury where she yelled at Katie about her
9  calendar.  I believe that's what that is in
10  response to.
11     Q.  What do you remember about the
12  statement, "Did not hear litigate concern about
13  performance."  Hear, H-E-A-R?
14     A.  You know what, I don't recall.  I don't
15  recall what Shelly was talking about in that.
16     Q.  You don't remember?
17     A.  I don't remember.
18     Q.  Would you agree that the City
19  Administrator, Cheryl Harrison-Lee, had high
20  expectations for her employees?
21     A.  Absolutely.
22     Q.  Would you agree she's intense?
23     A.  Absolutely.
24     Q.  You wrote that Shelly found that the
25  Travis situation changed the relationship between

Page 348

1  you and Cheryl.  Do you remember that
2  conversation with Shelly?
3         MR. HUBBARD:  Object to form.
4      A.  This is Shelly's -- yes, what Shelly
5  said she found.  This is what I heard Shelly tell
6  me.
7      Q.  And again, the Travis situation is in
8  reference to what?
9      A.  A planner and his --
10         MR. HUBBARD:  Object to form.
11  BY MR. NAPOLITANO:
12     Q.  The failure to verify the education
13  credentials?
14     A.  That's correct.
15     Q.  And you would agree, though, that that's
16  when the relationship started to change?
17         MR. HUBBARD:  Object to form.
18  Misstates prior testimony.  You can testify
19  further if you...
20     A.  I don't recall.  I -- yes, and -- yes,
21  ongoing.
22  BY MR. NAPOLITANO:
23     Q.  I'm at the next body of -- the next
24  paragraph I guess, "Councilman Fotovich signed a
25  light on me."  I'm assuming that was meant to be

Page 361

1          MR. HUBBARD:  Object to form.
2  Misstates prior testimony.
3      A.  I said he was forwarding them to Mayor
4  Morrow.
5  BY MR. NAPOLITANO:
6      **Q.  Nevertheless, you didn't bring it up**
7  **during the meeting, the acts of retaliation,**
8  **correct?**
9          MR. HUBBARD:  Objection.  Asked and
10  answered.  Now arguing with the witness again.
11  You can answer if you have anything further to
12  add.
13      A.  I have nothing further.
14  BY MR. NAPOLITANO:
15      **Q.  I'm sorry, that's not the answer to my**
16  **question.  Did you or did you not talk about the**
17  **acts of what you believed to be the acts of**
18  **retaliation during your March 6th meeting with**
19  **Shelly Freeman and Mayor Morrow?**
20      A.  I --
21          MR. HUBBARD:  Objection.  Asked and
22  answered.  Also argumentative.  You can answer
23  again.
24      A.  I did not.
25  BY MR. NAPOLITANO:

Page 362

1      **Q.  Thank you.  Tell me about what you**
2  **remember about the March 12th meeting where the**
3  **special events coordinator position was**
4  **discussed.**
5          MR. HUBBARD:  Object to form.
6      A.  I went in to meet with Mayor Morrow and
7  City Administrator Harrison-Lee, and Mayor Morrow
8  stated that my position was being eliminated as
9  of 3-28.  They presented a Level 4 position to
10  me, a Parks and Recreation special events
11  coordinator, $35,000 less than what I was
12  currently making.  They asked that I make a
13  decision right then or I was told I could take a
14  severance package to be paid out in nine weeks.
15  And I asked for -- I was like, "Can I have more
16  time?"  And they said I needed to make the
17  decision, so I said no.
18      **Q.  The final salary of that position was**
19  **never settled upon, was it, in that meeting?**
20          MR. HUBBARD:  Object to form.
21  Misstates her prior testimony.
22      A.  They presented a position and it was
23  $35,000 less.  It was a Level 4 position.
24  BY MR. NAPOLITANO:
25      **Q.  There are ranges, though, with each**

Page 363

1  level, correct, a minimum and a maximum?
2      A.  There are.
3      **Q.  So my question is:  Was there a specific**
4  **number that you remember?**
5      A.  I believe it was $51,300 or $51,400.
6      **Q.  You also say that you told them that the**
7  **position would negatively impact your KPERS**
8  **retirement by nearly half.  How is that?**
9      A.  When they take your final average
10  salary, the last years I would be working it
11  would be way under where I currently was.
12      **Q.  In your duties as an administrative**
13  **services manager and HR manager before that, were**
14  **you familiar with KPERS?**
15      A.  I was familiar with KPERS.
16      **Q.  What does KPERS stand for?**
17      A.  Kansas Public Employees Retirement
18  System.
19      **Q.  It's your understanding that the KPERS**
20  **benefit is based off your last years of**
21  **employment?**
22      A.  I didn't say last year.  They have a --
23  there's a formula that they use based on final
24  average salaries.
25      **Q.  And what's the final average salary, how**

Page 364

1  do they calculate that?
2      A.  I can't -- I don't know.  I'd have to
3  look it up.  I can't tell you that off --
4      **Q.  Did you run the numbers before you made**
5  **this statement to them in the March 12th meeting?**
6      A.  I had looked at KPERS and had sent an
7  e-mail to them asking what my impact would be,
8  actually that was after the fact, but I did -- I
9  knew it was going to impact it and when I checked
10  with KPERS, it was going to be half.
11      **Q.  Do you still have that documentation?**
12      A.  I don't.
13      **Q.  What did you do with it?**
14      A.  I probably deleted it.  I don't know.  I
15  don't recall.
16      **Q.  Then Councilman Shute's response, he**
17  **writes, "There is significant sentiment on the**
18  **Council in favor of at least tabling the**
19  **discussion on eliminating the Admin Services**
20  **Manager position."  Did I read that correctly?**
21      A.  You did.
22      **Q.  So he didn't say they weren't going to**
23  **not eliminate it, correct?**
24          MR. HUBBARD:  Object to form.
25      A.  He said there's significant sentiment.

Page 365

BY MR. NAPOLITANO:
2   Q.   To tabling it?
3   A.   To tabling it.
4   Q.   Was the only reason that you didn't take
5   the special events coordinator position is
6   because of salary?
7   A.   It was because it wasn't an approved
8   position.  It had never been approved, it wasn't
9   budgeted, it wasn't -- it wasn't approved.  There
10  was no position.  It wasn't in the budget.  I
11  didn't even now how they were going to get this
12  done.  And then the salary was one, to go over to
13  work in Parks and Rec and it would just be
14  setting myself up for Cheryl to start all over on
15  something else against me, so no, it wasn't very
16  interested in that.  I was very disappointed in
17  the findings because I truly anticipated that
18  they would do some corrective action with Cheryl
19  about how she was mistreating employees,
20  including myself, and how she was treating older
21  employees and they completely just ignored that.
22  I was very disappointed in our Mayor and our City
23  as an whole, very disappointed that they didn't
24  address that.
25  Q.   Had the events coordinator position paid

Page 366

1   what you were currently making as administrative
2   services manager, would you have stayed?
3   A.   Absolutely.
4       MR. HUBBARD:  Object to form.  You
5   can answer.
6   A.   Absolutely.
7   BY MR. NAPOLITANO:
8   Q.   Even without any, what you define as
9   corrective action with Cheryl?
10  A.   I would have thought to get that taken
11  care of.  She would have ultimately probably
12  fired me anyway, but I would have taken it.
13  Q.   You didn't have any big objection to the
14  duties of the position, did you?
15      MR. HUBBARD:  Object to form.
16  A.   I really didn't know what they were.  I
17  didn't really know what they were.
18  BY MR. NAPOLITANO:
19  Q.   You had been involved in special events
20  planning, though, for the City in your role as
21  Administrative Services Manager, correct?
22  A.   From a --
23      MR. HUBBARD:  Object to form.
24  A.   Excuse me.  From an administrative side,
25  not from a Parks and Recreation side to do Fourth

Page 367

1   of July events and crafting and baseball, I
2   didn't -- I didn't have any experience in that.  I
3   had done --
4   BY MR. NAPOLITANO:
5   Q.   I mean, would you -- I'm sorry to
6   interrupt you.  Go ahead.
7   A.   Those are completely different jobs.
8   Q.   But you had planned parties for state
9   dignitaries and things like that, correct?
10  A.   I had been, yes, a part of that.
11  Uh-huh.
12  Q.   And were you involved in the Fourth of
13  July events in 2014?
14  A.   No, sir, not involved in any of them.
15  None of the Parks and Rec events.
16  Q.   If you would look at Exhibit 34 again.
17  A.   Do you have --
18      MR. HUBBARD:  Oh.
19      THE WITNESS:  Okay.
20  BY MR. NAPOLITANO:
21  Q.   And this is the Charge of Discrimination
22  you filed, correct?
23  A.   That is correct.
24  Q.   And that's your signature there at the
25  bottom?

Page 368

1   A.   It is.
2   Q.   And you understood that you were signing
3   this under oath?
4   A.   I did.
5   Q.   And the Appendix B that we talked about
6   earlier, the notes that you then gave to Shelly
7   Freeman, you didn't e-mail those to anybody, did
8   you?
9   A.   I don't believe so.
10  Q.   But in your position description, you
11  stated that you did, correct?  Or not in your
12  position description.  In your Charge of
13  Discrimination, you stated you did.
14  A.   Yes, we misstated that and I missed it.
15  I missed it and we have subsequently corrected
16  that.  It was a mistake.
17      MR. NAPOLITANO:  Is there an
18  amended charge, Dirk?
19      MR. HUBBARD:  I think she means
20  corrected it by letting you know.
21      THE WITNESS:  Yeah.
22      MR. HUBBARD:  There's no amended
23  charge.  You knew this before today.  We told you
24  that --
25      THE WITNESS:  Right.

Page 373

1  exchange pleasantries.
2  **Q.  Okay.  Now I know that you just made**
3  **reference to Cheryl being discriminatory, and I**
4  **know that you've said a lot of it is based on her**
5  **body language and stuff that you perceived to be**
6  **discriminatory, but what specific comments have**
7  **you heard from Cheryl that you believe were**
8  **discriminatory against people of higher ages?**
9        MR. HUBBARD:  Object to form.  You
10  may answer.
11     A.  It's what I've stated before, her
12  comment about the farm league, her comment about
13  if people -- it's harder for older people to -- I
14  believe it's older -- for older people to learn,
15  the some of the hiring practices of bringing in
16  younger African American people at higher
17  salaries.  Those are my concerns, sir.
18  BY MR. NAPOLITANO:
19     **Q.  Other than the farm league comment --**
20  **well, I guess let me back up.**
21        **You said something about older people**
22  **have more difficulty learning.  Can you tell me**
23  **about that comment?**
24     A.  She made that comment to me and, you
25  know, it was probably -- it's always around a

Page 374

1  discussion about personnel and hiring and various
2  things and, you know, it's just one of the
3  comments, one of many that she makes.
4     **Q.  What are the others?**
5     A.  I've stated my major concerns already.
6     **Q.  I'm asking for the other comments that**
7  **you just referenced.**
8     A.  About the --
9        MR. HUBBARD:  Objection.  Asked and
10  answered.  You can answer further.
11     A.  Okay.  About the farm league, I've
12  stated also my concern that she made a comment
13  about weight and I felt that was related directly
14  to me as well.  So those are the kind of things.
15  BY MR. NAPOLITANO:
16     **Q.  So aside from the weight with respect to**
17  **age, there were the two comments.  The farm**
18  **league comment and then the comment about being**
19  **difficult for older people to learn?**
20     A.  Yes, sir.
21     **Q.  What about comments that you heard**
22  **Cheryl say that you interpreted to be**
23  **discriminatory based on race?**
24        MR. HUBBARD:  Object to form.  You
25  can answer.

Page 375

1     A.  Excuse me.  Those are in regard to her
2  hiring practices with the engineer, the executive
3  assistant and the communication manager.
4  BY MR. NAPOLITANO:
5     **Q.  So no comments, just the hiring**
6  **practice?**
7     A.  The hiring practice.
8        MR. HUBBARD:  Same objection.
9  Object to form.
10     A.  And the farm league to me is also
11  racially, I consider that racially motivated as
12  well.
13  BY MR. NAPOLITANO:
14     **Q.  Why?**
15     A.  You know, the farm league --
16        MR. HUBBARD:  Objection.  Asked and
17  answered.  You can answer again.
18     A.  I believe that she is talking about
19  lower, lower level, lower educated white versus
20  black.  I believe it's racially motivated and the
21  way she would in her demeanor that's how she
22  meant it.
23  BY MR. NAPOLITANO:
24     **Q.  In your opinion?**
25     A.  Absolutely in my opinion.

Page 376

1     **Q.  But you don't know?**
2     A.  That's what you're asking me.
3     **Q.  Right.  But you stated as though you**
4  **know that that's what she meant when you're**
5  **speculating as to what she meant, correct?**
6        MR. HUBBARD:  Object to form.  Now
7  you're arguing with the witness.
8     A.  I don't --
9        MR. HUBBARD:  You can answer if you
10  can.
11     A.  I've stated what I think.
12  BY MR. NAPOLITANO:
13     **Q.  Right.  But again I think you had said**
14  **earlier that you're not in her mind, right?**
15        MR. HUBBARD:  Same objection.
16  Argumentative.  Object to the form.
17     A.  I did state that.
18        MR. HUBBARD:  Asked and answered.
19     A.  I did.
20  BY MR. NAPOLITANO:
21     **Q.  You said engineer executive assistant**
22  **and somebody else?**
23     A.  The communication PIO manager.
24     **Q.  And when you say "executive assistant,"**
25  **you're referring to Ann Forrester?**

Page 381

1  some point in time had coffee with Kristy
2  Harrison, correct?
3      A.  Prior to my complaint?
4      Q.  Yes.
5      A.  Yes.
6      Q.  Do you remember when that was?
7      A.  I don't.
8          (Deposition Exhibit Number 48 was marked
9  for identification.)
10 BY MR. NAPOLITANO:
11     Q.  I'm handing you what I've marked as
12 Exhibit 48.  What is this?
13     A.  This is an e-mail from Kristy to me at
14 9:39 on November the 16th asking if still want to
15 meet for coffee or lunch, she could do lunch or
16 coffee Tuesday, Wednesday.  It looks like we had
17 coffee on Wednesday.
18     Q.  And so that would have been the 19th,
19 November 19th?
20     A.  I believe so, sir.
21     Q.  And is that to the best of your
22 recollection, is that the meeting you were
23 referring to earlier?
24     A.  I met with Kristy from time to time
25 previous, we had coffee just kind of friends, so

Page 382

1  I can't tell you specifically this was the one
2  that we talked about, about Cheryl, but I know it
3  was -- this could have been it.  I just can't
4  confirm that.
5      Q.  And based on the e-mail that she had
6  sent to you, it sounds like you had previously
7  asked to have coffee or lunch; is that true?
8      A.  Sure.  Sure, yeah.
9      Q.  And do you remember where you had
10 coffee?
11     A.  I think it was at Perkin's.
12     Q.  Did you talk about the HR supervisor
13 position?
14     A.  I don't recall.
15     Q.  Did you tell her about the Travis Hulse
16 issue?
17     A.  I don't believe so.
18     Q.  What did you tell her?
19     A.  I mean, as I stated earlier -- are you
20 talking about this particular conversation or...
21     Q.  Yeah, I'm sorry.  I'll be more clear.
22 At Perkin's on or around November 19th, if that's
23 the meeting where you talked to Kristy about
24 Cheryl, did you just tell her that she had been
25 treating you differently, or what was the

Page 383

1  substance?
2          MR. HUBBARD:  Object to form.
3      A.  I mean, I -- I talked about that
4  earlier, but it was concerns about Cheryl and her
5  interactions and behavior toward myself and
6  others, and that I was seeking -- I was seeking
7  guidance and advice to try to figure out how to
8  help her.  That was -- that was basically the
9  conversation.
10         (Deposition Exhibit Number 49 was marked
11 for identification.)
12 BY MR. NAPOLITANO:
13     Q.  I'm handing you what I've marked as
14 Exhibit 49.  This is something that you've
15 produced.
16     A.  Uh-huh.
17     Q.  And correct me if I'm wrong, it appears
18 to be your calendar printed off going back to
19 September of 2014 through January 24th of 2015?
20     A.  That's correct.
21     Q.  And down at the bottom it looks like you
22 printed it on January 22nd, 2015 at 5:38 p.m.; is
23 that right?
24     A.  That's correct.
25     Q.  Why did you print all of these off?

Page 384

1      A.  I don't recall.
2      Q.  Is that something you would do normally?
3      A.  No, I mean, I can make a speculation
4  based on what was going on in my -- the way
5  Cheryl was treating me that I probably just
6  printed them off so I would have them.  I also
7  had a file in my office of calendars, we -- we
8  would print them, my assistant would print them
9  weekly and we put them in there, so I can't tell
10 you why I printed them.  I don't recall.
11     Q.  Well, you said you could speculate.
12 That were you thinking about?
13     A.  Speculating just based on the way Cheryl
14 was treating me, that I probably just printed
15 them off to have on what was I doing, what were
16 my job duties, where are the projects, it -- who
17 knows.
18     Q.  Something to present to Cheryl?
19     A.  No, for my records.  I don't think I
20 would have presented this to Cheryl.  She had
21 access to my calendar so I wouldn't print them
22 for her.
23     Q.  I just had it.  Where did it go.  I
24 think last time we talked about your various
25 contacts at the various insurance companies that

Page 389

1  talking to you?
2      A.   Well, in November it was a little
3  different than after I filed my complaint, so my
4  concern with Kristy was the treatment of myself
5  and others and her behavior and -- and it was
6  truly what can I do to help her?  How can we help
7  this?  How can we address it and make it better?
8  It wasn't -- and I told her at the beginning,
9  this is not to bash Cheryl, this was how can we
10  help.
11      Q.   But did you tell Kristy -- is it
12  Kristina or Kristy?
13      A.   Well, it's Kristina but she goes by
14  Kristy, yeah.
15      Q.   Did you tell Kristy that tasks and
16  duties were being taken away from you?
17      A.   I don't recall if I did.
18      Q.   Did you tell her that Cheryl was
19  starting to rely on others?
20          MR. HUBBARD:  Same objection.
21  Object to form.
22      A.   I don't recall that I did.
23  BY MR. NAPOLITANO:
24      Q.   Did you tell anybody that you thought
25  Cheryl was mad at you regarding the Travis Hulse

Page 390

1  issue?
2          MR. HUBBARD:  Object to form.
3      A.   Probably Lisa, Lisa, I probably would
4  have told her, make sure I was pretty upset over
5  that and we -- yeah, I probably did.
6  BY MR. NAPOLITANO:
7      Q.   Anybody else?
8      A.   I don't -- I don't think so.
9          I probably need to correct that because
10  Brian Faust was aware that Cheryl was upset about
11  it.  He was the director so he would have been
12  aware of the situation.  I don't know that -- I
13  don't think I talked to him about it, but he was
14  aware.
15      Q.   Thank you for that correction.
16      A.   I apologize.
17      Q.   Okay.  Since you left the employment
18  with the City of Gardner, where have you worked?
19      A.   I worked -- I worked for the City of
20  Ottawa just for a few weeks when their -- while
21  their director was coming on board, they had an
22  opening and when my job opened, Richard Nienstedt
23  contacted me to see if I would be interested in
24  being their interim HR director.  I worked with
25  them a few weeks, not very many, three maybe.

Page 391

1  And I worked part-time for Oakbrook Animal
2  Hospital, and I worked part-time for Fire
3  District 1 of Johnson County, and then
4  consequently have gone on full-time with them.
5      Q.   Okay.  How long did you say you worked
6  for Ottawa?
7      A.   A couple, two or three weeks.  It wasn't
8  very long.
9      Q.   And then you started working for the
10  Fire District?
11      A.   No.  Then I worked for Oakbrook Animal
12  Hospital part-time, and then I went to the Fire
13  District last year working part-time and then
14  full-time as of January of this year.
15      Q.   Okay.
16          (Deposition Exhibit Number 51 was marked
17  for identification.)
18  BY MR. NAPOLITANO:
19      Q.   I'm handing you what I've marked Exhibit
20  51.  Is this your W-2 from the Fire District for
21  2016?
22      A.   It is.
23      Q.   And it shows you earned $17,670?
24      A.   It does.
25      Q.   And then if you flip to the next page,

Page 392

1  it looks like another W-2 from Oakbrook Animal
2  Hospital?
3      A.   That's correct.
4      Q.   And it shows you earned $1,377.10 from
5  Oakbrook Animal Hospital in 2016?
6      A.   That's correct.
7      Q.   That's an accurate copy of your W-2?
8      A.   It is.
9      Q.   Okay.  Thank you.
10          MR. NAPOLITANO:  Dirk, did you
11  produce the 2015 ones?
12          MR. HUBBARD:  Yes.  Subsequently I
13  don't think I have them Bates numbered yet.
14          MR. NAPOLITANO:  Maybe that's why
15  they didn't make it to the file yet.
16          MR. HUBBARD:  I can print them off.
17          MR. NAPOLITANO:  Are we going to
18  have any issues to stipulating to the
19  authenticity of those?
20          MR. HUBBARD:  No, I will stipulate
21  to their authenticity for sure.  But that's what
22  happened.  I did not get that one Bates numbered.
23  I noticed that one was missing and we produced it
24  like two weeks later.
25          MR. NAPOLITANO:  Okay.