CHERYL HARRISON-LEE  5/4/2017

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS
 2
    MARY BETH BUSH,              )
 3                              )
    Plaintiff,                   )       Case No.
 4                              )    16-2675-JWL-GEB
        vs.                      )
 5                              )
    CITY OF GARDNER, KANSAS,     )
 6                              )
    Defendant.                   )
 7

 8

 9

10

11    VIDEOTAPED DEPOSITION OF CHERYL HARRISON-LEE
12          TAKEN ON BEHALF OF PLAINTIFF
13                  MAY 4, 2017
14               9:35 TO 2:56
15    Maria L. Taylor, CCR, CSR, RPR, MO Notary Public
16

17

18

19

20

21
22                          Summary Judgment Exhibit
23
24                              8
25
```

CHERYL HARRISON-LEE  5/4/2017

Page 2

```
 1                        INDEX
 2   WITNESS:                              PAGE
 3   CHERYL HARRISON-LEE
 4     EXAMINATION BY MR. HUBBARD                8
 5
 6
                  PREVIOUSLY MARKED EXHIBITS
 7
     EXHIBIT
 8   NUMBER            DESCRIPTION           PAGE
 9
     Exhibit 101    January 26, 2015, letter to    100
10                  Mary Bush
11   Exhibit 102    Information regarding Ms.       75
                    Bush's employment
12
     Exhibit 103    Information regarding Ms.       76
13                  Bush's employment
14   Exhibit 104    Position description for the    77
                    human resources manager
15
     Exhibit 105    2006 review                     77
16
     Exhibits       Exhibits pertaining to Mary     79
17   106-110        Bush
18   Exhibit 112    Position description for the     80
                    administrative services
19                  manager
20   Exhibit 114    2013 evaluation for Mary Bush   80
21   Exhibit 115    2013 performance appraisal      82
22   Exhibit 120    Policy                          98
23   Exhibit 121    Second copy of Exhibit 120      98
                    policy
24
     Exhibit 123    Performance evaluation on       22
25                  your performance
```

Page 3

```
 1            PREVIOUSLY MARKED EXHIBITS (cont.)
 2    EXHIBIT
      NUMBER            DESCRIPTION              PAGE
 3
      Exhibit 124   Combined review from all       27
 4                  council members
 5    Exhibit 125   2015 performance review done   38
                    by Councilwoman Harrison
 6
      Exhibit 126   2016 review done by            41
 7                  Councilman Winters
 8    Exhibit 127   Lee Moore's Facebook page      48
 9    Exhibit 128   Council's vote to vacate the   56
                    written reprimand
10
11                       EXHIBITS
12    EXHIBIT
      NUMBER            DESCRIPTION              PAGE
13
      Exhibit 157   Excerpts from the City's      130
14                  budget for 2014-2015
15    Exhibit 158   Revised organizational charts 133
16    Exhibit 159   City of Gardner               138
                    Organizational Charts
17                  effective December 31, 2015
18    Exhibit 161   Job description for the       145
                    administrative services
19                  manager position
20    Exhibit 163   First written document        147
                    regarding the position
21                  elimination
22    Exhibit 167   Document regarding salary     153
23    Exhibit 168   E-mail from Jeff Stewart to   165
                    Ms. Harrison-Lee
24
      Exhibit 173   Special events coordinator    164
25                  job description
```

Page 4

```
 1                      EXHIBITS (cont.)
 2    EXHIBIT
      NUMBER            DESCRIPTION              PAGE
 3
      Exhibit 174    Policy and procedures        159
 4
      Exhibit 175    Policies and procedures in a 159
 5                   different format
 6    Exhibit 176    Responses to the             116
                     interrogatories
 7
      Exhibit 180    Copy of Ms. Harrison-Lee's    63
 8                   resume
 9    Exhibit 182    2017 Council Meeting Agenda   58
10    Exhibit 183    Agenda briefings             123
11    Exhibit 184    Agenda council briefing      128
12    Exhibit 185    First supplement             173
                     interrogatory responses
13
      Exhibit 186    Second supplemental          174
14                   interrogatories
15
16
17    NOTE:  Exhibits were attached to the original
      transcript.  Previously marked exhibits were not
18    attached.
19
20
21
22
23
24
25
```

CHERYL HARRISON-LEE  5/4/2017

Page 14

1          Q.    **Where?**

2          A.    In Gardner as well, just a previous house.

3          Q.    **So sometime prior to living on the Dogwood**

4    **Street, you previously rented another place in**

5    **Gardner?**

6          A.    Another house, yes.

7          Q.    **Have you ever rented any other place in the**

8    **Kansas City area?**

9          A.    Oh, no.

10         Q.    **And have you owned any other place in the**

11   **Kansas City area?**

12         A.    No.

13         Q.    **Do you drive your son all the way to**

14   **Barstow to school in the morning?**

15         A.    Sometimes.

16         Q.    **I guess he's old enough to drive himself to**

17   **school; correct?  Is that right, he drives himself**

18   **sometimes?**

19         A.    No.

20         Q.    **No?  Not doing that yet?  Sometimes that's**

21   **a relief, sometimes that's a terror.**

22               **When did you become city administrator for**

23   **the City of Gardner?**

24         A.    In July of 2012.

25         Q.    **And where did you come from prior to being**

Page 27

1   discussion.  It had to do with what streets would be

2   truck routes, but I don't recall the detail.

3          Q.   **You can set that exhibit aside.**

4          A.   Okay.

5          Q.   **I'm going to hand you what I've marked as**

6   **Exhibit 124.**

7               THE COURT REPORTER:  And ma'am, I would

8   just ask that you speak up for me, please.

9               THE WITNESS:  Okay.

10      (Exhibit 124 was previously marked for

11   identification.)

12         Q.   **(By Mr. Hubbard)  Once the various council**

13   **members have done their independent evaluations, are**

14   **all of the comments and ratings collected together on**

15   **a review such as Exhibit 124?**

16         A.   Yes.

17         Q.   **And is Exhibit 124 your combined review**

18   **from all council members and the mayor for the year**

19   **2014?**

20         A.   Correct.

21         Q.   **And did you read all the comments and**

22   **ratings in this review when it was provided to you?**

23         A.   Yes.

24         Q.   **And did you provide any written response or**

25   **rebuttal to any of the comments or ratings in this**

Page 28

1   review?

2        A.   No.

3        Q.   Do you recall providing any oral response

4   to any of the ratings or comments in this review?

5        A.   Yes.

6        Q.   What do you recall providing as an oral

7   response to something that was in this Exhibit 124

8   review?

9        A.   Just general comments about how to move

10  forward with some of the budget components, the agenda

11  preparation as it relates and briefing with council

12  members.  More process and organizational activities

13  that we would take forward.

14       Q.   And what were the setting -- what was the

15  setting for those discussions?

16       A.   It would be executive session.

17       Q.   And do you recall if that would have been

18  shortly after you received this review or do you know

19  the time period for those discussions?

20       A.   It would have been shortly after.

21       Q.   If you turn to page 6 which is the review

22  on Exhibit 124?

23       A.   Uh-huh.

24       Q.   Under the Planning Organization and

25  Execution of Work Product, Councilman Freeman has some

Page 29

1    comments that we haven't looked at.

2            Who is Councilman Freeman?  What is that

3    person's first name?

4        A.   Heath.

5        Q.   Heath?

6            Okay.  Mr. Freeman in his comments notes,

7    starting with that second sentence, Continued focus

8    needs to be placed on ensuring that not only the

9    management team but members of the representative

10   departments understand the value they provide during

11   the process and are recognized for their efforts.

12           Did I read that correctly?

13       A.   Correct.

14       Q.   Do you recall being -- receiving this?

15   Reading this comment?

16       A.   Yes.

17       Q.   And do you know what Councilman Freeman is

18   discussing with regard to the need to show employees

19   of their value?

20           MR. GIST:  Object to the question to the

21   extent it calls for speculation.

22       A.   I don't recall.

23       Q.   (By Mr. Hubbard)  Councilman Freeman

24   continues, It is important that all members of the

25   city staff feel as though the work efforts are

Page 106

1        A.    Well, in addition to Shelly and the mayor

2   talking -- the mayor and I talked with Mary as well

3   and talked about the position.

4        Q.    **When did you and the mayor talk to Mary**

5   **Bush?  Before or after Shelly and the mayor?**

6        A.    I think it was after.

7        Q.    **So you weren't there when Mary Bush was**

8   **first informed that her position was being eliminated;**

9   **correct?**

10       A.    I wasn't in the meeting with the mayor and

11  Shelly, so I don't want to provide testimony of what

12  took place in that meeting.

13       Q.    **By the time you met with Mary Bush with the**

14  **mayor, Mary Bush already knew and had been informed**

15  **that her position was being eliminated; correct?**

16       A.    Yes.

17       Q.    **And is it your testimony that Shelly**

18  **Freeman and the mayor did not inform you in your**

19  **meeting on March 6th that they were going to tell Mary**

20  **that her position was being eliminated?**

21       A.    No.  We talked -- I knew that her position

22  was being eliminated because March was not the first

23  time we talked about -- that the mayor and I talked

24  about that position.

25       Q.    **During the time period after Mary Bush's**

Page 112

1   services manager position?

2       A.   No.

3       Q.   Did you make any documentation of your

4   meetings with anyone prior to January of 2015 with

5   regard to your proposal to eliminate the

6   administrative services manager position?

7       A.   I did not.

8       Q.   Now, you made this decision in June of

9   2016, didn't you?

10           MR. GIST:  Object to the form of the

11   question.

12       Q.   (By Mr. Hubbard)  Is that accurate?

13           MR. GIST:  In June of 2016?

14       Q.   (By Mr. Hubbard)  Oh, sorry.

15       A.   June of 2016?  That's not accurate.

16       Q.   You made the decision in June of 2014 to

17   eliminate the administrative services manager;

18   correct?

19       A.   June of '14?  Let me think.

20           June of '14 was a time when it was really

21   -- it was brought to my attention that it was going to

22   be very difficult to not have someone that -- in that

23   position that had a better understanding of the HR

24   tasks.

25       Q.   Who brought that to your attention?

Page 113

1          A.    Well, it was actually brought to my

2    attention before there was some concerns raised about

3    some of the activities.  It really became very, very

4    apparent to me while I was attending the SHRM

5    conference.

6          **Q.    So you decided at a conference in June of**

7    **2014 to eliminate the administrative services manager**

8    **position based on your interaction with Mary Bush?**

9          A.    No.

10          MR. GIST:  Objection.  It's been asked and

11   answered.  Misstates testimony.

12          **Q.    (By Mr. Hubbard)  Please tell me I'm how**

13   **I'm incorrect.**

14          MR. GIST:  Can I get my objection out

15   before you ask your next question, please?

16          MR. HUBBARD:  I apologize.

17          MR. GIST:  Objection to the form of the

18   question, assumes facts, and argumentative.

19          If you remember the question --

20          A.    I don't.  What is your question?

21          MR. HUBBARD:  Can you read it back, please?

22          (WHEREIN, the requested portion of the

23   record was read by the Court Reporter.)

24          A.    No.

25          **Q.    (By Mr. Hubbard)  What is it that you**

Page 114

1   decided based on the conference in 2014?

2        A.   I decided the magnitude of the scope of

3   task we needed to have occurring in human resources

4   and that we not -- we didn't have those tasks

5   occurring.

6        Q.   And you did nothing to look back at the

7   past history of Mary Bush as HR manager; correct?

8        A.   No.  I was looking at the current lack of

9   task that needed to be occurring based on the some of

10  the emerging trends in HR that I was exposed to.

11       Q.   Did you document any of this, ma'am?

12       A.   No.

13       Q.   Didn't think so.  Let me hand you what

14  Exhibit --

15            MR. GIST:  Objection.  Move to strike.

16  Counsel's comment, I don't know if that got caught on

17  the record, "I didn't think so" is completely

18  inappropriate.

19       Q.   (By Mr. Hubbard)  I thought you said you

20  didn't document any of this.  Did you document

21  anything with regard to your decision to eliminate the

22  administrative services manager position?

23            MR. GIST:  I'm referring to your comment

24  afterward, "I didn't think so."  That's completely

25  inappropriate.  If you're going to be doing that kind

Page 115

1   of stuff, we're going to have a real problem.  I don't

2   know why on earth you'd do something like that.

3           MR. HUBBARD:  It was just confirming what

4   her prior testimony -- You're the one that's creating

5   a problem right now, Matt.

6           MR. GIST:  No.  You're commenting on the

7   witness's testimony "I didn't think so."  That's

8   inappropriate and you know it.

9           MR. HUBBARD:  It's a comment based upon

10  what her evidence was.

11          MR. GIST:  You're here to ask questions of

12  the witness.  Not to comment on her testimony saying I

13  don't think so.  That's inappropriate.

14          MR. HUBBARD:  I don't appreciate you

15  raising your voice in this matter.

16          MR. GIST:  Well, I don't appreciate the way

17  you're treating the witness.  And you're trying to

18  weasel out of it by saying, yeah, I was just --

19          MR. HUBBARD:  You've called me a weasel.

20  Now I think we've had enough.  Let's move on with the

21  deposition, Counsel.

22          MR. GIST:  You better cut it out.

23          MR. HUBBARD:  Don't point at me and don't

24  threaten me, Counsel.  You don't need to do that.

25          MR. GIST:  How did I threaten you?

Page 118

1          Q.    -- and decided she would work to proceed

2    with the elimination in latter part of June of 2014.

3               Did I read that correctly?

4          A.    Correct.

5          Q.    Is that accurate?

6          A.    Yes.

7          Q.    So from June of 2014 on, Mary Bush's

8    position as administrative services manager, a

9    decision had been made to eliminate that position;

10   correct?

11         A.    Correct.

12         Q.    You did not inform Mary Bush of this in

13   June of 2014, did you?

14         A.    No.

15         Q.    Did you inform Mary Bush of this at any

16   time in 2014?

17         A.    I did not.

18         Q.    Was the first time Mary Bush was informed

19   of this in March of 2015?

20              MR. GIST:  Objection.  It calls for

21   speculation.

22              You can answer.

23         A.    Can you repeat your question?

24         Q.    (By Mr. Hubbard)  Was the first time Mary

25   Bush was informed that the position of administrative

Page 136

1    please?

2         Q.    These thoughts that you claim to have had

3    in June of 2014 about eliminating the administrative

4    services manager position --

5         A.    Right.

6         Q.    -- when is the first time you contend you

7    communicated those thoughts to someone else?

8         A.    It would have been -- I don't remember the

9    exact time frame, but as we were developing the

10   budget, we -- there was some discussion about what the

11   position really needed to be, whether it needed to be

12   a supervisor or whether it needed to be a new position

13   that would be a director.  So there are conversations

14   about what the position should be.

15        Q.    With whom?

16        A.    I had that conversation with councilman

17   Fotovich.

18        Q.    Anyone else?

19        A.    Had that conversation with the mayor.

20        Q.    Anyone else?

21        A.    And then we had that conversation with

22   Kristy Harrison.

23        Q.    And I'm talking about prior to August of

24   2014.  So you're contending you talked with all three

25   of those --

Page 157

1    and responses?

2          A.    Yes.

3          Q.    And then did you provide the supplement

4    answer that's listed on page 2 of the first supplement

5    answer?

6          A.    Yes.

7          Q.    And does that note that the salary range

8    for the special events coordinator position was 40,260

9    to 58,542 as proposed on March 16, 2015?

10         A.    Yes, that's what it says.

11         Q.    And then notes that when the position was

12   eventually created and filled, the high end of the

13   salary was 61,607; correct?

14         A.    Correct.

15         Q.    And when was that position eventually

16   created and filled?

17         A.    Don't know the start date of the incumbent.

18         Q.    Do you know roughly the time period?

19         A.    I don't.

20         Q.    Was it in 2015?

21         A.    Yes, but I don't know when.

22         Q.    Latter part of 2015?

23         A.    I don't recall.

24         Q.    Do you know why if you'd done a pay and

25   compensation study for the pay range that the salary

Page 158

1  range when actually filled went up?

2       A.   I don't -- I don't recall what -- what was

3  shown for the pay and compensation.  I don't remember.

4       Q.   Why was Mary Bush only offered 51,395 if

5  the salary ended up being 61,000-plus?

6       A.   Well, this number may have been -- I don't

7  recall.  I don't recall.  So I don't want to

8  speculate.

9       Q.   Your e-mail says 51,395 is the special

10 events coordinator salary; correct?

11      A.   Correct.

12      Q.   Were you inaccurate in this e-mail?

13      A.   I don't know where that -- when this was

14 done what transpired from this time frame to the time

15 we actually hired the -- so I don't want to speculate.

16      Q.   I'm asking about the March 16th date which

17 is the date --

18      A.   Right.

19      Q.   -- Mary Beth's position was eliminated;

20 right?

21      A.   Right.

22      Q.   And as of that date, were you accurate that

23 the salary for the position was going to be 51,395?

24      A.   I believe I was.

25      Q.   Did you look to any guidelines as to what

Page 159

1    the salary should have been for a person who is having

2    their position eliminated?

3         A.   No, I got asked that position -- I spoke

4    with the pay and comp consultant to find out the pay

5    grade for the position.

6         Q.   Are you aware of any guidelines as to

7    operation of employment at the City of Gardner?

8         A.   Yes.

9         Q.   Are those embodied in the policies and

10   procedures of the City of Gardner?

11        A.   Yes.

12        (Exhibit 174 was marked for identification.)

13        (Exhibit 175 was marked for identification.)

14        Q.   I'll hand you what I'll mark as

15   Exhibit 174.

16        A.   Okay.

17        Q.   And also 175.

18             Again, I believe those are the same policy

19   and procedures again, just under different formats.

20        A.   Uh-huh.

21        Q.   Do you see on both Exhibit 174 and 175 a

22   heading reduction in force that's listed as 9-102?

23        A.   Right.

24        Q.   And would those be the guidelines to follow

25   when there's a reduction in force?

1        A.    Right.

2        Q.    And yet, we know from the form you

3   submitted that the special events coordinator position

4   had a pay range that went up to 48,071; is that right?

5        A.    Correct.

6        Q.    If 48,071 times 12 is 58,452, Mary Bush was

7   supposed to be offered 15 percent higher to that,

8   right, according to these policies and procedures?

9        A.    Which we never finalized that because Mary

10  told us in the meeting that she was not going to be

11  taking the special events coordinator position and --

12  because that didn't work for her so we never had a

13  chance to finish the discussions about that position.

14       Q.    Mary Bush informed you and the City --

15       A.    And the mayor.

16       Q.    -- that it was because of the pay that she

17  could not take the position; correct?

18       A.    Right.  Because we didn't finish the

19  discussion on it.

20       Q.    Had you ever told her the pay would be

21  higher than 51,395?

22       A.    Don't recall what we said the pay -- the

23  exact pay would be.

24       Q.    Do you have any reason to think you said a

25  different number than you told the city council on

Page 176

1    Administrator Harrison-Lee believed to be a base-level

2    of understanding of human resource and IT practices

3    and procedures.

4              Did I read that correctly?

5        A.   Yes.

6        Q.   Did you ever articulate that to Mary Bush?

7        A.   Yes.

8        Q.   When?

9        A.   When we had the incident of the failure to

10   check education of the technician, I explained that's

11   kind of a basic function of HR, confirming education

12   and degree requirements.

13       Q.   And did you understand Mary Bush understood

14   the need to do that but something just happened on

15   that particular time that the verification slipped

16   through the cracks?

17       A.   I don't want to speculate on what she

18   thought.

19       Q.   Well, you found that they had, in fact,

20   done employment verifications on many, many potential

21   employees; correct?

22             MR. GIST:  Objection.

23       A.   What?

24       Q.   (By Mr. Hubbard)  You did a review

25   afterwards to see which situations in the past there

Page 177

1  had or had not been employment -- or education

2  verification done; correct?

3       A.   Yes.

4       Q.   And you found that some had been done and

5  some had not; correct?

6       A.   I found -- I only looked back to the time

7  frame that I started and I found they weren't done,

8  that only one was done.

9       Q.   All right.  Did you document any of that

10 review?

11      A.   No.  All the documents was still in the HR

12 file of what was done.  It was easily -- the

13 documentation was easy to obtain.

14      Q.   And which one do you contend or do you know

15 which person there was a background check done and

16 which one there wasn't?

17      A.   There was a background -- right, the only

18 one I found when I looked in the file was the one for

19 the city administrator position.

20      Q.   And you don't -- you looked in the files

21 yourself to find them?

22      A.   I had Lisa pull the files for me.

23      Q.   And did you ask Lisa whether or not there'd

24 be another location that would memorialize --

25      A.   I did.

Page 185

1    conduct a compensation study.

2              When do you contend that this was a

3    performance issue for Mary Bush?

4        A.   Don't remember the exact date.

5        Q.   What is it you contend Mary Bush did

6    erroneously with regard to the compensation study?

7        A.   The compensation study included

8    recommendations for salaries that were well beyond

9    what would be appropriate salaries for the City of

10   Gardner.

11       Q.   And did you ask Mary about that?

12       A.   We talked about the salaries and the --

13   where she, you know, got that information.  And then I

14   told her that I was not going to be making that

15   recommendation to the council because I wasn't

16   comfortable with it.  And so we didn't move forward

17   with those recommendations.

18       Q.   Did you document any of this?

19       A.   No.

20       Q.   Do you know even what month or year this

21   occurred in?

22       A.   This would have occurred -- I don't

23   remember, but I -- I do have -- I mean, the material

24   that was provided from her with the recommendations of

25   the salary.

Page 188

1        **Q.   Did you ever ask Mary Bush why the**

2   **communities that were used on the pay study were**

3   **selected?**

4        A.   No.  We talked about using cities of

5   growth, using cities that had similar trends, but I

6   didn't go back to look at the 10-year-old pay and comp

7   study to see what cities were used, it was kind of

8   dated.  Or even the previous reviews, pay reviews, a

9   ten-year gap is a time to really take a complete look.

10       **Q.   I guess my question maybe wasn't very**

11  **clear.**

12            **You say Mary Bush failed to appropriately**

13  **conduct a compensation study; correct?**

14       A.   Correct.

15       **Q.   And you say you're critical of the cities**

16  **she used as comparables?**

17       A.   I said I was critical of the recommended

18  salaries.  They were way out of line for what the City

19  of Gardner would pay.

20       **Q.   But you say that was based on the**

21  **communities used; right?**

22       A.   Well, based on -- right.  The communities

23  that she would have used would have had salaries that

24  were well beyond what we would have paid.

25       **Q.   And did you ever discuss with her why the**