**CHRISTOPHER ALAN MORROW   4/26/2017**

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS
 2
     MARY BETH BUSH,            )
 3                              )
     Plaintiff,                 )      Case No.
 4                              )    16-2675-JWL-GEB
          vs.                   )
 5                              )
     CITY OF GARDNER, KANSAS,   )
 6                              )
     Defendant.                 )
 7
 8
 9
10
11   VIDEOTAPED DEPOSITION OF CHRISTOPHER ALAN MORROW
12            TAKEN ON BEHALF OF PLAINTIFF
13                   APRIL 26, 2017
14                   9:27 TO 1:53
15   Maria L. Taylor, CCR, CSR, RPR, MO Notary Public
16
17
18
19
20
21
22
23
24
25
```

Summary Judgment Exhibit

**9**

Ensz & Jester, P.C.

**CHRISTOPHER ALAN MORROW   4/26/2017**

Page 2

```
 1                        INDEX
 2   WITNESS:                                     PAGE
 3   CHRISTOPHER ALAN MORROW
 4     EXAMINATION BY MR. HUBBARD                   9
 5
 6
                          EXHIBITS
 7
     EXHIBIT
 8   NUMBER          DESCRIPTION                  PAGE
 9   Exhibit 101   E-mail from Mayor Morrow         12
10   Exhibit 102   Payroll change form              22
11   Exhibit 103   Letter from Ms. Mundt sent on    22
                   behalf of the City to Mary
12                 Bush
13   Exhibit 104   City of Gardner position         24
                   description for the human
14                 resources manager
15   Exhibit 105   City of Gardner, Kansas          26
                   performance evaluation
16
     Exhibit 106   City of Gardner, Kansas,         31
17                 performance evaluation for
                   Mary Beth Bush for the time
18                 period October 2006 to
                   April 2007
19
     Exhibit 107   Mary Bush's City of Gardner,     33
20                 Kansas, performance evaluation
                   for the time period April 2008
21                 to April 2009
22   Exhibit 108   City of Gardner, Kansas          39
                   performance evaluation
23
     Exhibit 109   City of Gardner performance      42
24                 review for Mary Bush for the
                   time period November 2009 to
25                 November 2010
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**CHRISTOPHER ALAN MORROW   4/26/2017**

Page 3

| | | | |
|---|---|---|---|
| 1 | Exhibit 110 | City of Gardner, Kansas, performance evaluation for Mary Bush for the November 2010 to November 2011 time period | 45 |
| 4 | Exhibit 111 | Payroll change notice reflecting Mary Bush's promotion from human resource manager to administrative services manager on January 21, 2013 | 46 |
| 7 | Exhibit 112 | Administrative services manager position description at the City of Gardner | 47 |
| 9 | Exhibit 113 | Pay increase document for Mary Bush | 49 |
| 11 | Exhibit 114 | Pay increase information for Mary Bush | 51 |
| 12 | Exhibit 115 | City of Gardner, Kansas, performance appraisal form for Mary Bush that lists 2013 as the review period | 52 |
| 15 | Exhibit 116 | Unidentified document | 57 |
| 16 | Exhibit 117 | E-mail from Cheryl Harrison-Lee to Mary Bush and others | 57 |
| 18 | Exhibit 118 | Certificate of appreciation for safety awards | 58 |
| 19 | Exhibit 119 | Recognition of contribution to interdepartmental safety committee | 58 |
| 21 | Exhibit 120 | City of Gardner, Kansas, Personnel Policies | 60 |
| 23 | Exhibit 121 | City of Gardner, Kansas, Personnel Policies | 61 |
| 24 | Exhibit 122 | Salary increase document | 82 |

| | | | |
|---|---|---|---|
| 1 | Exhibit 123 | Review of City Administrator Cheryl Harrison-Lee for the 2014 time period | 84 |
| 2 | | | |
| 3 | Exhibit 124 | Combined review ratings and comments of Mayor Morrow and council members or Cheryl Harrison-Lee for the evaluation period of 2014 | 88 |
| 4 | | | |
| 5 | | | |
| 6 | Exhibit 125 | Kristina Harrison's review of City Administrator Cheryl Harrison-Lee's performance of 2015 | 94 |
| 7 | | | |
| 8 | | | |
| 9 | Exhibit 126 | Performance review done by Councilman Todd Winters with regard to City Administrator Cheryl Harrison-Lee | 96 |
| 10 | | | |
| 11 | Exhibit 127 | E-mail forwarding a post from Lee Moore's Facebook page | 100 |
| 12 | | | |
| 13 | Exhibit 128 | Post from Councilman Moore | 107 |
| 14 | Exhibit 129 | E-mail from Mayor Morrow to Mary Bush | 134 |
| 15 | Exhibit 130 | Memo sent to Mary Bush on January 27th | 136 |
| 16 | | | |
| 17 | Exhibit 131 | E-mail from Shelly Freeman to Mayor Morrow | 146 |
| 18 | Exhibit 132 | E-mail from Shelly Freeman to Mayor Morrow | 148 |
| 19 | | | |
| 20 | Exhibit 133 | complaint of discrimination sent to Ms. Freeman | 149 |
| 21 | Exhibit 134 | E-mail forwarded to the investigator | 151 |
| 22 | | | |
| 23 | Exhibit 135 | January 30th e-mail from Shelly Freeman to Mayor Morrow | 152 |
| 24 | Exhibit 136 | Communications drafter by Ms. Freeman | 152 |
| 25 | | | |

**CHRISTOPHER ALAN MORROW   4/26/2017**

Page 5

 1    Exhibit 137    E-mail between Mayor Morrow      154
                    and Shelly Freeman
 2

      Exhibit 138    Attorney-client privileged       154
 3                   communication, an engagement
                     letter dated February 2, 2015
 4

      Exhibit 139    Invoices from Shelly Freeman     155
 5

 6

 7

     NOTE:  Exhibits were attached to the original
 8   transcript.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHRISTOPHER ALAN MORROW  4/26/2017

Page 110

1  did after you received this complaint and read it was
2  to call the city attorney.  Does that sound right?
3           A.   I believe that's what I said.  I'm not a
4  hundred percent sure if that's the first thing I did.
5           Q.   How long after receiving the complaint did
6  you present it to Cheryl Harrison-Lee, the city
7  administrator?
8           A.   That I don't recall.  I mean, I just don't.
9  I met with Mary Bush.  I talked with the city
10 attorney.  I didn't -- I don't recall when I
11 approached Cheryl about it.
12          Q.   Do you recall from a standpoint of at least
13 within the next week you had conveyed it to Cheryl
14 Harrison-Lee?
15          A.   I would think so.  Probably -- I want to
16 say once we made the decision to engage Shelly
17 Freeman, since I can't as mayor obligate and accept
18 the -- you know, the City for services, and neither
19 can the city attorney, that she needed to be informed,
20 I think, to sign off on the fact that Shelly Freeman
21 would be doing an independent investigation.
22               And that -- and because of that I had to
23 let her know that a complaint had been made.  But the
24 days, dates, times, none of that -- I don't recall any
25 of it clearly.

1   sure.
2       Q.   Did you make any notes or do anything to
3   memorialize your meeting with Cheryl about this?
4       A.   No.
5       Q.   What did Cheryl say in the meeting?
6       A.   I think she was surprised, curious, but
7   prepared to move forward in whatever manner was
8   required.
9       Q.   Did she tell you in that first meeting that
10  she had intended to eliminate the administrative
11  services manager position?
12      A.   No.
13      Q.   And when did you learn that?
14      A.   That was something that had been a topic of
15  discussion previously.  I want to say the Friday the
16  23rd was the day that the decision was finally made by
17  Cheryl Harrison-Lee, but in conversation with myself
18  and then Council President Harrison.
19      Q.   So you -- you contend you had a meeting on
20  January 23rd of 2015 with the city administrator and
21  Council President Harrison?
22      A.   It was a continuation.  We had already met
23  previously.  We were talking with police chief
24  candidates and the police chief search committee.  We
25  stayed in the conference room after we finished those

1    discussions and discussed the administrative services
2    manager position.
3         Q.   Did you make any notes about that
4    **discussion?**
5         A.   I did not.  Whenever I was in the room with
6    Cheryl, Cheryl takes very good notes.  I usually rely
7    on that.
8         Q.   **So Cheryl should have notes from that**
9    **meeting?**
10        A.   I would imagine.
11        Q.   **She was taking notes?**
12        A.   I would imagine.  I don't recall, but I
13   would imagine.  I rely on her to refer back on matters
14   like that.
15        Q.   **And how long did that meeting last?**
16        A.   That I couldn't -- I couldn't tell you for
17   sure because it was a continuation of a meeting we'd
18   been having previously.  I -- I don't know.  We -- I'd
19   spent a good portion of my day at City Hall.
20        Q.   **You said you had previous discussions.**
21   **When did the previous discussions you claim to have**
22   **had with regard to the elimination of the**
23   **administrative services position taking place?**
24        A.   Some of them occurred at similar junctures
25   where the city administrator, the council president

1  and I all found ourselves together.  I know that

2  Cheryl and I talked about it one-on-one on occasion.

3  I know that council president had talked with Cheryl

4  one-on-one about it.

5            It'd been ongoing.

6       **Q.   For how long do you claim there had been**

7  **discussions with regard to the elimination of the**

8  **administrative services manager position before**

9  **January 23rd of 2015?**

10           MR. NAPOLITANO:  Object to form.

11           You may answer.

12      A.   Several months.

13      **Q.   (By Mr. Hubbard)  And did you ever see any**

14  **documentation with regard to this supposed elimination**

15  **of the administrative services management position**

16  **before the January 23rd meeting you claim to have made**

17  **that decision in?**

18      A.   No.  And we hadn't -- there wasn't any

19  documentation that -- there wasn't anything prepared

20  at the January 23rd meeting.  That was just discussion

21  and decision making.

22      **Q.   Okay.  So tell me what Cheryl Harrison-Lee**

23  **said at the January 23rd meeting.**

24      A.   I can't tell you exactly what she said.  I

25  can say that we all discussed whether or not we should

```
 1   be eliminating the administrative services manager
 2   position.
 3              It was unanimous that we should move
 4   forward with eliminating that position.
 5        Q.    Now, the position had been budgeted for the
 6   entire year of 2015 just a few months earlier;
 7   correct?
 8        A.    Five or six months earlier, yes.
 9        Q.    In August of 2014 it was budgeted; correct?
10        A.    Yes.
11        Q.    Do you recall when in August?  The last
12   part of August; correct?
13        A.    That -- it was one of the August meetings.
14   Usually we approve the budget in the first week of
15   August.
16        Q.    And so the decision you made on
17   January 23rd, was there a timetable put on
18   eliminating the position or was it going to phase it
19   out at the end of the year?  Or what was going to be
20   done?
21        A.    We were going to be looking to eliminate
22   the position and take other action.
23        Q.    Was there a timetable put on the
24   elimination on the position in the January 23rd
25   meeting?
```

1      A.   I don't recall that there was a timetable
2  put on it, but it was what we were going to be moving
3  forward with.
4      **Q.   Now, whose recommendation originally was it**
5  **to eliminate the administrative services manager**
6  **position?**
7      A.   That I couldn't tell you for sure.  Between
8  the council president, Cheryl and I -- I mean, we'd
9  been discussing the necessity of the position as I
10 mentioned earlier for months.
11           And we believed that restructuring was in
12 order.
13     **Q.   And there was no documentation ever that**
14 **you're aware of of any of these discussions; is that**
15 **right?**
16     A.   That'd be a better question to one of the
17 other -- better question to ask Cheryl Harrison-Lee.
18     **Q.   You would expect the city administrator to**
19 **have documented a restructuring that she's proposing,**
20 **wouldn't you?**
21          MR. NAPOLITANO:  Objection.  Calls for
22 speculation.  Foundation.
23          You can answer if you want to or if you
24 can.
25     A.   I would imagine that she has personal

```
 1          A.   I don't recall if I called and talk to
 2    Terry or not.  I talked to Ryan.  He suggested it
 3    probably wasn't --
 4          Q.   You don't have to tell me what Ryan said.
 5               MR. NAPOLITANO:  Sorry.
 6          A.   There you go.
 7          Q.   (By Mr. Hubbard)  We'll leave that out for
 8    now.
 9          A.   Thanks.
10          (Exhibit 130 was marked for identification.)
11          Q.   (By Mr. Hubbard)  Let me hand you now
12    what's been marked as Exhibit 130.  And is this a memo
13    that you sent to -- provided, hand delivered, I think,
14    maybe to Mary Bush on the day following her complaint
15    on January 27th?
16          A.   Yes.
17          Q.   And you think you hand delivered that to
18    her?
19          A.   Yes.
20          Q.   And you provided her some of the policies
21    prohibiting discrimination and the anti-retaliation
22    policy; correct?
23          A.   Yes.
24          Q.   And then at the end you note, "Should you
25    experience any adverse employment action which you
```

```
 1          Q.   By whom?
 2          A.   Well, reorganization isn't -- nobody was on
 3    trial.
 4          Q.   No one's performance was at issue?
 5               MR. NAPOLITANO:  Objection.  Form of the
 6    question.
 7               You may answer.
 8          A.   We were -- the discussion was about
 9    reorganizing.
10          Q.   (By Mr. Hubbard)  And not about any
11    individual performance; is that correct?
12               MR. NAPOLITANO:  Same objection.
13               You may answer.
14          A.   I'm not going to say that performance was
15    never discussed, but -- but it wasn't about -- it
16    wasn't a performance issue.  It was -- it was a
17    restructuring issue.
18          Q.   (By Mr. Hubbard)  Now, at some point you
19    determine to hire an investigator; correct?
20          A.   Yes.
21          Q.   How did you determine what investigators
22    you would look to to choose from as to who you would
23    select?
24               MR. NAPOLITANO:  I'm going to interpose an
25    objection that this question calls for privileged
```

1   been produced, but I may have missed them, so I'll
2   look further.  But I don't think we have anything
3   about this first 1.2 hour for day one invoice.
4            MR. NAPOLITANO:  Okay.  I'll look.
5        **Q.   (By Mr. Hubbard)  And this would reflect**
6   **1.2 hour charges on January 29th for reviewing the**
7   **complaint memo, anti-retaliation memo, and city**
8   **policies and preparing the engagement letter; is that**
9   **right?**
10       A.   That's -- yes.
11       **Q.   Do you know what city policies were sent to**
12  **Ms. Freeman?**
13       A.   I don't recall.
14       **Q.   Now, during the time period of the**
15  **investigation, at some point did Shelly Freeman report**
16  **to you her findings?**
17       A.   I mean, prior to meeting with Mary Bush on
18  March 6th?
19       **Q.   Yes.**
20       A.   I mean, prior to meeting with her, yes, but
21  maybe just prior to meeting with her.  I don't recall
22  actual day or time when the actual, you know, findings
23  were presented to me.  I just -- I know that I knew
24  walking into the meeting with Mary, the -- what Shelly
25  Freeman was going to discuss with her.

```
 1            Q.   Right.
 2                 And you found that out from an oral
 3   communication with Shelly Freeman and not a written
 4   document; correct?
 5            A.   I don't recall, but I believe so.
 6            Q.   Okay.  So what -- when was that oral
 7   conversation?
 8            A.   I don't recall.
 9            Q.   Did you make any documentation of a record
10   of that conversation?
11            A.   No.  I didn't.
12            Q.   What did Shelly tell you in that
13   conversation?
14            A.   Shelly found the complaint that -- that we
15   hadn't actually -- that the complaint -- I don't want
16   to say -- well, yes, I do -- that the complaint was
17   more or less without merit, and that we were on safe
18   ground as far as EEOC complaints, Title 7, anything
19   like that.
20            Q.   Anything else you recall from the
21   conversation with Shelly Freeman in which she orally
22   reported to you her findings?
23            A.   You know, that the -- that the city
24   administrator wasn't acting outside of the scope of
25   her authority and that she was demanding -- it appears
```