# MARY BETH BUSH

vs.

# CITY OF GARDNER

# LISA WILMS

*June 30, 2017*

Summary Judgment Exhibit
**13**
Ensz & Jester, P.C.



CHRISTOPHER VIDEO & REPORTING
1100 Main Street, Suite 2190 - Kansas City, MO 64105
816.471.7800 www.christophervideo.com 816.471.7998 (Fax)

```
 1            IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
 2
     MARY BETH BUSH,
 3
                 Plaintiffs,
 4
     -vs-                    CASE NO: 2:16-cv-02675-JWL-GEB
 5
     CITY OF GARDNER, KANSAS,
 6
                 Defendant.
 7

 8                     THE DEPOSITION OF
                          LISA WILMS
 9
     produced, sworn and examined on the part of the
10   Defendant, pursuant to Notice of Deposition on
     June 30, 2017, at Ensz & Jester, P.C., 1100 Main
11   Street, 2121 City Center Square, in the City of
     Kansas City, in the County of Jackson, and State
12   of Missouri, before me,

13
                       SHEILA A. KOETTING
14          (Mo) CCR NO. 678 - (Ks) CCR NO. 0312
                              of
15              CHRISTOPHER VIDEO & REPORTING

16
     a Certified Court Reporter in and for the States
17   of Missouri and Kansas.

18

19                       APPEARANCES:

20   For Plaintiffs:

21          WALTERS, BENDER, STROHBEHN
               & VAUGHAN, P.C.
22          1100 Main Street
            2500 City Center Square
23          Kansas City, Missouri 64105
            816.274.9777
24          dhubbard@wbsvlaw.com
            By:  Mr. Dirk L. Hubbard
25
```

```
 1                  APPEARANCES (Cont'd)

 2   For Defendant:

 3           ENSZ & JESTER, P.C.
             1100 Main Street
 4           2121 City Center Square
             Kansas City, Missouri 64105
 5           816.474.8010
             cnapolitano@enszjester.com
 6           By:  Mr. Christopher M. Napolitano

 7   Also present:

 8           Ms. Cheryl Harrison-Lee
             City Administrator
 9           City of Gardner
             120 East Main Street
10           Gardner, Kansas 66030

11
                          ***
12

13                        I N D E X
                                             Page
14
     Examination by Mr. Napolitano              4
15   Examination by Mr. Hubbard                93
     Further Examination by Mr. Napolitano    118
16   Further Examination by Mr. Hubbard       126
     Signature Page                           127
17   Reporter's Certificate                   129

18
                          ***
19

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2    Ex. No.                                          Idfd

 3    197    Diagram of office drawn by
             Ms. Wilms                                   68
 4
      198    MBB-0000797-798
 5           May 17, 2016 Faye Watts interview
             Of Lisa Wilms                               83
 6
             Previously Marked Exhibits Discussed
 7
        3    Validity Screening Solutions documents
 8           on Lori Lynn Winsler, Michelle J.
             Leininger, Robert J. Sanchez,
 9           Matthew Wolff, Abdulrasak T. Yahaya         86

10      6    E-mail string ending with January 22,
             2015 Harrison-Lee to Mary Bush              32
11
        8    City of Gardner Base Salary
12           Structure Fiscal Year 2014                  88

13     50    E-mail string ending with January 27,
             2015 Lisa Wilms to Mary Bush                73
14
      196    Exit Interview Questionnaire of
15           Katie Asbury                               105

16         (Exhibits attached, copies to counsel.)

17

18

19

20

21

22

23

24

25
```

1  about the position wanting to know if it was
2  still open and available and I said it was.  And
3  she was not able to contact us at that time
4  because she was dealing with her sister's death.
5  And he was just inquiring as to whether the
6  position was available.
7           And then she sent her
8  application -- I said it was.  And so I sent her
9  application in.  And I believe I commented to
10 Mary that, you know, he was very nice, was
11 inquiring about the position for his wife, you
12 know, here it is.
13     Q.   What, if anything, did Mary say about
14 Daneeka?
15           MR. HUBBARD:  Object to form.
16     A.   Daneeka was a wonderful person.  Very
17 easy to work with.  I don't remember specific
18 comments.
19     Q.   (By Mr. Napolitano)  In your experience
20 as HR, was she qualified for that position?
21     A.   Yes, she was.
22     Q.   Did Mary ever express to you that she
23 believed she wasn't qualified for that position?
24           MR. HUBBARD:  Object to form.
25     A.   Not that I know of.

1   documents.  Please reply if you would like any
2   changes made or if these are okay to use.  The
3   first candidate will be here at 8:00."  Did I
4   read --
5        A.   That is correct.
6        Q.   -- that correctly?  So does this refresh
7   your recollection as to when the in-person police
8   chief interviews were?
9        A.   I'm sorry, can you repeat that?
10       Q.   Sure.  Does this document refresh your
11  recollection as to when the in-person police
12  chief interviews were?
13       A.   In person, yes.
14       Q.   So they would have been January 23rd?
15       A.   Yes, that is correct.
16       Q.   Of 2015?
17       A.   That is correct.
18       Q.   You can set that aside for a moment.
19            Did you prepare those scenarios that you
20  e-mailed to Cheryl?
21       A.   Those -- the scenario 1, the one that we
22  did for the communications manager, I believe
23  Mary had prepared that one for that.  So I was
24  told to use that one.  Yes, those had been
25  previously prepared by Mary for other positions.

1   Q.   So she didn't prepare them for the chief
2   position specifically?
3   A.   No.  She had been asked to put scenarios
4   together, I believe, and had directed me to use
5   these.  And that's when I sent those to Cheryl
6   for her review.
7   Q.   Okay.  Do you recall if you were working
8   on the day that the police chief interviews
9   occurred?
10  A.   Yes, I was.
11  Q.   And again, worked till 5:00, I assume?
12  A.   Yes.
13  Q.   Do you work at your desk most of the
14  day?
15  A.   Yes.
16  Q.   Do you recall if you were at your desk
17  during the police chief interviews?
18  A.   Yes, I was.  In and out, you know.  To
19  go get the mail or, you know, take breaks or
20  things like that.  But, yes, I was in the
21  building and typically at my desk.
22  Q.   Just pop away for a minute or two to go
23  get something?
24  A.   Certainly.
25  Q.   How would you describe Cheryl

```
 1   question.
 2       A.   In my opinion, it's intimidating.
 3       Q.   But would you agree that there's a
 4   difference between being uncomfortable and
 5   feeling intimidated?
 6            MR. HUBBARD:  Object to form, asked
 7   and answered, further arguing with the witness.
 8       A.   I still say it is intimidating.
 9       Q.   (By Mr. Napolitano)  And that's not my
10   question.
11            MR. NAPOLITANO:  Could you read the
12   question back, please?
13            (The requested portion of the record
14   is read by the reporter.)
15            MR. WADDELL:  Same objection.
16       A.   Yes, there is.
17       Q.   (By Mr. Napolitano)  Cheryl never
18   threatened to harm you, did she?
19       A.   No.
20       Q.   Did you ever feel mistreated by Cheryl
21   personally?
22       A.   No.
23       Q.   What did you mean by Cheryl is direct?
24       A.   She gets to the point when she wants
25   something done, she is very -- very direct.
```

1    conversation -- that we discussed in the future
2    that we would need to do the education for the
3    background check.  And that's when we changed
4    policy and started doing the education, adding
5    that as one of the criteria.
6         Q.   Had you ever checked anybody's
7    education?
8              MR. HUBBARD:  Object to form.
9         A.   I believe there had been -- there'd been
10   an employee that was -- I can't remember his
11   name.  Anil, I believe.  It was A-n-i-l.  I don't
12   remember his last name.  That we did check on his
13   education.  I think he had gained his credentials
14   outside of the United States, so we were checking
15   those.
16        Q.   (By Mr. Napolitano)  And who told you to
17   check those?
18        A.   That would have been Mary.
19        Q.   So except for that one situation, Mary
20   never asked you to check or verify education?
21        A.   It was just standard practice --
22             MR. HUBBARD:  Object to form.
23        A.   It was standard practice that when I
24   started that we checked the items that I
25   previously mentioned, and it wasn't until Cheryl

1   directed us to do the background checks including
2   the education.
3       Q.   (By Mr. Napolitano)  And I'm sorry, I
4   just don't think that was the answer to my
5   question.
6       A.   Sorry.
7       Q.   Prior to this Travis issue --
8       A.   Um-hum.
9       Q.   -- coming to light --
10      A.   Yes.
11      Q.   -- Mary never asked you to verify the
12  education credentials of applicants --
13              MR. HUBBARD:  Object --
14      Q.   (By Mr. Napolitano)  -- with the
15  exception of Anil, correct?
16              MR. HUBBARD:  Object to form.  Also
17  asked and answered.
18      A.   I -- not that I remember.
19      Q.   (By Mr. Napolitano)  You certainly
20  weren't doing it, right?
21      A.   I was not doing it, no.
22      Q.   So it wasn't a one-time mistake,
23  correct?
24      A.   Right.
25      Q.   Did Mary ever counsel you or reprimand

1  And then these two belonged to parks and
2  recreation.
3       Q.   Okay.
4       A.   Does that help?
5       Q.   It does.  I'm going to go ahead and --
6            MR. HUBBARD:  You want to just
7  write conference room on that one?
8            MR. NAPOLITANO:  Oh, yeah.
9            MR. HUBBARD:  So it has the words.
10           THE WITNESS:  Sure.
11           MR. HUBBARD:  I think all the rest
12 are labeled.
13           THE WITNESS:  Okay.
14      Q.   (By Mr. Napolitano)  And I'm going to
15 mark this as Exhibit 197.  I'm going to hand it
16 back to you.
17      A.   Uh-huh.
18      Q.   Want to get some more information based
19 on your knowledge there.
20      A.   Uh-huh.
21      Q.   What's the distance between the
22 conference room and Katie Asbury's cubicle, to
23 the best of your knowledge?
24      A.   Oh, gosh.  Probably no more from here to
25 maybe where Cheryl was sitting at this time.

1    Q.   If you had to estimate it in feet, what
2  would you say?
3    A.   I'm terrible at that.  I'm sorry.  Ten
4  feet maybe.  Is that --
5    Q.   And so a few feet more than to yours
6  from the conference room?
7    A.   Yes.
8    Q.   And what's the distance between your
9  cubicle and Mary Bush's former office?
10   A.   Between here and the wall.  So six,
11 eight to the door of her office.
12   Q.   And then from your cubicle to Cheryl's
13 office, how far would that be?
14   A.   Again, I'm -- I'm bad with estimates.
15   Q.   Just do the best you can.
16   A.   I would say 20 maybe, 20 feet or more.
17 20 to 30 feet.
18   Q.   Okay.  Thank you.
19   A.   I --
20   Q.   No, it's helpful to kind of see it.
21        Do you ever overhear conversations that
22 Mary was having in her office when the door was
23 shut?
24   A.   When the door was shut?  No.
25   Q.   Did you ever hear --

```
 1      Q.   And do you know who would have prepared
 2   this document at the city?
 3              MR. HUBBARD:  Object to form.
 4      A.   At this time frame, I'm assuming it was
 5   done August of '14 and January of '15.  I've
 6   never seen this document, so I don't know who --
 7      Q.   (By Mr. Napolitano)  And that's fine --
 8      A.   -- would have prepared it.
 9      Q.   -- I was just --
10              MR. HUBBARD:  Object to form then,
11   speculation.
12      Q.   (By Mr. Napolitano)  So it's not
13   something you had seen before, right?
14      A.   No.
15      Q.   Okay.
16      A.   I didn't see that before.
17      Q.   And I'm sorry, I can't remember if I've
18   asked this.  Did Mary Beth Bush ever express to
19   you that she felt Cheryl Harrison-Lee was
20   discriminating against her on the basis of her
21   age or race?
22      A.   I don't remember any conversations.
23      Q.   And you've never -- or I guess have you
24   ever submitted a complaint that you thought you
25   were discriminated against?
```

1    A.   Never.
2    Q.   Did you ever complain about a hostile
3 work environment at Gardner?
4    A.   No.
5    Q.   Sorry.  I want to take the opportunity
6 now to give you on the record in this deposition
7 a check in the amount of 61.71 which represents
8 the $40 appearance fee since you're here under a
9 subpoena, and then the remainder of that check
10 should be the appropriate mileage based on the
11 address -- or the cross streets you gave me
12 before.
13   A.   Okay.  Thank you.
14   Q.   Just a couple more things.  I think you
15 had indicated there were some tasks removed from
16 Mary?
17   A.   Yes.
18   Q.   And I know we talked about a couple of
19 them.  But could you identify all of those for
20 me?
21        MR. HUBBARD:  Object to form, asked
22 and answered.  She doesn't have to restate what
23 she's already stated.
24   A.   I know that she didn't have access to
25 budget records.  She previously -- Mary had