## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARY BETH BUSH,             )
      Plaintiff,             )
                           )
vs.                        )        Case No. 16-2675-JWL-GEB
                           )
CITY OF GARDNER,          )
      Defendant.        )

## PLAINTIFF MARY BUSH'S
## MEMORANDUM IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff Mary Bush, by and through her attorneys of record, and submits

her Memorandum in Opposition to Defendant's Motion for Summary Judgment (ECF No. 80):

# TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE CASE .................................................1

II.     RESPONSE TO DEFENDANT'S ALLEGED STATEMENT OF FACTS ...........5

III.    PLAINTIFF'S CONCISE STATEMENT OF ADDITIONAL UNCONTROVERTED
        FACTS.................................................................................................32

        A.      Mary Bush's History of Exceptional Performance and Reviews....................32

        B.      City Administrator Cheryl Harrison-Lee Receives Performance Criticisms ...................39

        C.      City of Gardner's Budget Process – Decision Made in August of 2014 to Add to Human
                Resources Department and to Mary Bush's Responsibilities .............................40

        D.      Mary Bush's Protected Activity .........................................................41

        E.      Elimination of Plaintiff's Position of Administrative Services Manager........................47

        F.      Alleged Performance Deficiencies........................................................60

        G.      Additional Facts Regarding New Human Resources Supervisor........................61

        H.      Additional Facts Regarding Favoritism by City Administrator .........................63

IV.     ARGUMENT AND AUTHORITIES .........................................................64

        A.      Summary Judgment Standard..............................................................64

        B.      Plaintiff's Retaliation Claims Are Appropriate for Jury Consideration .........................66

                1.      Mary Bush Engaged In Protected Activity .........................................67

                2.      Mary Bush's Retaliation Claim Meets the Causation Element.............................72

                        a.      *Close Temporal Proximity* .....................................73

                        b.      *Disclosure to Mary Bush of Job Elimination in Meeting Called to
                                Discuss Results of Discrimination Investigation*.......................77

                        c.      *Procedural Irregularities and the City's Failure to Follow Policies and
                                Procedures* .................................................................77

                        d.      *Lack of Any Discussions with Mary Bush Concerning Job Elimination
                                Prior to Protected Activity* .........................................79

                        e.      *No Documented Discussions by City Regarding Elimination of ASM
                                Position Prior to Mary Bush's Protected Activity* ....................79

                        f.      *Inconsistencies in Testimony Regarding City's Alleged Oral Discussions
                                Regarding Elimination of the ASM Position* ............................79

                        g.      *The City's Varying and Different Alleged Reasons for the Elimination of
                                ASM Position*.............................................................81

                        h.      *Falseness of the Alleged Performance Issues* .......................83

i

                        i.        *Lack of Any Documentation of Alleged Performance Issues* ................. 83

              3.       City of Gardner's Alleged Legitimate Business Reason ............................. 83

              4.       Genuine Issues of Disputed Fact Exist Regarding Pretext ................................. 83

      C.      Plaintiff's Age Discrimination Claim Is For Jury Consideration ........................ 84

      D.      Plaintiff's Race Discrimination Claim Is For Jury Consideration ...................... 85

**V.**    **CONCLUSION** ........................................................................................................ **86**

## <u>TABLE OF AUTHORITIES</u>

*Anderson v. Coors Brewing Co.*, 181 F. 3d 1171 (10th Cir. 1999).......................................................73

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................................64

*Archuleta v. Colorado Dept. of Institutions*, 936 F.2d 483 (10th Cir. 1991) ..........................................68

*Berkemeier v. Standard Beverage Corp.*, 171 F. Supp. 3d 1122 (D. Kan. 2016)...............................82

*Bowers v. Bethany Medical Center*, 959 F.SUpp. 1385 (D. Kan. 1997) ..............................................74

*Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339 (10th Cir. 1982) ..............................................73

*Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390 (10th Cir. 1997)............................................................73

*Conroy v. Vilsak*, 707 F.3d 1163 (10th Cir. 2013)...............................................................................83

*Daneshvar v. Graphic Technology, Inc.*, 18 F.Supp. 2d 1277 (D. Kan. 1998)........................74, 78

*Dey v. Colt Const. & Development Co.*, 28 F.3d 1446 (7th Cir. 1994) ....................................................69

*Doebele v. Sprint/United Management Co.*, 342 F.3d 1117 (10th Cir. 2003) .........................................78

*Downs v. Jostens, Inc.*, 23 F.Supp. 3d 1332 (D. Kan. 2014) .................................................................77

*Dyer v. City of Gastonia*, 164 F.Supp. 3d 777 (W.D.N.C. 2016) ..........................................................76

*Fugett v. Security Transport Services, Inc.* 147 F.Supp.3d 1216 (D. Kan. 2015) ...............................73

*Gaetano v. Bayer, Inc.*,  2007 WL 3334985 (W.D. Pa. Nov. 8, 2007)...........................................76-77

*Garcia-Paz v. Swift Textiles, Inc.*, 873. F.Supp. 547 (D. Kan. 1995) ....................................................69

*Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210 (10th Cir. 2002)..........................................................64

*Gomez v. Metropolitan District*, 10 F.Supp. 3d 224 (D. Conn. 2014).....................................................81

*Gullickson v. Southwest Airlines Pilots' Ass'n*, 87 F.3d 1176 (10th Cir. 1996) ...............................64

*Hertz v. Luzenac America, Inc.*, 370 F.3d 1014 (10th Cir. 2004)...........................................................69

*Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897 (10th Cir. 2011) ...................................81

*Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303 (10th Cir. 2005)...............................................82-83

*Jeffries v. State of Kan.*, 147 F.3d 1220 (10th Cir. 1998) .....................................................................64

*Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000) .........................................78

*Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012)..................................................................66

*Lyman v. Nabil's Inc.*, 903 F.Supp. 1443 (D. Kan. 1995) ......................................................................70

*Marx v. Schnuck Markets, Inc.*, 76 F.3d 324 (10th Cir. 1996)...............................................................73

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .....................................................................66

*McGowan v. City of Eufala*, 472 F.3d 736 (10th Cir. 2006)...................................................................66

*Mickelson v. New York Life Ins. Co.*,  460 F.3d 1304 (10th Cir. 2006) ........................................64, 65

*Mohammed v. Calloway*, 698 F.2d 395 (10th Cir. 1983)..................................................78

*Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th Cir. 1997) ..................................................79

*Murdock v. City of Wichita*, 2011 WL 1230325 (D. Kan. March 30, 2011) ............67, 73, 74

*Newell v. Kmart Corp.*, 1998 WL 230866 (D. Kan. Apr. 6, 1998)..................................74

*O'Neal v.Ferguson Construction Co.*, 237 F.3d 1248 (10th Cir. 2001) ...............67, 73, 74

*Piercy v. Maketa*, 480 F.3d 1192 (10th Cir. 2007) ......................................................64, 65

*Pinkerton v. Colo. DOT*, 563 F.3d 1052 (10th Cir. 2009) ...............................................65

*Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005) ........................................................64, 65

*Proctor v. UPS*, 502 F.3d 1200 (10th Cir. 2007)........................................................72, 84

*Pruitt v. State of Kansas*, 364 F. Supp. 2d 1264 (D. Kan. 2005).....................................71

*Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995)...............................................66, 84

*Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133 (2000) ...........................64, 81-82

*Rettiger v. IBP, Inc.*, 980 F.Supp. 1182 (D. Kan. 1997).........................................69, 72, 74

*Semsroth v. City of Wichita*, 555 F.3d 1182 (10th Cir. 2009).........................................66

*Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153 (10th Cir. 2011) ..........................64

*Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106 (10th Cir. 2007) ...................................78

*Tolan v. Cotton*, 134 S.Ct. 1861 (U.S. 2014)..............................................................65

*Trujillo v. Pacificorp*, 524 F.3d 1149 (10th Cir. 2008)...................................................78

*Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205 (10th Cir. 2003)....................................72

*Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106 (10th Cir. 2006) .....................................65

*Zinn v. McKune*, 143 F.3d 1353 (10th Cir. 1998)......................................................69, 72

*Zokari v. Gates*, 561 F.3d 1076 (10th Cir. 2009)...........................................................66

iv

## PLAINTIFF'S EXHIBIT INDEX

1     Deposition of Christopher Morrow, Vol. 1
2     Deposition of Cheryl Harrison-Lee, Vol. 1
3     Deposition of Steve Shute
4     Deposition of Kristina Harrison
5     Deposition of Shelly Freeman
6     Deposition of Mary Bush, Vol. 1
7     Deposition of Lisa Wilms
8     Deposition of Leslie Quillen
9     Deposition of Katie Asbury
10    Deposition of Jeff Stewart
11    10/11/06 Correspondence Regarding Mary Bush Hiring
12    Human Resources Manager Job Description
13    Mary Bush Performance Review, 10/06-4/07
14    Mary Bush Performance Review, 4/07-4/08
15    Mary Bush Performance Review, 4/08-4/09
16    Mary Bush Performance Review, 4/09-11/09
17    Mary Bush Performance Review, 11/09-11/10
18    Mary Bush Performance Review, 11/10-11/11
19    Administrative Services Manager Job Description
20    Mary Bush Performance Review as ASM
21    City of Gardner's Policies and Procedures
22    1/27/15 Memo from Mayor Morrow to Mary Bush
23    Deposition of Christopher Morrow, Vol. 2
24    Deposition of Cheryl Harrison-Lee, Vol. 2
25    1/26/15 Email and Attachment from Mary Bush
26    Deposition of Mary Bush, Vol. 2
27    3/10/15 Email from Mary Bush to Mayor Morrow
28    2014/2015 Gardner Budget (Excerpts)
29    August 2014 City of Gardner Organizational Chart
30    Defendant's Interrogatory Responses
31    3/16/15 Reorganization Proposal
32    Declaration of Mary Bush
33    Mary Bush's Speaking Points For Meeting With City Investigator
34    Defendant's Responses and Supplemental Responses to Interrogatory No. 4
35    Deposition of Kevin Bush
36    Mary Bush Interrogatory Responses
37    Transcribed Notes of Investigator Shelly Freeman from Interview with Mary Bush

I.      **NATURE AND SUMMARY OF THE CASE**

Plaintiff Mary Bush claims that Defendant City of Gardner acted in a retaliatory, age discriminatory, and racially discriminatory manner when it eliminated her position as Administrative Services Manager ("ASM") in March of 2015.   Mary Bush is a Caucasian female who was 57 years old when the City informed her it was eliminating her ASM position on March 6, 2015.   Less than six weeks earlier, Mary Bush had engaged in protected activity when she complained to the City of Gardner about the age and race discrimination that she, as the City's head of Human Resources, believed she and other employees had experienced in their employment. Mrs. Bush's protected activity also included her complaint about gender discrimination in pay.

Mary Bush began working for Defendant City of Gardner in October of 2006 as the Manager of Human Resources.   During her many years as HR Manager, Mary's reviews all evaluated her performance as "Exceeds Expectations."   In January of 2013, Plaintiff Mary Beth Bush became Administrative Services Manager with responsibility for managing five divisions of the City, including Human Resources.   Mary Bush also excelled in her performance of the responsibilities of the ASM position.   The sole performance review provided to Mary Bush in her ASM capacity rated her performance as "Exceeds Expectations."

City Administrator Cheryl Harrison-Lee started working at the City of Gardner in 2012. Mary Bush reported directly to the City Administrator both as Manager of Human Resources and as Administrative Services Manager.   As the chief Human Resources employee at the City, Mary Bush had observed what she perceived to be a hostile working environment created by the City Administrator's treatment of Mary and many other City of Gardner employees.   On January 26, 2015, Mary forwarded an email to the City of Gardner's Mayor, Chris Morrow, and to the City Council President, Kristina Harrison.   The email referenced age, race, and gender discrimination,

and a hostile working environment experienced by Mary Bush and other current and former City of Gardner employees. The items about which Mary Bush complained included the City Administrator's age biased comment, "As people get older, they don't think as clearly," and her race-based comment, "I am from the South. I have to be tough. I am used to working with white men." Mary Bush's complaints also noted the high turnover of primarily older employees experienced by the City at the Director level since the City Administrator had come to the City of Gardner, as well as other issues which Mary Bush perceived as creating a hostile work environment and/or constituting racial, age, or gender discrimination.

On March 6, 2015, Mary Bush was called to a meeting for a report on the City's investigation of her January 26th discrimination complaints. At that meeting, Mary was informed that the City did not find any merit in her complaints of discrimination <u>and</u> that her position as Administrative Services Manager was being eliminated. In between Mary's January 26th complaint email and this March 6th meeting, the City Administrator was observed glaring at Mary Bush. During this time period, the City Administrator also intentionally kept Mary out of conversations related to matters within the scope of her job responsibilities, took Mary off of tasks within her job duties, including ones she had performed for years for the City, and took away Mary Bush's access to some of the City materials and programs.

The decision to eliminate Mary Bush's position as Administrative Services Manager was recommended by City Administrator Cheryl Harrison-Lee, agreed to by Mayor Chris Morrow, and later ratified (after the decision had already been conveyed to Mary) by the City Council. The City of Gardner did not follow its normal policies and procedures in eliminating Mary Bush's position, but instead made what one Councilman referred to as a hasty decision. For many months during the normal budgetary process in 2014, the City had studied what positions were needed for the year

2015.   The City had determined based on those many months of study that a new and additional position should be created to bolster the City's Human Resources Department.   This Human Resources Supervisor position was to report to the Administrative Services Manager, Mary Bush. There was no mention by anyone at the City during the time period of this extensive study that the creation of the Human Resources Supervisor position would render Mary Bush's Administrative Services Manager position unnecessary or redundant.   Yet, that is what the City Administrator decided to recommend to the Mayor and Council – in the first quarter of 2015 and within just a few weeks of Mary Bush's complaint of discrimination on behalf of herself and others.

The City of Gardner and its City Administrator claim that there were discussions regarding elimination of the position prior to January 26, 2015, but there is no documentation of any such discussions or decision.   Indeed, others stated that the City Administrator took notes in the meetings on which the City Administrator alleges such discussions to have occurred, but those notes have not been produced.   In addition, there are many inconsistencies in the testimony of the City's witnesses regarding these supposed discussions.   In fact, the City Administrator claims the decision to move toward eliminating the Administrative Services Manager position was made way back in June of 2014.   Even if there had been some general discussions regarding human resources needs or even a brief mention of possibly eliminating the position (which Plaintiff contests), it is clear that no final decision had been made by the City of Gardner on whether or not to eliminate the Administrative Services Manager position until after Mary Bush's January 26, 2015 complaint.   There had also been no decision made on the timetable for considering whether or not to eliminate the position, and the usual timetable would have been to study the issue during the 2015 budget discussions for 2016 implementation.   Further, as of January 26, 2015, the City had not made a decision on what alternative position or pay to offer Mary Bush.

The position offered by the City in March of 2015 involved a move out of the Human Resources area to work in the Parks & Recreation Department as a Special Events Coordinator.   It was a reduction of several pay levels, with the salary amount offered being approximately $35,000 below her current salary as Administrative Services Manager.   In setting the salary to be offered to Mary for this new Special Events Coordinator position, the City failed to follow its policies and procedures and offered a salary far lower than that which its policies require to have been offered. With further regard to the supposed Special Events Coordinator position, such position was not taken to the Council for approval as part of the 2015 budget.   In addition, the City Council did not, in fact, authorize the position when it was later brought to them in March.   The position description and offer were thrown together when the City Administrator determined to eliminate the Administrative Services Manager position after Mary Beth Bush complained of race and age discrimination.   Further, Mary Bush was not offered the Human Resources Supervisor position (or even an opportunity to seek that position) which had not yet been filled at the time of Mary Bush's complaint.   She was also not offered any of the other Human Resources positions recommended by City Council President Kristina Harrison.   The overall determination by the City to eliminate her position and offer the Special Events Coordinator position (instead of the other positions noted) at the reduced salary level was motivated by retaliation, age bias, and racial bias.

Although the City Administrator has claimed that Mary Bush had performance issues in the latter half of 2014, no documentation of any of these performance issues was made pursuant to the City of Gardner's policies and procedures.   Further, each of these alleged performance issues occurred after the June of 2014 time period in which the City Administrator claims to have made the determination to move toward eliminating Mary Bush's position as Administrative Services

4

Manager.   Next, Mary Bush was initially told by the City of Gardner that the position elimination was not based on performance, but was due to restructuring.   Finally, Mary Bush provides evidence disputing the accuracy of many of the City Administrator's after-the-fact alleged performance issues.

## II.    RESPONSE TO DEFENDANT'S ALLEGED STATEMENT OF FACTS

Pursuant to D. Kan. Rule 56.1, Plaintiff Mary Bush will first respond to the facts set forth in the City of Gardner's Memorandum in Support of its Motion for Summary Judgment.   (Doc. # 81 – "Defendant's Memorandum").   Plaintiff Mary Bush will then set forth in Section III additional facts which also controvert the facts set forth by the City of Gardner and which raise genuine issues of material fact.

1.   Uncontroverted.

2.   Uncontroverted.

3.   Uncontroverted.

4.   Uncontroverted with explanation.   Mary Bush also alleges that the City, through Ms. Harrison-Lee, eliminated her position with the City in retaliation for Mary Bush's protected activity.

5.   Uncontroverted with explanation.   Mary Bush had extensive background and experience in human resources, and the City hired Mrs. Bush because of that extensive human resources experience.   (See Plaintiff's Facts, ¶ 3).

6.   Uncontroverted.

7.   Uncontroverted.

8.   Uncontroverted.

9.   Uncontroverted.

10.   Uncontroverted.

11.    Uncontroverted.

12.    Uncontroverted.

13.    Uncontroverted.

14.    Uncontroverted with additional explanation.   The City of Gardner had for years reviewed Mary Bush's performance as Human Resources Manager as "Exceeds Expectations." (See Plaintiff's Facts, ¶¶ 4-10).

15.    Uncontroverted with additional explanation.   The performance evaluation rated Mary Bush's performance as "Exceeds Expectations" and contained many specific comments praising Mary Bush's skills and performance.   (See Plaintiff's Facts, ¶¶ 13-14).

16.    Uncontroverted with additional explanation.   The performance evaluation rated Mary Bush's performance as "Exceeds Expectations" and contained many specific comments praising Mary Bush's skills and performance.   (See Plaintiff's Facts, ¶¶ 13-14).   Also, Mary Bush attended a Human Resource Conference.   (Exhibit 6: tr. 118:14-19).

17.    Uncontroverted with explanation.   Mary Bush's testimony was that the City Administrator "wanted me to perhaps go and take some classes at KU, look for some additional training in the various areas I was over.   My – my job duties and the level of work did not allow for me to be gone.   I was working about 80 hours a week.   So we had that discussion about when should I go do this because I had a huge job.   And that was basically it, look for some training opportunities."   (Exhibit 6: tr. 117:17-118:3).

18.    Controverted.   Any criticisms now being alleged are not credible and the testimony and interrogatory answers of City Administrator Harrison-Lee are not worthy of belief.   (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).   Further, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged

6

criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).

19.    Uncontroverted.

20.    Controverted.   The cities that Mary Bush used in providing pay review information, including Olathe and Overland Park, were specifically requested by the City Administrator. Mary Bush testified:   "Mr. Fairburn [former City Administrator] had a different set of cities than Cheryl Harrison wanted, so the administrator would make the determination here are the cities that I want to look at." (Exhibit 6: tr. 82:1-4).   With regard to this 2014 compensation study, the City Administrator voiced no contemporaneous concerns to Mary Bush regarding her work performance or that study.   (Exhibit 6: tr. 90:3-6).   Based on the related documentation shown to Mary Bush during her deposition, it is clear that Mary Bush did not create or provide the information as alleged by the City Administrator.   Instead, Mary Bush testified "I think that would have come via through our finance side of it."   (Exhibit 6: tr. 90:20-91:12).   Further, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).   Further, any criticisms now alleged are not credible and the testimony and interrogatory answers of City Administrator Harrison-Lee are not worthy of belief.   (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).

21.    Uncontroverted.

22.    Controverted.   The cities that Mary Bush used in providing pay review information, including Olathe and Overland Park, were specifically requested by the City Administrator. Mary Bush testified:   "Mr Fairburn [former City Administrator] had a different set of cities than Cheryl Harrison wanted, so the administrator would make the determination here are the cities that I want to look at." (Exhibit 6: tr. 82:1-4).   With regard to this 2014 compensation study, the City

Administrator voiced no contemporaneous concerns to Mary Bush regarding her work performance or that study.  (Exhibit 6: tr. 90:3-6).  Based on the related documentation shown to Mary Bush during her deposition, it is clear that Mary Bush did not create or provide the information as alleged by the City Administrator.  Instead, Mary Bush testified "I think that would have come via through our finance side of it."  (Exhibit 6: tr. 90:20-91:12).  In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).  Further, any criticisms now alleged are not credible and the testimony and interrogatory answers of City Administrator Harrison-Lee are not worthy of belief.  (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).

23.    Controverted.   The cities that Mary Bush used in providing pay review information, including Olathe and Overland Park, were specifically requested by the City Administrator. Mary Bush testified:  "Mr Fairburn [former City Administrator] had a different set of cities than Cheryl Harrison wanted, so the administrator would make the determination here are the cities that I want to look at." (Exhibit 6: tr. 82:1-4).   With regard to this 2014 compensation study, the City Administrator voiced no contemporaneous concerns to Mary Bush regarding her work performance or that study.  (Exhibit 6: tr. 90:3-6).  Based on the related documentation shown to Mary Bush during her deposition, it is clear that Mary Bush did not create or provide the information as alleged by the City Administrator.  Instead, Mary Bush testified "I think that would have come via through our finance side of it."  (Exhibit 6: tr. 90:20-91:12).  In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).   Further, any criticisms now alleged are not credible and the testimony and

interrogatory answers of City Administrator Harrison-Lee are not worthy of belief.   (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).

24.   Controverted.   The cities that Mary Bush used in providing pay review information, including Olathe and Overland Park, were specifically requested by the City Administrator. Mary Bush testified:   "Mr Fairburn [former City Administrator] had a different set of cities than Cheryl Harrison wanted, so the administrator would make the determination here are the cities that I want to look at." (Exhibit 6: tr. 82:1-4).   With regard to this 2014 compensation study, the City Administrator voiced no contemporaneous concerns to Mary Bush regarding her work performance or that study.   (Exhibit 6: tr. 90:3-6).   Based on the related documentation shown to Mary Bush during her deposition, it is clear that Mary Bush did not create or provide the information as alleged by the City Administrator.   Instead, Mary Bush testified "I think that would have come via through our finance side of it."   (Exhibit 6: tr. 90:20-91:12).   In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).   Further, any criticisms now alleged are not credible and the testimony and interrogatory answers of City Administrator Harrison-Lee are not worthy of belief.   (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).

25.   Uncontroverted.

26.   Uncontroverted with explanation.   It is uncontroverted that in August of 2014, the City Administrator said abruptly to Mary Bush as they were walking into a Council Meeting, "You need to be prepared I think council is going to demote you."   That was all that was said and the City Administrator walked off.   (Exhibit 6: tr. 190: 15-20).   There was no discussion of anything like that at the Council Meeting, and when Mary Bush tried to bring it up again, the City

Administrator would not talk to her about it.   (Exhibit 6: tr. 190:20-25).   The City Administrator did not allege any basis for the statement she made, but instead was possibly responding to criticisms of the City Administrator's own performance and/or pressures being placed on here. She may also have been trying to intimidate Mary Bush and seeking to force her to leave on her own like other Directors who reported to the City Administrator had done.   (Exhibit 32: ¶ 5).

27.    Uncontroverted with explanation.   The City Administrator was shown the request for proposal prior to it going out, and she approved it going out.   (Exhibit 6: tr. 104:24-105:2).

28.    Controverted in part.   AOS was the City's IT consultant, and so AOS was asked to do an assessment of what it thought the City needed.   AOS had great references, was well-respected, and had done good work already for the City.   (Exhibit 6: tr. 104:11-18).

29.    Uncontroverted.

30.    Controverted in part.   The testimony is that "we" were disappointed there were not more responses.   In addition, it was because the City Administrator was supposed to talk to a counterpart in Florida that that project got put on hold and stalled getting completed.   A committed approach was determined with contributions from some IT directors from other communities.   (Exhibit 6: tr. 105:13-106:9).   Further, there was no contemporaneous criticism by the City Administrator of Mary Bush for the first IT request for proposal, and it was the City Administrator who caused delay in getting out the second IT request for proposal.   (Exhibit 32: ¶ 6).   In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).   Further, any criticisms now alleged are not credible and the testimony and interrogatory answers of City Administrator Harrison-Lee are not worthy of belief.   (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).

31.   Controverted.   The City Administrator reviewed and approved of the first IT proposal.  (Exhibit 6: tr. 104:24-105:2).   Further, there was no contemporaneous criticism by the City Administrator of Mary Bush for the first IT request for proposal, and it was the City Administrator who caused delay in getting out the second IT request for proposal.  (Exhibit 32: ¶ 6).   In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).   Further, any criticisms now alleged are not credible and the testimony and interrogatory answers of City Administrator Harrison-Lee are not worthy of belief.  (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).

32.   Uncontroverted.

33.   Controverted.   Further, there was no contemporaneous criticism by the City Administrator of Mary Bush at or around the time of this June conference.  (Exhibit 32: ¶ 7).   In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).   Further, any criticisms now alleged are not credible and the testimony and interrogatory answers of City Administrator Harrison-Lee are not worthy of belief. (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).   To the contrary, Mary Bush's performance reviews show she performed the ASM and HR Manager positions at an "Exceeds Expectations" level.   (See Plaintiffs' Facts, ¶¶ 4-14).

34.   Controverted.   Further, there was no contemporaneous criticism by the City Administrator of Mary Bush at or around the time of this June conference.  (Exhibit 32: ¶ 7).   In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation

11

based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).   Further, any criticisms now alleged are not credible and the testimony and interrogatory answers of City Administrator Harrison-Lee are not worthy of belief. (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).   To the contrary, Mary Bush's performance reviews show she performed the ASM and HR Manager positions at an "Exceeds Expectations" level.   (See Plaintiffs' Facts, ¶¶ 4-14).

35.   Controverted in part.   It is uncontroverted that the City Administrator made hostile and negative comments regarding persons without a college degree.   It is controverted that this was in any way substantive in that Mary Bush's performance reviews show she performed the ASM and HR Manager positions at an "Exceeds Expectations" level.   (See Plaintiffs' Facts, ¶¶ 4-14).

36.   Controverted.   Further, there were no contemporaneous criticisms by the City Administrator of Mary Bush at or around the time this June time period.   (Exhibit 32: ¶ 7).   In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).   Further, any criticisms now alleged are not credible and the testimony and interrogatory answers of City Administrator Harrison-Lee are not worthy of belief. (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).   To the contrary, Mary Bush's performance reviews show she performed the ASM and HR Manager positions at an "Exceeds Expectations" level.   (See Plaintiffs' Facts, ¶¶ 4-14).

37.   Uncontroverted

38.   Uncontroverted with explanation.   The DOL auditor commended the City's attorney

and Mary Bush and said it was the best audit she had ever been through with a City.   The auditor said the City and Mary Bush were prepared, organized, and had the information requested.   The auditor said that usually there are many findings of problems, "and that this was the best she had ever done in her career."   (Exhibit 6: tr. 73:2-11).   The only position found to be misclassified was the City Clerk position, and it resulted in a payment by the City of only $400.   (Exhibit 6: tr. 73:11-15).   In addition, the City Clerk position had been previously been a salaried position under the prior City Administrator.   City Administrator Harrison-Lee determined to change the position to an hourly instead of a salaried position, including making the duties less broad.   After this change, the position was appropriately re-classified as non-exempt, but there was an approximate 6-month time period for which overtime wages were owed because the classification had not yet been changed.   (Exhibit 6: tr. 73:24-78:3).

39.   Uncontroverted with explanation.   The classification of City positions as exempt or non-exempt positions is ultimately the decision of the City Administrator.   (Exhibit 6: tr. 74:16-24.   In addition, the City Clerk position had been previously been a salaried position under the prior City Administrator.   City Administrator Harrison-Lee determined to change the position to an hourly instead of a salaried position, including making the duties less broad.   After this change, the position was appropriately re-classified as non-exempt, but there was an approximate 6-month time period for which overtime wages were owed because the classification had not yet been changed.   (Exhibit 6: tr. 73:24-78:3).

40.   Controverted.   At the time the Department of Labor audit findings were announced in a meeting, the City Administrator "was quite pleased with the findings because the information from the investigator and telling us what a fine job we did and how well our department was run

13

and put together, she was quite pleased with that."   (Exhibit 6: tr. 78:4-16).   Further, there were

no contemporaneous criticisms by the City Administrator of Mary Bush about the Department of

Labor audit findings.   (Exhibit 32: ¶ 8).   In addition, Mary Bush was never provided any verbal

warning, written reprimand, or probation based upon this or any other alleged criticism now being

alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 16-21).   Further, any criticisms now

alleged are not credible and the testimony and interrogatory answers of City Administrator

Harrison-Lee are not worthy of belief.   (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109,

136-141).

41.   Controverted in part.   The testimony was that there was a threat about Mary Bush's

job prior to the audit being completed, but that "when they got done with the investigation, they

complimented Mary on it."   (Exhibit 35:   Deposition of Kevin Bush, tr. 24:9-22).

42.   Controverted in part.   Human resources and the City Administrator discovered this

during the Department of Labor audit.   The Director of the relevant Department had known all

along that this employee had not yet completed his Master's thesis.   (Exhibit 6: tr. 54:20-56:2).

43.   Controverted in part.   With regard to the potential employee background checks,

Mary Bush believed that such checks were being included in the background checks as part of our

protocol.   She was not sure that she had been clear in setting forth that protocol based upon the

Human Resource Senior Specialist not understanding that those checks were to have been done.

She would have only expected to have been told if a background check came up negative, so she

did not know that employment checks were not being included in the background checks.

(Exhibit 32, ¶ 9).

44.   Uncontroverted.

45.    Uncontroverted with explanation.   The City of Gardner's policies and procedures have steps of progressive discipline which require written documentation of verbal warnings, written reprimands, and probations.  (See Plaintiff's Facts, ¶¶ 16-18).   In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 19-21).

46.    Controverted.   In November of 2014, after the time period of the Travis issue, City Administrator Cheryl Harrison-Lee addressed a group of City of Gardner employees at Recognizing Excellence in Gardner event, at which time she praised Mary Bush for her excellent job performance.   (Exhibit 2: tr. 96:14-97:24).

47.    Uncontroverted.

48.    Controverted in part.   In November of 2014, after the time period of the Travis issue, City Administrator Cheryl Harrison-Lee addressed a group of City of Gardner employees at Recognizing Excellence in Gardner event, at which time she praised Mary Bush for her excellent job performance.   (Exhibit 2: tr. 96:14-97:24).   The City of Gardner's policies and procedures have steps of progressive discipline which require written documentation of verbal warnings, written reprimands, and probations.  (See Plaintiff's Facts, ¶¶ 16-18).   In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 19-21).

49.    Uncontroverted.

50.   Controverted.   The coffee meeting Mary Bush had with Kristina Harrison was with regard to Mary Bush's concerns that she and other employees were being treated inappropriately by the City Administrator, as ultimately expressed in her letter of January 26, 2015 and to the investigator.   That meeting also addressed the issue of the large turnover of directors and other city employees due to the environment created by the City Administrator.   Mary Bush did not tell Kristin Harrison in that meeting that the failure to ensure education credentials had changed the relationship she had with the City Administrator.   Mary Bush also did not say that the hostile environment she was reporting was because of the education credential situation, but instead expressed that she was being subjected to many non-substantive and inaccurate criticisms and that the City Administrator was not responding to her or supporting her as needed in order to do her job.   (Exhibit 32: ¶ 10; Exhibit 26:   tr. 255:19-256:19).

51.   Controverted.   The coffee meeting Mary Bush had with Kristina Harrison was with regard to Mary Bush's concerns that she and other employees were being treated inappropriately by the City Administrator, as ultimately expressed in her letter of January 26, 2015 and to the investigator.   That meeting also addressed the issue of the large turnover of directors and other city employees due to the environment created by the City Administrator.   Mary Bush did not tell Kristin Harrison in that meeting that the failure to ensure education credentials had changed the relationship she had with the City Administrator.   Mary Bush also did not say that the hostile environment she was reporting was because of the education credential situation, but instead expressed that she was being subjected to many non-substantive and inaccurate criticisms and that the City Administrator was not responding to me or supporting me as needed in order to do my job. (Exhibit 32: ¶ 10; Exhibit 26:   tr. 255:19-256:19).

52.   Controverted in part.   Mr. Stewart testified that there was less communication and interaction between Mary Bush and the City Administrator.   He also testified he did not know when that occurred, but that he would "guesstimate" that it was like that for "several months, if not longer," before Mary left in mid-March, 2015.   (Exhibit 10: tr. 31:10-32:25).

53.   Controverted in part.   Mr. Stewart testified that Mary Bush was frustrated "that she was not receiving responses from Cheryl or the communication she needed to perform" and that he believed Mary expressed this concern "several months before separation" in mid-March of 2015. (Exhibit 10: tr. 31:10-32:25, 48:5-15).

54.   Uncontroverted with explanation.   Mary Bush updated her resume because she felt she was being treated discriminatorily and subjected to a hostile working environment.   Further, the December 29th date of this resume updating shows that Mary Bush was concerned for the issues set forth in her January 26th letter before the police chief interviews on January 23rd. (Exhibit 32, ¶ 11).   Mary Bush testified, "The environment was pretty bad so I had my eyes open."   (Exhibit 26: tr. 407:7-12).

55.   Uncontroverted with explanation.   Mary Bush printed off her calendar on January 22nd based on her concern that she was being treated discriminatorily and subjected to a hostile working environment.   The calendar entries were to assist her in discussing her complaints of discrimination and hostile work environment.   Further, the January 22nd date of this printing shows that Mary Bush was concerned for the issues set forth in her January 26th letter before the police chief interviews on January 23rd .   (Exhibit 32, ¶ 12).

56.   Uncontroverted with explanation.    Mary Bush testified, "The environment was

17

pretty bad so I had my eyes open."   (Exhibit 26: tr. 407:7-12).

    57.   Uncontroverted.

    58.   Uncontroverted with explanation.   Mary Bush had texted the City Administrator on multiple occasions that day regarding a concern one of the police chief search committee members had about not have his/her name released.   The City Administrator failed to respond, and there was a time line for getting the other requested information released.   As such, the requested information was initially sent without the committee member's name.   There had been no prior instructions from the City Administrator regarding what information should or should not be released.   (Exhibit 6: tr. 59:25-61:20).

    59.   Uncontroverted with explanation.   Mary Bush had texted the City Administrator on multiple occasions that day regarding a concern one of the police chief search committee members had about not have his/her name released.   The City Administrator failed to respond, and there was a time line for getting the other requested information released.   As such, the requested information was initially sent without the committee member's name.   There had been no prior instructions from the City Administrator regarding what information should or should not be released.   (Exhibit 6: tr. 59:25-61:20).

    60.   Uncontroverted with explanation.   Mary Bush had texted the City Administrator on multiple occasions that day regarding a concern one of the police chief search committee members had about not have his/her name released.   The City Administrator failed to respond, and there was a time line for getting the other requested information released.   As such, the requested information was initially sent without the committee member's name.   There had been

no prior instructions from the City Administrator regarding what information should or should not be released.   (Exhibit 6: tr. 59:25-61:20).

61.   Uncontroverted.

62.   Controverted.   With regard to the police chief interview scenarios, witness Lisa Wilms confirmed that City Administrator Cheryl Harrison-Lee had said she would be preparing those scenarios.   It was only a short time before the interviews when the City Administrator changed course and said Mary Bush was to do the scenarios.   Mary Bush was out of the office, and so she instructed Lisa Wilms to provide the generic scenarios from prior interviews.   (Exhibit 7: tr. 58:22-59:7, 95:8-96:4, 124:5-14).

63.   Uncontroverted.

64.   Uncontroverted with explanation.   With regard to the police chief interview scenarios, witness Lisa Wilms confirmed that City Administrator Cheryl Harrison-Lee had said she would be preparing those scenarios.   It was only a short time before the interviews when the City Administrator changed course and said Mary Bush was to do the scenarios.   Mary Bush was out of the office, and so she instructed Lisa Wilms to provide the generic scenarios from prior interviews.   (Exhibit 7: tr. 58:22-59:7, 95:8-96:4, 124:5-14).

65.   Uncontroverted with explanation.   With regard to the police chief interview scenarios, witness Lisa Wilms confirmed that City Administrator Cheryl Harrison-Lee had said she would be preparing those scenarios.   It was only a short time before the interviews when the City Administrator changed course and said Mary Bush was to do the scenarios.   Mary Bush was out of the office, and so she instructed Lisa Wilms to provide the generic scenarios from prior interviews.   (Exhibit 7: tr. 58:22-59:7, 95:8-96:4, 124:5-14).

19

66.   Uncontroverted with explanation.   Both positions were to assist and report to Mary Bush as Administrative Services Manager.   During the budget process of 2014 for the 2015 budget, there was no discussion or consideration that these positions were to in any way replace Mary Bush or cause her position to need to be eliminated. (See Plaintiff's Facts, ¶¶ 33-38).

67.   Controverted.   Katie Asbury was not clear on the date of this discussion, but said it occurred about the time she was moving in 2015. (Exhibit 9: tr. 46:1-16).   The discussion, in fact, occurred after Mary Bush's January 26, 2015 complaint.   (Exhibit 32: ¶ 13).

68.   Controverted in part.   It is uncontroverted that in August of 2014, the City Administrator said abruptly to Mary Bush as they were walking into a Council Meeting, "You need to be prepared I think council is going to demote you."   That was all that was said and the City Administrator walked off.   (Exhibit 6: tr. 190: 15-20).   There was no discussion of anything like that at the Council Meeting, and when Mary Bush tried to bring it up again, the City Administrator would not talk to her about it.   (Exhibit 6: tr. 190:20-25).   The City Administrator did not allege any basis for the statement she made, but instead was possibly responding to criticisms of the City Administrator's own performance and/or pressures being placed on here. She may also have been trying to intimidate Mary Bush and seeking to force her to leave on her own like other Directors who reported to the City Administrator had done.   (Exhibit 32: ¶ 5).

69.   Uncontroverted.

70.    Uncontroverted.

71.   Uncontroverted with explanation.   The IT position was originally organized and budgeted to report to Mary Bush as Administrative Services Manager.   (Exhibit 6: tr. 135:12-19). During the budget process of 2014 for the 2015 budget, there was no discussion or consideration

that these positions were to in any way replace Mary Bush or cause her position to need to be eliminated. (See Plaintiff's Facts, ¶¶ 33-38).

72.   Uncontroverted.

73.   Uncontroverted with explanation.   The City Administrator said at that time that she wanted to have more hands-on with IT.   (Exhibit 6: tr. 138:12-16).   There was no indication at that time to Mary Bush or anyone else that the ASM position was going to be eliminated.   (See Plaintiff's Facts, ¶¶ 73-78).

74.   Uncontroverted.

75.   Uncontroverted with explanation.   It is uncontroverted that the City Administrator made such overarching comments that were not true.   In addition, the City of Gardner's policies and procedures have steps of progressive discipline which require written documentation of verbal warnings, written reprimands, and probations.   (See Plaintiff's Facts, ¶¶ 16-18).   In addition, Mary Bush was never provided any verbal warning, written reprimand, or probation based upon this or any other alleged criticism now being alleged by the City Administrator. (See Plaintiffs' Facts, ¶¶ 19-21).

76.   Controverted.   The decision to eliminate the ASM position was not made until after Mary Bush's January 26, 2015 complaint.   (See Plaintiff's Facts, ¶¶ 108, 33-38, 70-107). Further, the testimony and interrogatory answers of City Administrator Harrison-Lee are not credible and are not worthy of belief.   (See Plaintiffs' Facts, ¶¶ 87, 90, 99-101, 104-107, 109, 136-141).

77.   Uncontroverted with explanation.   Mr. Abramovitz has not performed near the

level of Mary Bush in the position of head of Human Resources.   (See Plaintiff's Facts, ¶¶ 142-145).   In addition, he has engaged in unprofessional conduct.   (See Plaintiff's Facts, ¶ 142). Despite this, because he has not engaged in protected activity, the City Administrator did not terminate his employment.   (See Plaintiff's Facts, ¶ 142).

78.   Uncontroverted.

79.   Uncontroverted.

80.   Uncontroverted.

81.   Uncontroverted with explanation.   Mr. Abramovitz was not hire to replace and did not replace Mary Bush.

82.   Controverted in part.   Councilman Shute testified that he had discussions in October/November time frame of 2014 in which he questioned why certain positions had not yet been filled and for which he held the City Administrator accountable.   The City Administrator said that the new Human Resources Supervisor would assist in getting these positions filled.   The discussion at that time with the City Administrator was that Mary Bush was "dealing with multiple different sets of responsibilities" and that "she couldn't focus on the HR duties that were needed in order to be able to . . . screen through these resumes and . . . get those particular functions completed."  (Exhibit 3: tr. 24:7-26:21).   Next, Councilman Fotovich's criticisms are from the time period in which Mary Bush's performance was reviewed as "Exceeds Expectations."   (See Plaintiff's Facts, ¶¶ 13-14).   In addition, Mary Bush was not provided any written documentation of any performance criticism as required by the City of Gardner's policies and procedures.   (See Plaintiff's Facts, ¶¶ 16-20).

83.   Controverted.   Defendant's witnesses have provided inconsistent and contradictory

testimony regarding conversations about eliminating the ASM position, and defendant has also failed to produce any documentation supporting such discussions.  As such, the testimony of Defendant's witnesses is not worthy of belief.   (See Plaintiff's Facts, ¶¶ 88-109, 113).   Further, Kristina Harrison testified she could not recall whether or not a decision had been made to eliminate the ASM position at the January 23rd meeting with the Mayor and City Administrator.  (Exhibit 4: tr. 27:7-12).

84.   Controverted.   Defendant's witnesses have provided inconsistent and contradictory testimony regarding conversations about eliminating the ASM position, and Defendant has also failed to produce any documentation supporting such discussions.  As such, the testimony of Defendant's witnesses is not worthy of belief.   (See Plaintiff's Facts, ¶¶ 88-109, 113).    Further,

85.   Controverted.   Defendant's witnesses have provided inconsistent and contradictory testimony regarding conversations about eliminating the ASM position, and Defendant has also failed to produce any documentation supporting such discussions.  As such, the testimony of Defendant's witnesses is not worthy of belief.   (See Plaintiff's Facts, ¶¶ 88-109, 113).    Further, Kristina Harrison testified she could not recall whether or not a decision had been made to eliminate the ASM position at the January 23rd meeting with the Mayor and City Administrator.  (Exhibit 4: tr. 27:7-12).   In addition, Mayor Morrow could not recall exactly what was said by the City Administrator during this alleged January 23, 2015 discussion.   (Exhibit 1: tr. 114:22-115:4, 115:16-22).   According to the Mayor, the result of the meeting was that "We were going to be looking to eliminate the position and take other action."   (Exhibit 1: tr. 115:16-22).   Mayor Morrow did not recall any timetable being placed on elimination of the position at this alleged meeting, but he did acknowledge that the position had been budgeted for the entire year of 2015.

23

(Exhibit 1: tr. 115:23-116:3).   Finally, on February 2, 2015, Mayor Morrow told Investigator Freeman that the elimination of the ASM position was being considered, but that no decision had been made on whether or not to eliminate the ASM position.   (Exhibit 5: tr. 19:21-20:6, 21:17-23; Exhibit 1: tr. 10:12-11:8).

86.   Controverted.   Defendant's witnesses have provided inconsistent and contradictory testimony regarding conversations about eliminating the ASM position, and Defendant has also failed to produce any documentation supporting such discussions.   As such, the testimony of Defendant's witnesses is not worthy of belief.   (See Plaintiff's Facts, ¶¶ 88-109, 113).

87.   Controverted in part.   It is uncontroverted that the City Administrator was creating a hostile environment for Mary Bush and others prior to January 26, 2015. It is controverted that there was any discussion or decision to eliminate the ASM position prior to that date.   (See Plaintiff's Facts, ¶¶ 74-78, 88-108).   Also, there had been no progressive discipline regarding any performance deficiencies of Mary Bush as of January 26, 2015.   (Plaintiff's Facts, ¶¶ 16-21, 85).   Finally, in the cited testimony Mary Bush specifically testified that even though she thought the CA was up to something, "I didn't think she would work me out because I worked too hard for her and I was too good of a performer."   (Exhibit 6: tr. 147:7-10).

88.   Controverted in part.   It is uncontroverted that the City Administrator was creating a hostile environment for Mary Bush and others prior to January 26, 2015. It is controverted that there was any discussion or decision to eliminate the ASM position prior to that date.   (See Plaintiff's Facts, ¶¶ 74-78, 88-108).   Also, there had been no progressive discipline regarding any performance deficiencies of Mary Bush as of January 26, 2015.   (Plaintiff's Facts, ¶¶ 16-21, 85).   Finally, in the cited testimony Mary Bush specifically testified that even though she thought the

24

CA was up to something, "I didn't think she would work me out because I worked too hard for her and I was too good of a performer."   (Exhibit 6: tr. 147:7-10).

89.   Controverted in part.   It is uncontroverted that the City Administrator was creating a hostile environment for Mary Bush and others prior to January 26, 2015. It is controverted that there was any discussion or decision to eliminate the ASM position prior to that date.   (See Plaintiff's Facts, ¶¶ 74-78, 88-108).   Also, there had been no progressive discipline regarding any performance deficiencies of Mary Bush as of January 26, 2015.   (Plaintiff's Facts, ¶¶ 16-21, 85). Finally, in the cited testimony Mary Bush specifically testified that even though she thought the CA was up to something, "I didn't think she would work me out because I worked too hard for her and I was too good of a performer."   (Exhibit 6: tr. 147:7-10).

90.   Controverted in part.   It is uncontroverted that the City Administrator was creating a hostile environment for Mary Bush and others prior to January 26, 2015. It is controverted that there was any discussion or decision to eliminate the ASM position prior to that date.   (See Plaintiff's Facts, ¶¶ 74-78, 88-108).   Also, there had been no progressive discipline regarding any performance deficiencies of Mary Bush as of January 26, 2015.   (Plaintiff's Facts, ¶¶ 16-21, 85). Finally, in the cited testimony Mary Bush specifically testified that even though she thought the CA was up to something, "I didn't think she would work me out because I worked too hard for her and I was too good of a performer."   (Exhibit 6: tr. 147:7-10).

91.   Uncontroverted with explanation.   Human Relations Senior Specialist Lisa Wilms testified that one cannot hear what is said in conference room at City Hall when door is closed. She testified that she could not hear discussions during the January 23rd Police Chief interviews. (Exhibit 7: 69:21-70:12, 71:12-17).

92.   Uncontroverted with explanation.   The original complaint was attached to her email to Mayor Morrow and Council President Harrison.

93.   Controverted with explanation.   The January 26, 2015 email and attachment was Mary Bush's first written complaint.   Mary Bush had previously orally complained to Council President Harrison.   (Exhibit 32: ¶ 10).

94.   Uncontroverted with explanation.   It is uncontroverted that Mary Bush's written complaint contained these references and more.   In addition, Mary Bush orally advised the investigator that the City Administrator had made age-biased and race-biased comments, as well as other facts.   (See Plaintiff's Facts, ¶¶ 40, 51-52).   Mary Bush's complaint complained of race and age and gender discrimination and constituted protected activity.   (See Plaintiff's Facts, ¶¶ 40-66).

95.   Uncontroverted with explanation.   It is uncontroverted that Mary Bush's written complaint contained these references and more.   In addition, Mary Bush orally advised the investigator that the City Administrator had made age-biased and race-biased comments, as well as other facts.   (See Plaintiff's Facts, ¶¶ 40, 51-52).   Mary Bush's complaint complained of race and age and gender discrimination and constituted protected activity.   (See Plaintiff's Facts, ¶¶ 40-66).

96.   Uncontroverted.

97.   Uncontroverted with explanation.   Mary Bush further testified that she believed that the use of the phrase "farm league" denoted age and/or race discrimination.   (Exhibit 6: tr. 196:1-6).

98.   Controverted.   Mary Bush did not hear Mayor Morrow ever use the words "farm

league," but she did hear the City Administrator use that phrase to describe Mayor Morrow and City of Gardner employees in general.   (Exhibit 32, ¶ 14).   Also, Mayor Morrow's testimony is not worthy of belief.   (See Plaintiff's Facts, ¶¶ 93-97, 105, 113).

99.   Uncontroverted with explanation.   While much of the staff received negative treatment from the City Administrator, Mary Bush also complained of specific age and race-biased comments as well as the targeting of upper level directors with age and racially discriminatory treatment.   (See Plaintiff's Facts, ¶¶ 40, 51-52, 56-66).

100.   Controverted in part.   Plaintiff does not controvert that the quoted language is in her complaint, however the persons the City Administrator wanted to succeed were all younger persons such as Matt Wolf.   (Exhibit 32, ¶ 15).   Further, Mary Bush also complained of specific age and race-biased comments as well as the targeting of upper level directors with age and racially discriminatory treatment.   (See Plaintiff's Facts, ¶¶ 40, 51-52, 56-66).

101.   Uncontroverted with explanation.   Plaintiff does not controvert that the City Administrator made these unfounded and inappropriate comments, possibly as a means of attempting to intimidate Mary Bush into leaving employment with the City.   However, Plaintiff's performance as Human Resources Manager and ASM had been evaluated by the City to be at the "Exceeds Expectations" level, and she had never been put on any progressive discipline pursuant to the City's policies and procedures.   (See Plaintiff's Facts, ¶¶ 4-24, 85).

102.   Uncontroverted.

103.   Uncontroverted.

104.   Uncontroverted   with explanation.   It is uncontroverted that the speaking points

document includes a reference to "Retaliation due to Travis issue," but Mary Bush's written complaint, speaking points, and oral discussions with the City's Investigator included much more than a discussion of that one incident.   (See Plaintiff's Facts, ¶¶ 40, 51-52, 56-66).

105.    Uncontroverted with explanation.   It is uncontroverted that the speaking points document includes a reference to "Retaliation due to Travis issue," but Mary Bush's written complaint, speaking points, and oral discussions with the City's Investigator included much more than a discussion of that one incident.   (See Plaintiff's Facts, ¶¶ 40, 51-52, 56-66).

106.    Uncontroverted with explanation.   It is not controverted that Mary Bush identified several current and former employees who Mary Bush, as head of Human Resources, had determined were subjected to similar age or race discrimination.   It is also not controverted that none of those employees made formal complaints of age or race discrimination. The investigator did not talk to any of the ex-employees identified by Mary Bush as having been subjected to similar discriminatory treatment.   (See Plaintiff's Facts, ¶¶ 40, 51-52, 56-66).

107.    Uncontroverted with explanation.   It is not controverted that Mary Bush identified several current and former employees who Mary Bush, as head of Human Resources, had determined were subjected to similar age or race discrimination.   It is uncontroverted that some of the employees identified by Mary Bush had not been hired by the City Administrator and that some had been hired by the City Administrator.

108.    Uncontroverted with explanation.   Leslie Quillen is Caucasian.

109.    Uncontroverted with explanation.   The majority of employees identified, those

who had suffered the most from the City Administrator's conduct, and those believed by Mary Bush to have been subjected to age discrimination were the former directors.  All of these directors were over the age of 50.  (Exhibit 32, ¶ 16).  In addition, Amy Kynard, Katie Asbury, Jeanne Koontz, and Jeff Stewart are all Caucasians.

110.    Uncontroverted with explanation.   The majority of employees identified, those who had suffered the most from the City Administrator's conduct, and those believed by Mary Bush to have been subjected to age discrimination were the former directors.  All of these directors were over the age of 50.  (Exhibit 32, ¶ 16). In addition, Amy Kynard, Katie Asbury, Jeanne Koontz, and Jeff Stewart are all Caucasians.

111.    Uncontroverted with explanation.   The City Administrator had shown instance of bias in favor of seeking to hire an unqualified African-American employee.  (See Plaintiff's Facts, ¶ 146).

112.    Uncontroverted with explanation. Mary Bush did not discuss the motivations or biases of the City Administrator.

113.    Controverted in part.   The City Administrator began engaging in acts of retaliation that were similar but more intense and more frequent than the intermittent conduct in which the City Administrator had previously engaged.   (Exhibit 32, ¶ 17; See Plaintiff's Facts, ¶¶ 67-69).

114.    Uncontroverted with explanation.   The investigator did only a cursory investigation and basically accepted the denials of the City Administrator over the claims of Mary Bush.   (See Plaintiff's Facts, ¶¶ 51-56).

115.   Uncontroverted.

116.   Uncontroverted.

117.   Uncontroverted.

118.   Uncontroverted.

119.   Uncontroverted with explanation.   Mary Bush did not know what other

employment she would eventually find when she did not accept the Special Events Coordinator

position.   She was given a very short time to decide and determined to decline the position for a

number of reasons.   (See Plaintiff's Facts, ¶¶ 122-128).

120.   Controverted.   Mary Bush testified that she would have accepted the Human

Resources Supervisor position if it paid $9,000 less.   (Exhibit 6: tr. 426:22-427:11).   She also

testified that she potentially would have accepted a demoted position noting, "there's a lot of

variables in that, but I would highly consider it."   (Exhibit 6: tr. 427:15-25).

121.   Uncontroverted with explanation.   The City had not found the position worthy of

funding in the 2015 budget or prior budgets, despite its request by the Parks and Recreation

Department.   (See Plaintiff's Facts, ¶ 129).

122.   Controverted.   As of March 6, 2015, there had been so little actual discussion of

elimination of the ASM position that neither the City Administrator nor the Mayor knew what

position would be offered to Mary Bush.   As such, the decision on what position to offer Mary

Bush was made in an approximate period of less than one week.   (See Plaintiff's Facts, ¶ 118).

Further, the testimony of Mayor Morrow is not worthy of belief.   (See Plaintiff's Facts, ¶¶ 93-97,

113).

30

123.    Controverted.   The City Administrator has no documentation regarding the salary

determination or any alleged conversation with a salary consultant, and the City Administrator's

testimony is not worthy of belief.   (Exhibit 24: tr. 40:12-16; See Plaintiff's Facts, ¶¶ 99-101,

104-107, 124-127).     In addition, the City Administrator ignored and violated the specific

policies and procedures applicable to the salary that should have been offered to Mary Bush for the

Special Events Coordinator position.   (See Plaintiff's Facts, ¶¶ 124-127).

124.    Uncontroverted.

125.    Controverted in part.   The City did not create and fill the position in March of

2015.  Instead, the position was not filled until 2016.   At that time, a much higher salary was

offered to an outside applicant than was offered to long-term employee Mary Bush.   (See

Plaintiff's Facts, ¶¶ 125-127; Exhibit 34:   Defendant's Response and Supplemental Response to

Interrogatory No., 4).

126.    Uncontroverted.

127.    Controverted.   In her deposition, Mary Bush was asked about comments and

responded with the example of the farm league comment and also with examples of

racially-discriminatory hiring and pay practice issues.   (See Plaintiff's Facts, ¶¶ 146-148).

Defendant's counsel did not return to his question regarding racial comments, and so Mary Bush

did not get the opportunity to address the additional racial comment which she reported to the

investigator.  (See Plaintiff's Facts, ¶¶ 51, 54).

128.    Uncontroverted with explanation.   (See Plaintiff's Facts, ¶ 146).

129.    Uncontroverted with explanation.   The City Administrator was involved in the

hiring process and decision.

130.   Uncontroverted.

131.   Uncontroverted with explanation.   The City of Gardner's statistics do not note

how few African-American applicants the City had for these positions.

132.   Uncontroverted.

133.   Controverted in part.   Mary Bush did not set forth in her January 26th written

complaint the ageist comment, but she noted that specific comment to the investigator in her

February 2nd meeting.     (See Plaintiff's Facts, ¶ 51).

134.   Uncontroverted with explanation.   The City of Gardner's statistics do not note the

age of the other applicants for these positions.

135.   Uncontroverted with explanation.   The City of Gardner's statistics do not note the

age of the other applicants for these positions.

## III.   PLAINTIFF'S CONCISE STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS

Plaintiff Mary Bush sets forth the following additional facts which also controvert the alleged

facts set forth by the City of Gardner and which raise genuine issues of material fact.

### A.   Plaintiff Mary Bush's History Of Exceptional Performance and Reviews

1.   Mary Bush was employed by the City of Gardner from October 16, 2006 until

March 27, 2015.   (Parties' Stipulation No. 1).

2.   Mary Bush was employed as Human Resources Manager for the City of

Gardner from October 16, 2006 to January 20, 2013.   (Parties' Stipulation No. 2).

3.   In its letter offering the Human Resources Manager position to Mary Bush, the City of Gardner wrote, in part, that the "City of Gardner has selected you based on your extensive background in human resources management."   (Exhibit 1:   Deposition of Mayor Morrow, Vol. 1, tr, 23:24-24:14; Exhibit 2:   Deposition of Cheryl Harrison-Lee, Vol. 1, tr. 76:4-19; Exhibit 11: 10/11/06 Correspondence from City of Gardner to Mary Bush).

4.   As Human Resources Manager, Mary Bush was responsible for planning and managing all aspects of the human resources and risk management functions for the City of Gardner.   (Exhibit 1: tr. 24:21-25:19; Exhibit 2: tr. 77:9-16; Exhibit 12: Human Resources Manager Job Description, 12/21/11).

5.   The City of Gardner provided Mary Bush the highest ranking, "Exceeds Expectations," for her performance as Human Resources Manager for the time period of October 2006 through April of 2007.   She received an average score of 2.846 on a 3.00 scale on the Form A criteria applicable to all employees.   She received an average score of 2.875 on the Form F criteria applicable to management employees.   (Exhibit 1: tr. 26:5-31:5; Exhibit 13:   Mary Bush Performance Review, 10/06-4/07).

6.   The City of Gardner provided Mary Bush the highest ranking, "Exceeds Expectations," for her performance as Human Resources Manager for the time period of April 2007 through April of 2008.   She received an average score of 2.76 on a 3.00 scale on the Form A criteria applicable to all employees.   She received an average score of 2.75 on the Form F criteria applicable to management employees.   (Exhibit 1: tr. 31:6-33:22; Exhibit 14:   Mary Bush Performance Review, 4/07-4/08).

7.   The City of Gardner provided Mary Bush the highest ranking, "Exceeds Expectations," for her performance as Human Resources Manager for the time period of April

2008 through April of 2009.   She received an average score of 2.84 on a 3.00 scale on the Form A criteria applicable to all employees.   She received an average score of 2.875 on the Form F criteria applicable to management employees.   (Exhibit 1: tr. 33:23-39:2; Exhibit 15:   Mary Bush Performance Review, 4/08-4/09).

        8.   The City of Gardner provided Mary Bush the highest ranking, "Exceeds Expectations," for her performance as Human Resources Manager for the time period of April 2009 through November of 2009.   She received an average score of 2.84 on a 3.00 scale on the Form A criteria applicable to all employees.   She received an average score of 2.875 on the Form F criteria applicable to management employees.   (Exhibit 1: tr. 39:3-42:19; Exhibit 16:   Mary Bush Performance Review, 4/09-11/09).

        9.   The City of Gardner provided Mary Bush the highest ranking, "Exceeds Expectations," for her performance as Human Resources Manager for the time period of November 2009 through November of 2010.   She received an average score of 2.84 on a 3.00 scale on the Form A criteria applicable to all employees.   She received an average score of 2.875 on the Form F criteria applicable to management employees.   (Exhibit 1: tr. 42:20-45:5; Exhibit 17:   Mary Bush Performance Review, 11/09-11/10).

       10.   The City of Gardner provided Mary Bush the highest ranking, "Exceeds Expectations," for her performance as Human Resources Manager for the time period of November 2010 through November of 2011.   She received an average score of 2.84 on a 3.00 scale on the Form A criteria applicable to all employees.   She received an average score of 2.875 on the Form F criteria applicable to management employees.   (Exhibit 1: tr. 45:6-46:9; Exhibit 18:   Mary Bush Performance Review, 11/10-11/11).

       11.   After serving as Human Resources Manager, Mary Bush was then employed

as Administrative Services Manager for the City of Gardner from January 21, 2013 to March 27, 2015.   (Parties' Stipulation No. 3).

12.   As Administrative Services Manager, Mary Bush was responsible for all functions related to the administrative services division, which included human resources, risk management, city clerk, information technology, and building maintenance.   (Exhibit 19: Administrative Services Manager Job Description; Exhibit 1: tr. 47:21-48:19; Exhibit 2: tr. 80:8-12).

13.   Mary Bush excelled in her performance of the responsibilities of the ASM position.   She received a merit pay increase in 2014.   (Exhibit 1:  tr. 51:18-52;16).   The sole performance review provided to Mary Bush in her ASM capacity rated her performance as "Exceeds Expectations."   She received an average score of 2.81 on a 3.00 scale on the criteria on which she was rated.   (Exhibit 1: tr. 52:21-74:4; Exhibit 2: tr. 80:17-83:5, 86:25-87:4; Exhibit 20: Mary Bush Performance Review as ASM).

14.   Mary Bush's performance review as ASM was signed by City Administrator Cheryl Harrison-Lee on October 6, 2014.   It was signed by Mary Bush on September 18, 2014. (Exhibit 20; Exhibit 1: tr. 52:21-53:23).   This review of Mary Bush's performance as ASM, signed by the City Administrator in October of 2014, included the following comments:

- "Customer service is one of Mary's strengths.   She consistently displays a high level of customer service."

- "Mary strives hard to work with all departments and often goes beyond her required duties to demonstrate teamwork.

- "Mary does an excellent job on presentations and staff training."

- "Excellent demonstration of leadership!"

- "Mary demonstrates a high level of professionalism.   I encourage her to continue to work on challenging situations at Council meetings."

35

- "Mary has a good sense of how to communicate with staff at all levels."

- "The quality of Mary's work is good.  She consistently produces large volumes of work within established time frames."

- "Mary is good at seeking input on tasks and performance.  When a mistake is pointed out to her, she accepts responsibility and discusses corrective action for the future."

- "In spite of the constant demands to complete many tasks, Mary remains positive. She was tasked with accomplishing many new goals last year and displayed a 'can do' attitude each time."

- "Mary is always certain to follow procedures and department policies."

- "Mary has acquired new divisions and is still learning new duties.  She has shown tremendous ability to manage multiple new tasks."

- "Over the course of the last year, Mary developed a strong sense of visionary, strategic thinking skills.  She has been able to utilize these skills to guide her department."

- "Mary has been a great resource for the department and the City."

- "Mary has an excellent attitude about the organization's extensive changes."

- "Mary does not wait to be told to move forward on tasks.  She thinks carefully about a course of action and is confident in the execution of tasks."

- "Mary demonstrates the ability to grasp the message of difficult situations, even if they are presented without being overt."

- "Mary is responsible for training Citywide.  She does an excellent job.  In addition, she identified good training opportunities for the leadership team.

- "Mary is prepared in staff meetings and does an excellent job preparing for our one-on-one briefings.  She provides agendas and appropriate back-up materials to discuss the topics."

- "Mary has shown significant growth last year in the level of work produced for Council meetings.  I am pleased that she is able to anticipate problematic situations and develops a strategy for addressing them before they arise."

(Exhibit 20; Exhibit 1: tr. 54:3-57:4; Exhibit 2: tr. 86:25-87:4).

15.    In November of 2014, City Administrator Cheryl Harrison-Lee addressed a group of City of Gardner employees at the Recognizing Excellence in Gardner event, at which time she praised Mary Bush for her excellent job performance.   (Exhibit 2: tr. 96:14-97:24).

16.    Section 7-103.1 of the City of Gardner's Personnel Policies sets forth the following: "Verbal warning is an oral reprimand given by the employee's supervisor.   All verbal warnings shall be documented in writing."   (Exhibit 21: City of Gardner's Personnel Policies; Exhibit 1: tr. 60:24-63:2; Exhibit 2: tr. 16-20; Exhibit 3: tr. 27:5-10; Exhibit 4: Deposition of Kristina Harrison, tr. 11:18-12:1).

17.    Section 7-103.2 of the City of Gardner's Personnel Policies sets forth the following:   "A written reprimand is a written notification of the employee's unsatisfactory performance or other violation of the personnel policies, administrative policies and procedures, and/or other City or departmental policies."   (Exhibit 21: City of Gardner's Personnel Policies; Exhibit 1: tr. 63:3-10; Exhibit 2: tr. 98:21-99:2; Exhibit 3: tr. 27:11-16; Exhibit 4: tr. 12:2-5).

18.    Section 7-103.3 of the City of Gardner's Personnel Policies sets forth the following:   "A special probation is a period of a specified length of time during which the employee is required to fulfill a set of conditions to improve work performance or on-the-job behavior.   Failure to meet the probational requirement will result in additional disciplinary action to and including termination."   (Exhibit 21: City of Gardner's Personnel Policies; Exhibit 1: tr. 63:17-64:4).

19.    Mary Bush never received any verbal warnings during her employment with the City of Gardner.   (Exhibit 1: tr. 63:11-13; Exhibit 2: tr. 99:11-13; Exhibit 32: Declaration of Mary Bush, ¶2).

20.    Mary Bush never received any written reprimands during her employment

with the City of Gardner.   (Exhibit 1: tr. 63:14-16; Exhibit 2: tr. 99:7-10; Exhibit 32: ¶2).

21.   Mary Bush was never put on special probation during her employment with the City of Gardner.   (Exhibit 1: tr. 64:2-4; Exhibit 2: tr. 99:14-16; Exhibit 32: ¶2).

22.   Mayor Morrow never saw any written criticisms of Mary Bush's work performance.  (Exhibit 1: tr. 60:5-8).

23.   Councilman Shute never saw any written documentation from the City Administrator with regard to any alleged performance deficiencies of Mary Bush as Administrative Services Manager.   (Exhibit 3: Deposition of Stephen Shute, tr. 26:22-27:4).

24.   Council President Kristina Harrison is not aware of any documented verbal warning or any written reprimands regarding Mary Bush's performance.   (Exhibit 4: tr. 12:6-17).

25.   City of Gardner Human Resource Senior Specialist Lisa Wilms testified that Mary Bush was an excellent Human Resources Manager while at the City of Gardner.   "She was very caring.   She would go to bat for the employees.   She – even if somebody had a disagreement with her, maybe they didn't agree with a decision that she made, they still respected her.   She had respect for everyone."   (Exhibit 7: Deposition of Lisa Wilms, tr. 103:23-104:14).

26.   In her many years of working with Mary Bush, Human Resources Senior Specialist Lisa Wilms found Mary Bush to be competent in the HR field, hard-working, honest, and ethical.   (Exhibit 7: tr. 104:15-105:14).

27.   Jeff Stewart was Director of Parks and Recreations for the City of Gardner and worked with Mary Bush for many years when she was the Human Resources Manager.   Mr. Stewart testified that Mary Bush was personable, very approachable, and professional with staff. He testified that Mary Bush was very competent in the field of HR and responsive to requests for assistance.    He testified that he found Mary Bush to always be honest, ethical, and of the highest

integrity.   (Exhibit 10:   Deposition of Jeff Stewart, tr. 60:6-62:8).

**B.   City Administrator Cheryl Harrison-Lee Receives Performance Criticisms**

28.   City Administrator Cheryl Harrison-Lee's performance reviews for 2014 included overall ratings of "needs improvement" from one council member, "meets expectations" from four council members, and "exceeds expectations" from only Mayor Morrow.   (Exhibit 1: tr. 88:13-89:8; Exhibit 3: tr. 63:7-67:24).   The reviews reflect that the City Administrator was being criticized by Council during 2014, and they also include several negative comments regarding the City Administrator's performance.   (Exhibit 1: tr. 84:4-85:23, 86:24-87:8, 93:21-94:5).

29. Cheryl Harrison-Lee's performance as City Administator has not been rated nearly as high as Mary Bush's performance as Human Resources Manager and Administrative Services Manager.   (See paragraphs 5-10 and 13-14, above).

30.   City Administrator Cheryl Harrison-Lee admits that she has received criticisms regarding her performance as City Administrator for the City of Gardner.   (Exhibit 2: tr. 18:7-15, 22:9-32:1).

31.   City Administrator Cheryl Harrison-Lee began in August of 2014 to intermittently falsely blame Mary Bush for things that were the City Administrator's failures and/or make generalized and non-substance-based criticisms of her.   She did this based on age and race discrimination and in order to deflect criticism off her and put specific blame on Mary for some of things for which the City Administrator was responsible.   (Exhibit 32: ¶ 3).

32.   City Administrator Cheryl Harrison-Lee's performance reviews for 2015 continued noting that the City Administrator needed to improve her performance and criticizing her for the turnover in director positions and for other employee relations failures.   (Exhibit 1: tr.

94:16-95:25, 96:14-98:22, 99:10-100:1).

### C. City Of Gardner's Budget Process -- Decision Made In August of 2014 To Add To Human Resources Department and To Mary Bush's Responsibilities

33.    In August of 2014, the Council voted on the City of Gardner's budget, and Mary Bush's ASM position was budgeted for the entire year of 2015.    (Exhibit 1: tr. 115:5-15; Exhibit 3: tr. 16:3-10, 30:10-14; Exhibit 4: tr. 13:3-6; Exhibit 7: tr. 103:8-11; Exhibit 23: tr. 19:20-20:6).

34.    For many months during the normal budgetary process in 2014, the City had studied what positions were needed for the year 2015.    In February of 2014 was the first phase of planning and then in April of 2014 was the phase of budget development.    In June of 2014, there was the phase of government review, and in August of 2014 the budget was actually adopted.    The City had determined based on those many months of study that a new and additional position should be created to bolster the City's Human Resources Department.    (Exhibit 3: tr. 21:6-23:4; Exhibit 4: tr. 14:18-23, 15:18-16:23; Exhibit 28 – City of Gardner Budget for 2015, pp. 2-3).

35.    In the City of Gardner's budget for 2015, the Human Resources area was to be expanded with a new Human Resources Supervisor position that was to report to the Administrative Services Manager.    (Exhibit 1: tr. 150:23-151:2; Exhibit 3: tr. 23:19-25:7; Exhibit 4: tr. 17:14-25; Exhibit 7: tr. 61:21-62:11, 103:12-15; Exhibit 28: pp. 4-6).

36.    During 2013 and 2014, Mary Bush had been working about 80 hours a week in performing her job as ASM for the City of Gardner.    (Exhibit 6: tr. 22-24).

37.    Organizational charts were created in August of 2014 which showed how the Administrative Services Department at the City of Gardner was to be structured in 2015, as determined by the lengthy budgetary process.    These charts show the Human Resource Supervisor position reporting to the Administrative Services Manager.    (Exhibit 29:   City of

Gardner

Organization Charts, August 5, 2014, pp. 3-4; Exhibit 4: 18:6-19:9).

38.    There was no mention by anyone at the City during the time period of this extensive study that the creation of the Human Resources Supervisor position would render Mary Bush's Administrative Services Manager position unnecessary or redundant.    (Exhibit 3: tr. 21:6-14; Exhibit 4: tr. 16:24-17:25, 30:2-8).

39.    Despite all of the study and time that went into the decisions made in the 2014 budgetary process for 2015, the City never implemented this structure as the HR Supervisor had not even started in March of 2015 when Mary Bush's position was eliminated.    (Exhibit 23: tr. 21:8-23, 22:15-23:1).

### D.  Mary Bush's Protected Activity

40.    Mary Bush sent the email and attachment which was marked as Deposition Exhibit 101 to Mayor Chris Morrow and Council President Kristina Harrison on January 26, 2015, at 8:15 a.m.  (Parties' Stipulation No. 4; Exhibit 1:  tr. 12:12-23; Exhibit 25:1/26/15 email and attachment).   Mary Bush provided the City's investigator a document that contained some of the speaking points that Mrs. Bush reviewed with the investigator.   (Exhibit 33:   Document provided by Mary Bush during interview with City Investigator).   Mary Bush also provided other information to the investigator regarding comments that Mrs. Bush perceived to show age bias and race bias. ((Exhibit 5: tr. 79:22-81:1, 86:11-17).   She discussed with the investigator alleged terms and conditions discrimination based on age and/or race including a threatened demotion, false and unsubstantiated performance criticisms, inconsistent directions and standards, failure to respond and provide necessary access to do her job, taking away job responsibilities, and overall intimidating conduct.  (Exhibit 25; Exhibit 33; Exhibit 5: tr. 23:12-19, 42:24-43:2; Exhibit 37:

Transcript of Investigator Shelly Freeman's Notes from Interview with Mary Bush, pp. 32:6-20, 32:23-33:6, 34:8-12, 35:10-36:1).   Finally, Mary Bush complained during the investigation regarding gender discrimination in pay, with her speaking points noting that the new network administrator's salary was "negotiated without HR" and "male making more money than I." (Exhibit 33; Exhibit 25; Exhibit 37: tr. 34:25-35:9).

41.   Mayor Morrow understood Mary Bush's email to assert that there were issues occurring in the workplace that were prohibited by the Age Discrimination in Employment Act. (Exhibit 1: tr. 14:15-25).

42.   Mayor Morrow also understood Mary Bush's email to assert that the workplace environment at the City of Gardner was violative of Title VII of the Civil Rights Act of 1964.   (Exhibit 1:   tr. 15:1-18).

43.   Mayor Morrow's letter to Mary Bush of January 27, 2015, acknowledges Mrs. Bush's complaint was made pursuant to the anti-discrimination, equal opportunity, and anti-harassment policies of the City.   It provides these relevant policies of the City as well as the anti-retaliation policy.   (Exhibit 1: tr. 136:11-137:6; Exhibit 22 – 1/27/15 Memo from Mayor Morrow to Mary Bush).

44.   Mayor Morrow hired Shelly Freeman, an attorney recommended by the City's attorney and one who defends employers in discrimination and retaliation cases, to investigate Mary Bush's complaint letter.   The City could have hired as its investigator a former judge, city administrator, human resources manager, or an attorney who represents employees. Mayor Morrow did not hire an attorney who represents employees because the Mayor was trying to protect the City.   (Exhibit 1: tr. 141:12-145:12).

45.   Investigator Shelly Freeman acknowledged that Mary Bush's complaints

42

included allegations regarding age and race discrimination. (Exhibit 5: Deposition of Shelly Freeman, tr. 91:21-92:6).

46.   Councilman Shute testified that there was discussion that Mary Bush's complaint alleged a hostile environment based on age and gender.   (Exhibit 3: tr. 54:10-15).

47.   Mayor Morrow did not substantively talk to Mary Bush about the concerns raised in her complaint letter.  (Exhibit 1: tr. 17:2-6).   No one from the City Council talked to Mary Bush substantively about those concerns after her January 26th complaint.  (Exhibit 1: tr. 17:7-11).

48.   The City Administrator was aware of Mary Bush's complaint shortly after January 26, 2015, and she provided a copy of the complaint to and discussed it with Councilman Shute.   (Exhibit 3: tr. 45:10-46:3, 46:7-47:12).

49.   Mayor Morrow did not provide the investigator the written performance reviews of Mary Bush.   He did not provide the investigator the policies and procedures of the City of Gardner.   He did not provide the investigator any information on the City's policies which require reprimands be in writing.   He did not send the investigator any of the budgets or organizational charts that showed the HR Supervisor position was intended to report to the ASM position.   (Exhibit 1: tr. 150:1-22).

50.   The investigator noted that a recurring theme of Mary Bush's complaint was that the City Administrator would change her direction and that the City Administrator would not at times respond on things necessary for Mary Bush to do her job.   (Exhibit 5: tr. 23:12-19, 42:24-43:2).

51.   The investigator acknowledged that Mary Bush alleged, in her meeting during the investigation of Mrs. Bush's complaint, that City Administrator Harrison-Lee had made

43

the comment, "As people get older, they don't think as clearly."   The investigator agreed that such comment is inappropriate to make in the workplace. The investigator agreed that such comment is on its face age-related.   The investigator noted, "It would be quite an inappropriate age-based comment to make."   (Exhibit 5: tr. 79:22-81:1).

52.   The investigator acknowledged that Mary Bush alleged, in her meeting during the investigation of Mrs. Bush's complaint, that City Administrator Harrison-Lee had made the comment, "I am from the South.   I have to be tough.   I'm used to working with white men." (Exhibit 5: tr. 86:11-17; Exhibit 37: tr. 37:14-16, 38:13-19).

53.   In her report to the Council on March 2nd, Investigator Freeman did not inform the Council that Mary Bush had alleged that the City Administrator had made the statement:   "As people get older, they don't think as clearly."   (Exhibit 3: tr. 56:7-17; Exhibit 4: tr. 44:12-17).   Councilman Shute and City Administrator Cheryl Harrison-Lee agreed that such statement in the work environment could be viewed as showing age bias.   (Exhibit 2: tr. 72:12-16; Exhibit 3: tr. 57:1-58:14).   Council President Harrison did not know whether such statement exhibits age bias.   (Exhibit 4: tr. 44:18-23).

54.   In her report to the Council on March 2nd, Investigator Freeman did not inform the Council that Mary Bush had alleged that the City Administrator had made the statement, "I am from the South.   I have to be tough.   I am used to working with white men." (Exhibit 3: tr. 54:22-55:7; Exhibit 4: tr. 43:15-44:23).   Neither Councilman Shute nor City Administrator Harrison-Lee were able to answer why a racial designation was necessary in this statement.   (Exhibit 2: tr. 74:4-13; Exhibit 3: tr. 56:3-6).   Council President Harrison did not know whether such statement exhibits racial bias.   (Exhibit 4: tr. 43:24-44:11).

55.   The investigator met with Cheryl Harrison-Lee after having already met with

44

Mary Bush.   The investigator did not give Mary Bush any chance to respond, as she did not have any discussions with Mary Bush related to the specific criticisms and claims of the City Administrator.   (Exhibit 5: tr. 28:1-29:16, 42:17-43:13).

56.   Mary Bush provided six names of previous employees who Mary Bush believed had previously suffered from a discriminatory hostile environment created by the City Administrator.   The Investigator did not talk to any of those former employees as part of her investigation.   (Exhibit 5: tr. 35:4-10).   Mary Bush discussed with the investigator how many of these older Caucasian employees were subjected to potential age and/or race discrimination by the City Administrator, similar to what Mary Bush was also experiencing.   (Exhibit 37: tr. 33:24-34:7).

57.   Councilman Shute testified that he was concerned about the departure of many of the same persons identified by Mary Bush as aggrieved during the investigation of her complaint.   He testified that he felt that the turnover was "too pervasive" and that the City "had too much turnover in our organization."   (Exhibit 3: tr. 48:3-49:3).

58.   City Administrator Cheryl Harrison-Lee admitted that the following persons had left as Directors for the City of Gardner during her time period as City Administrator:   Brian Faust, Jeff Stewart, Michael Hall, and Gerald Cullumber.   (Exhibit 2: tr. 20:13-21:3).

59.   Councilman Shute had previously had discussions with Mike Hall, one of the persons identified by Mary Bush in her complaint.   Mike Hall had noted he was unhappy with the way he was treated by the City Administrator and that she didn't allow him to do his job.   Mr. Hall felt he was being set up to fail by the City Administrator and that the Mayor did not have his back. (Exhibit 3: tr. 49:4-50:13; Exhibit 7: tr. 38:1-17; Exhibit 10: 42:21-25).   Councilman Shute had also heard similar concerns and complaints about the City Administrator from Leslie Quillen and

Gerald Cullumber. (Exhibit 3: tr. 50:16-24). Mike Hall was over 50 years old. (See Defendant's Fact, ¶ 135).

60. Gerald Cullumber was City of Gardner Police Chief, and he also had issues with the way he was treated by the City Administrator. (Exhibit 10: tr. 42:21-43:2). Gerald Cullumber was over the age of 50. (See Defendant's Fact, ¶ 135).

61. Brian Faust was over the age of 50, and he also had issues with the way he was treated by the City Administrator. (Exhibit 10: 42:21-43:2; See Defendant's Fact #135).

62. Council President Harrison had previous discussions with Jim Moore and knew that he was upset about the City Administrator's treatment of him. (Exhibit 4: tr. 38:10-20). Jim Moore was over the age of 50. (Exhibit 32: ¶ 16).

63. Former electric director Bill Krawczyk had complained to Mayor Morrow regarding City Administrator Cheryl Harrison-Lee. (Exhibit 1: tr. 91:12-92:16). Mr. Krawczyk's complaints were that the City Administrator would not respond to him and how she was not supportive or helpful. (Exhibit 6: tr. 191: 15-22). Mr. Krawczyk was more than 50 years old. (Exhibit 32: ¶16).

64. Former Executive Assistant to City Administrator Cheryl Harrison-Lee confirmed that Cheryl Harrison-Lee was inconsistent in her demands and evaluations, as well as that many of the City of Gardner's Directors and Mary Bush were frustrated by the lack of access to discuss matters and the inconsistent directions from the City Administrator. (Exhibit 8: tr. 31:7-32:24, 43:10-44:2, 62:13-63:13).

65. Former Director of Parks and Recreation for the City of Gardner Jeff Stewart testified that Mary Bush had expressed frustration to him that City Administrator Cheryl Harrison-Lee was not providing responses and communications needed for Mary Bush to perform

46

her job.   Mary Bush's concern was the need for better communication and direction from the City Administrator.   (Exhibit 10: tr. 32:5-10, 33:7-13).

66.   There was a large turnover at the department director level at the City of Gardner in the initial years after Cheryl Harrison-Lee became the City Administrator.   The City Council has suggested that such turnover rate was too high.   (Exhibit 1:   tr. 70:7-71:3; 101:1-24).

67.   In the time between January 26th and March 6th , Mary Bush suffered retaliation in the form of her ASM job responsibilities and access to necessary materials being taken away from her without explanation.   (Exhibit 1: tr. 137:20-138:25, Exhibit 7: tr. 34:25-36:14, 77:10-23, 78:9-15, 79:12-15, 90:14-92:22).

68.   During this time period, Mary Bush should have been allowed to do the normal functions of her job as Administrative Services Manager.   (Exhibit 4: tr. 42:2-9).

69.   During this time period after Mary Bush's January 26th complaint, HR Specialist Lisa Wilms observed City Administrator Cheryl Harrison-Lee standing at the front counter in city hall and just glaring at Mary Bush.   (Exhibit 7: tr. 116:22-117:17).   It was during this six week time period that the relationship between the City Administrator and Mary Bush changed.   (Exhibit 7: tr. 43:21-44:2).

**E.  Elimination of Plaintiff's Position of Administrative Services Manager**

70.   About six weeks after her January 26, 2015 complaints of discrimination, Mary Bush was told on March 6, 2015 that the position as Administrative Services Manager was being eliminated.   (Parties' Stipulation No. 5; Exhibit 1: tr. 15:19-16:1).

71.   Mary Bush was told that her position as ASM was being eliminated in the meeting she was told to attend for a report on the results of the investigation into her complaints of discrimination.   (Exhibit 1: tr. 146:21-147:6).

47

72.   Mayor Morrow told Mary Bush that the elimination of her position was a restructuring.  (Exhibit 1, tr. 16:2-5).

73.   City Administrator Cheryl Harrison-Lee is the one who recommended the restructuring which consisted solely of eliminating the ASM position.  (Exhibit 1: tr. 126:12-25; Exhibit 4: tr. 9:12-15).

74.   Mayor Morrow admitted that, prior to her complaint of January 26, 2015, there had been no discussions with Mary Bush regarding elimination of the ASM position. (Exhibit 1: tr. 120:14-121:3).   The Mayor admitted that March 6th was the first time Mary Bush had been told her job was being eliminated.  (Exhibit 23: tr. 26:15-27:6).   Council President Harrison never told Mary Bush that her ASM job might be eliminated, also testifying, "I'm not saying that I had any indication that she knew."   (Exhibit 4: tr. 57:23-59:5).   Human Resources Senior Specialist Lisa Wilms testified regarding her observations that Mary Bush was surprised when she was told that her position as ASM was being eliminated.   (Exhibit 7: 82:23-83:6)

75.   Mayor Morrow admitted he was aware of no documentation even suggesting the elimination of the ASM position prior to January 26, 2015.  (Exhibit 23: tr.19:9-19).   The Mayor admitted that the first written document concerning elimination of the ASM position is dated in March of 2015.   (Exhibit 1: tr. 114:13-21).

76.   Councilman Shute testified that the first time he was informed that the City Administrator was working towards reclassification of Mary Bush or elimination of the ASM position was in late February of 2015.   (Exhibit 3: tr. 30:15-32:11).

77.   On February 2, 2015, the City told Investigator Freeman that the elimination of the ASM position was being considered, but that no decision had been made on whether or not to eliminate the ASM position.   (Exhibit 5: tr. 19:21-20:6, 21:17-23; Exhibit 1: tr.

10:12-11:8).

78.   There were no City Council briefings prior to March of 2015 at which the reclassification or elimination of the ASM position was discussed.   (Exhibit 3: tr. 11:15-15:2).

79.   The elimination of Mary Bush's ASM position is the only time the City of Gardner has ever eliminated a budgeted position and/or engaged in a restructuring mid-year and not as a part of the ordinary budget process.   (Exhibit 32: ¶ 4).

80.   Lisa Wilms, Human Resources Senior Specialist for the City of Gardner from 2007 to 2016, testified that the City and the City Administrator did not adhere to its normal processes in determining to eliminate Mary Bush's ASM position.   There would normally have been studies of financial impacts and much more time spent on budgetary analysis.   (Exhibit 7: tr. 101:21-103:7).

81.   To have gone through the normal budgetary process would have involved months of analysis and study, with a decision then made in July or August of 2015 whether the ASM position would remain for the 2016 year.   (Exhibit 3: tr. 19:16-20:3).

82.   There was sentiment on the City Council that the decision to eliminate the ASM position was a hasty one that should be tabled and studied further.   (Exhibit 3: tr. 17:16-18:24; 65:4-9).   Councilman Shute testified as follows:

> Because elimination of a position, in general, is not something that is to be taken lightly.   I just felt like a midyear – a midyear adjustment on this, rather than going to the process of going through the budget process and getting – and having it eliminated through the budget was probably not the way to go.

(Exhibit 3: tr. 18:25-19:15).

83.   Council members were not given any reason by the City Administrator or Mayor for the urgency in eliminating the ASM position that had been budgeted for the full year

2015.  (Exhibit 3: tr. 20:8-21:5; Exhibit 4: tr. 14:14-17).

84.    In the restructuring proposal provided to the Council, the reason stated is for "operational effectiveness."   There was no reference to the restructuring being in any way based on Mary Bush's job performance as Administrative Services Manager.   There was no discussion of Mary Bush's job performance in the Council's adoption of the proposed restructuring. (Exhibit 4: tr. 9:18-11:9; Exhibit 31: 3/16/15 Council Action Form).

85.    Mayor Morrow acknowledged that a performance plan would have been issued to Mary Bush prior to her termination if that termination was based on performance. (Exhibit 1, tr. 16:19-22).   Mary Bush was never issued a performance plan, a written warning, or an oral reprimand.   (Exhibit 32: ¶ 2).   Nonetheless, Mayor Morrow did not advise City Administrator Cheryl Harrison-Lee that she should document in writing any problems she had with Mary Bush's work performance.   (Exhibit 1: tr, 127:13-17).

86.    Mayor Morrow did not review any of Mary Bush's performance reviews prior to making the determination to eliminate the ASM position.   (Exhibit 1:   tr. 25:25-26:3). Mayor Morrow did not know of Mary Bush's extensive background in human resources, and he did not ask Mary Bush about that experience.   (Exhibit 1: tr. 127:1-12).   City Administrator Harrison-Lee also did not review any of Mary Bush's prior performance reviews as Human Resources Manager.   (Exhibit 2: tr. 77:17-20).

87.    Councilman Shute testified that the actions taken against Mary Bush after her January 26, 2015 complaint could be seen as retaliatory, although he did not see them that way at that time.   (Exhibit 3: tr. 40:22-41:9).

88.    Mayor Morrow has testified that he expected that the City Administrator would have personal notes supporting her alleged discussions regarding elimination of the ASM

50

position.  (Exhibit 1: tr. 116:13-117:3).  The City Administrator claimed she did not make any notes at any of the meetings at which she alleged there were discussions about eliminating the ASM position.  (Exhibit 24:  Volume 2 of Deposition of Cheryl Harrison-Lee, tr. 14:9-16:17).

89.    Mayor Morrow claims that there was discussion regarding eliminating the ASM position on Friday, January 23, 2015.  He claims the topic was discussed with the City Administrator and Council President following the Police Chief candidate interviews.  Mayor Morrow noted that the City Administrator was taking notes in this meeting.  (Exhibit 1: tr. 112:9-113:19).  The City Administrator claimed she did not make any notes at any of the meetings at which she alleged there were discussions about eliminating the ASM position. (Exhibit 24: tr. 14:9-16:17).

90.    Council President Harrison claims to have been in two meetings prior to January 26, 2015 at which the potentiality of eliminating the ASM position was discussed.  One was a January 23rd meeting with the Mayor and City Administrator.  She was not sure of the date of the other meeting.   Kristina Harrison claims to have provided the City Administrator some potential job descriptions for Mary Bush in the employee relations area.  (Exhibit 4: tr. 21:6-24:18).  The City Administrator testified that she was provided these materials, but that she could not locate these materials for production in this case.  She claims to have placed them in her briefing folder, "and I went back to look for them in the briefing folder and did not see them." She testified, "I don't know what happened to them."  (Exhibit 24: tr. 21:24-24:4).

91.    Council President Harrison testified that she could not recall whether or not a decision had been made to eliminate the ASM position at the January 23rd meeting with the Mayor and the City Administrator.  (Exhibit 4: tr. 27:7-12).

92.    Mayor Morrow could not recall exactly what was said by the City

Administrator during this alleged January 23, 2015 discussion.  (Exhibit 1: tr. 114:22-115:4, 115:16-22).  According to the Mayor, the result of the meeting was that "We were going to be looking to eliminate the position and take other action."  (Exhibit 1: tr. 115:16-22).  Mayor Morrow did not recall any timetable being placed on elimination of the position at this alleged meeting, but he did acknowledge that the position had been budgeted for the entire year of 2015. (Exhibit 1: tr. 115:23-116:3).

93.   Mayor Morrow's account of the alleged January 23rd meeting was inconsistent and contradictory.  At one point, Mayor Morrow claimed they had reviewed the City's organizational chart in that meeting as part of the discussion of "positions that would be impacted beyond just the position that was being eliminated."  Mayor Morrow then had to admit, "I don't believe we had those in there with us."  (Exhibit 1: tr. 117:18-118:11).

94.   Mayor Morrow also claimed that there were prior discussions over several months regarding elimination of the Administrative Services Manager position.  (Exhibit 1: tr. 113:20-114:12).  Mayor Morrow testified that he did not claim that such discussions took place prior to the 2015 budget being approved in August of 2014.  (Exhibit 1: tr. 118:12-119:7).

95.   Mayor Morrow claimed he did not recall when he first discussed the elimination of the ASM position, but testified that it was prior to November of 2014.  He admitted that he did not have any documents to support his contention that there were discussions about eliminating the ASM position prior to November 1, 2015.  (Exhibit 1: tr. 119:19-120:12).

96.   Mayor Morrow claims to have had conversations with Councilman Shute, prior to Mary Bush's complaint, about elimination of the Administrative Services Manager position.  (Exhibit 1: tr. 121:4-122:25).  Mayor Morrow claims to have more than one such conversation with Councilman Shute prior to Mary Bush's complaint of January 26, 2015, but the

Mayor cannot even place a month as to when any such meeting occurred.   (Exhibit 1: tr. 122:4-13).

97.   Councilman Shute contradicted Mayor Morrow's testimony and testified that he had not had any conversation with the Mayor regarding elimination of the ASM position or about reclassifying that position.   (Exhibit 3: tr. 45:3-9).

98.   Councilman Shute testified that he had discussions in October/November time frame of 2014 in which he questioned why certain positions had not yet been filled and for which he held the City Administrator accountable.   The City Administrator said that the new Human Resources Supervisor would assist in getting these positions filled.   The discussion at that time with the City Administrator was that Mary Bush was "dealing with multiple different sets of responsibilities" and that "she couldn't focus on the HR duties that were needed in order to be able to . . . screen through these resumes and . . . get those particular functions completed."   (Exhibit 3: tr. 24:7-26:21).

99.   Councilman Shute testified that he did not have any other discussions regarding Mary Bush or the ASM position prior to January 26, 2015, other than in the general context of wanting positions to be filled.   (Exhibit 3: tr. 30:4-9).

100.   Councilman Shute testified that none of his comments were critical or personalized toward Mary Bush.   His only criticism was that positions were not getting filled. Councilman Shute also did not say that he was "going to punch Mary Bush in the nose."   (Exhibit 3: tr. 46:4-47:3).

101.   The City Administrator had previously told Mary Bush that Councilman Shute had said he was going to punch her in the nose.   (Exhibit 6: tr. 198:2-18).   This statement by the City Administrator was false.   (Exhibit 3: tr. 46:4-47:3).

102.     The City Administrator claimed after this case was filed that she made the decision in June of 2014 to move toward the elimination of the ASM position.   (Exhibit 2: tr. 117:1-118:11).   The City Administrator admits she did not tell Mary Bush about this supposed June of 2014 decision until March of 2015.   (Exhibit 2: tr. 118:12-119:3).

103.     The City Administrator had never previously told any Council Member or the Mayor that she had decided as early as June of 2014 that she was planning on eliminating the ASM position.   (Exhibit 3: tr. 32:23-34:6; Exhibit 4: tr. 28:20-29:18).   Mayor Morrow was not informed by the City Administrator that she had made the decision to eliminate the ASM position before the 2015 budget was completed in August of 2014.   (Exhibit 1: tr. 133:23-134:13).

104.   Prior to March 16, 2015, the City Administrative did not document any of her discussions or thought processes regarding elimination of the ASM position.   (Exhibit 2: tr. 116:11-24).

105.   In her deposition, the City Administrator claimed she had conversations regarding elimination of the ASM position with the Mayor prior to August of 2014 during the 2014-2015 budget process.   (Exhibit 2: tr. 136:2-22).   Mayor Morrow, however, testified that there were no such discussions prior to the 2015 budget being approved in August of 2014. (Exhibit 1: tr. 118:12-119:7).

106.   In her deposition, the City Administrator claimed she had discussions with Kristina Harrison prior to January 26, 2015 regarding Mary Bush's work performance.   Kristina Harrison, however, could not remember any specific criticisms that the City Administrator ever provided regarding Mary Bush's work performance.   (Exhibit 4: tr. 32:12-16).

107.   In her deposition, the City Administrator claimed she had conversations with Steve Shute in 2014 regarding elimination of the ASM position.   (Exhibit 2: tr. 120:20-25,

54

126:15-24).   This was contradicted by Councilman Shute, who testified that he did not have any other discussions regarding Mary Bush or the ASM position prior to January 26, 2015, other than in the general context of wanting positions to be filled.   (Exhibit 3: tr. 30:4-9).

108.    The City Administrator admits that she and Mayor Morrow met in the time period between January 26, 2015 and March 6, 2015, after Mary Bush's complaint, and that the decision was made during that time to take to the Council the elimination of the ASM position. (Exhibit 2: tr. 106:25-108:8).

109.    In 2017, the Police Chief for the City of Gardner believed there were integrity issues such that he could not trust City Administrator Cheryl Harrison-Lee.   (Exhibit 1: tr. 105:15-106:3).

110.    In early 2017, the City Council enacted a change in the City of Gardner's policies and procedures to allow for an immediate appeal to the Council of any evaluations done by City Administrator Cheryl Harrison-Lee.   (Exhibit 1:   tr. 71:12-20; Exhibit 2: tr. 46:21-50:4).

111.    In early 2017, the City Council reversed a negative review of Police Chief Preutting done by City Administrator Cheryl Harrison-Lee.   The Council repealed the City Administrator's review of the Police Chief and assigned him a 3.00 review rating.   (Exhibit 1: tr. 73:12-74:9).

112.    The City Council overturned the performance review and written reprimand that the City Administrator had provided the Police Chief because "the personnel process wasn't followed," "there were no verbal reprimands in the file," and "there was no progressive discipline or performance improvement plan" as required by City of Gardner policies.   "There were actions that were taken [by the City Administrator] that were outside of the . . . personnel policy in terms of . . . pulling evidence . . . for possible action against an employee."   (Exhibit 3: 37:9-38:13).

113.    Councilman Shute testified that Mayor Morrow has been involved in chronic and blatant misrepresentation of facts to the governing body and citizens of Gardner. (Exhibit 3: tr. 67:25-73:10).   Councilman Shute still feels there is a concern for the trustworthiness and honesty of Mayor Morrow.   (Exhibit 3: tr. 73:11-14).

114.    Councilman Shute expressed the concern in the executive session of the City Council as to whether Mary Bush was being treated fairly.   (Exhibit 3: tr. 34:24-35:12).

115.    At the March 6th meeting when Mayor Morrow and Investigator Freeman informed Mary Bush of the results of the investigation and that her ASM position was being eliminated, Mary Bush was advised that the City wanted to retain her but did not know at that time what position would be offered.   (Exhibit 22; Exhibit 1: tr. 11:9-12:15).

116.    Contrary to what Mayor Morrow said at this March 6th meeting, the City Administrator had already decided and discussed with the Council and Mayor that it would be offering Mary Bush the Special Events Coordinator position.   (Exhibit 3: tr. 42:6-43:1, 51:45-52:25).

117.    Following the March 6, 2015 meeting, Mary Bush sent the following email to Mayor Morrow:

> While I was disappointed and disagree with the oral summary results of the investigation provided to me at the Friday meeting, and was not at all expecting to hear in that meeting that my position was being eliminated as part of a restructuring, I appreciate your commitment that the determination had also been made that I would be offered a new position in place of my current one.   As you stated I have skills and abilities that the City wants to retain, and the City was already in the process of preparing a job for me.
>
> Although I am disappointed and surprised to hear that my position is now being eliminated, I am always excited to take on new challenges and roles for the City that I have served so faithfully for these past 8+ years and to continue my career with the City.   I look to hearing back from you and the City Administrator as to the timetable for the elimination of my old position, and the nature and details of my new position.

56

I look forward to continuing to serve the citizens of Gardner.

(Exhibit 27 – 3/10/15 email from Mary Bush to Mayor Morrow).

118.     In between March 6th and March 10th, the City claims it determined what position it would offer Mary Bush.   Mayor Morrow does not remember if he had those discussions only with the City Administrator or whether the Council President was also involved. (Exhibit 23: tr. 12:16-13:13; 25:9-14).   No documentation was made by the City of any of these meetings or discussions.   (Exhibit 2: tr. 109:8-15).

119.     According to Mayor Morrow, the City considered offering Mary Bush a Human Resources position involving human relations, a Special Events Coordinator position in the Parks and Recreation Department, and possibly some other positions.   (Exhibit 23: tr. 13:2-14:24).

120.     Council President Harrison had suggested Mary Bush be placed in a Human Resources position involving employee relations.   (Exhibit 4: tr. 24:11-25:5, 25:18-20).

121.     The decision was made by the City Administrator and Mayor to offer Mary Bush the Parks and Recreation Department position.   Mayor Morrow did not document the discussions leading to this decision, but instead "relied on City Administrator Harrison-Lee to document those meetings."   (Exhibit 23: tr. 15:16-16:4).   No documentation of these meetings has been produced.

122.     On March 10, 2015, the City of Gardner offered Mary Bush the position of Special Events Coordinator in the Parks and Recreation Department.   It was a reduction of several pay levels, from a Level 8 to a Level 4, with the $51,395 salary amount offered being approximately $35,000 below her current salary as Administrative Services Manager.   (Exhibit 2: tr.  153:13-23; Exhibit 3: tr. 52:22-25).   The City Council was advised that there was a 40%

lowering in salary benefits in the new position offered Mary Bush and her prior ASM position. (Exhibit 3: tr. 34:14-23).

123.     In her sworn response to Plaintiff's Interrogatory No. 4, City Administrator Cheryl Harrison-Lee falsely claimed that the salary offered to Mary Bush for the Special Events Coordinator position was $61,607.   (Exhibit 34, pp. 1-2).

124.     Mayor Morrow testified that he was not involved in setting the salary to be offered Mary Bush for the Special Events Coordinator position, which was instead set by the City Administrator.   (Exhibit 23:   tr. 16:5-18).   The City Administrator contradicted this and said that she and Mayor Morrow discussed the salary amount to be offered Mary Bush and that together she and the Mayor made the decision.   (Exhibit 2: tr. 39:25-40:7).

125.     In setting the salary to be offered to Mary for this new Special Events Coordinator position, the City failed to follow its policies and procedures and offered a salary far lower than that which its policies require to have been offered. (Exhibit 3: tr. 75:18-24).   Mary Bush should have been offered 15% above the maximum of the new position's pay grade such that she should have been offered $67,293.90 instead of $51,395.   (Exhibit 2: 159:6-164:2).

126.     Mayor Morrow told Mary Bush that the salary being offered her was at the top of the salary range, but that was not true.   (Exhibit 23: tr. 16:19-17).

127.     The salary offered by the City to the person who filled this position after it was budgeted for in 2016 was $61,607.   (Exhibit 2: tr. 154:4-9).

128.     Mary Bush was given one day to either accept or reject this new position with the City.    She determined not to accept the position for a number of reasons:   (1) because the proposed position of Special Events Coordinator was never an approved position by the City of Gardner and thus was never officially offered to Mary Bush; (2) because the proposed

58

position of Special Events Coordinator also was not even discussed with Mary Bush and did not have clearly defined job duties and objectives; (3) because the proposed position was contemplated as becoming part of the Parks and Recreation Department, and it thus did not seem to be one in the area of Mrs. Bush's background and experience; (4) because accepting the proposed position would also have been a set-up for failure and for the City Administrator to further harass, falsely criticize, and ultimately wrongfully terminate Mary Bush again; (5) because the proposed position would have entailed a major pay and grade reduction for Plaintiff; and (6) because Mary Bush believed that the pay and grade reduction of the proposed position would have had a drastic impact on her pension.  (Exhibit 36:   Plaintiff's Response to Interrogatory No. 7).

129.    With further regard to the supposed Special Events Coordinator position, such position was <u>not</u> taken to the Council for approval as part of the 2015 budget.   It had been proposed but rejected based on the lengthy budgetary process conducted in 2014 for the 2015 budget.  (Exhibit 23: tr. 14:25-15:15).   The need and funding for that position had been discussed a number of times and possibly for multiple years, but it was never deemed an appropriate priority and never funded.  (Exhibit 10: tr. 35:20-37:2).   In addition, the City Council did not, in fact, authorize the position when it was later brought to them in March.   (Exhibit 36: Plaintiff's Response to Interrogatory No. 7).

130.    The new Human Resources Supervisor position had not yet been filled when the City of Gardner claims it decided to eliminate Mary Bush's ASM position.   (Exhibit 1: tr. 127:18-128:4).   Despite this, the City did not advise Mary Bush of this job elimination or allow her to seek the Human Resources Supervisor position.   (Exhibit 26: tr. 426:22-427:25).

131.    The job description for the Human Resources Supervisor position was essentially the same as the job description for Human Resources Manager that Mary Bush has

59

served in for so many years with all "Exceeds Expectations" reviews.   (Exhibit 1: tr. 129:12-130:3; Exhibit 3: tr. 40:5-10).

132.    Mayor Morrow provided other inconsistent and contradictory testimony when he first claimed that the City Administrator agreed with the Mayor that Mary Bush would not be offered the Human Resources Supervisor position, only later to say he did not, in fact, recall any such discussions with the City Administrator.   (Exhibit 1: tr. 130:4-131:23).   There is no documentation showing the City considered whether or not Mary Bush was qualified for the Human Resources Supervisor position.   (Exhibit 1: tr. 132:7-16).

133.    At the time the position as Administrative Services Manager was eliminated, Mary Beth Bush's annual salary was $85,698.12.   (Parties' Stipulation No.   6).

134.    On March 10, 2015, less than one week after the City informed Mary Bush that her position was being eliminated, the City of Gardner provided City Administrator Cheryl Harrison-Lee a 5% bonus in the amount of $7,242.87.   The City also gave the City Administrator a raise at that time from $65.701 per hour to $69.643 per hour.    The City also increased her car allowance to $800 per month.    (Exhibit 1:   tr., 82:13-83:23).

135.    [Paragraph Not Used.]

**F.  Alleged Performance Deficiencies**

136.    Mayor Morrow testified that the elimination of the ASM position was a reorganization and that "Reorganization isn't the same thing as corrective action or termination." (Exhibit 1: tr. 132:25-133:8).   The Mayor also testified, "I'm not going to say that performance was never discussed, but – but it wasn't about -- it wasn't a performance issue.   It was – it was a restructuring issue."   (Exhibit 1: tr. 140:10-17).

137.    Council President Harrison testified that "the elimination of the

60

administrative services position was not specific to a performance issue.   It was specific, in my vote, to the job not being needed."   (Exhibit 4: tr. 31:22-32:6).

138.   With regard to the police chief interview scenarios, witness Lisa Wilms confirmed that City Administrator Cheryl Harrison-Lee had said she would be preparing those scenarios.   It was only a short time before the interviews when the City Administrator changed course and said Mary Bush was to do the scenarios.   Mary Bush was out of the office, and so she instructed Lisa Wilms to provide the scenarios.   (Exhibit 7: tr. 58:22-59:7, 95:8-96:4, 124:5-14).

139.   With regard to the Department of Labor audit, only $400 in backpay was ordered to be paid.   (Exhibit 7:   tr. 58:15-21).

140.   With regard to the compensation studies, Mary Bush used the cities that were specifically requested by the City Administrator.   (Exhibit 6: tr. 86:12-23).

141.   Human Relations Senior Specialist Lisa Wilms testified that one cannot hear what is said in conference room at City Hall when the door is closed.   She testified that she could not hear discussions during the January 23rd Police Chief interviews.   (Exhibit 7: 69:21-70:12, 71:12-17).

### G.  Additional Facts Regarding New Human Resources Supervisor

142.   New Human Resources Supervisor Alan Abramovitz had an unprofessional outburst and yet was not fired or demoted.   His actions were unprofessional and inappropriate, and yet he only received a written reprimand.   (Exhibit 1: tr. 102:3-104:6; Exhibit 4: tr. 54:11-22).   According to Councilman Shute, the misconduct involved a "very unfortunate loss of temper in council chambers and making personal statements against the Police Chief (Exhibit 3: tr. 72:21-73:8).

**143.**    HR Specialist Lisa Wilms worked with the City of Gardner's new Human

Resources Supervisor Alan Abramovitz for approximately 18 months.   During that time period,

there were no major changes made in the structure or how things were done.   "It was business as

usual.   No major changes were placed into effect."   (Exhibit 7: tr. 110:17-111:5).   There were

several instances observed by Lisa Wilms which called into question the competency of Mr.

Abramovitz in HR functions.   (Exhibit 7: tr. 110:21-116:19).   Some of those included the

following:

(a) Alan could not remember the names of employees and he would not get out to meet with employees and to understand their jobs.   He did not make himself available to employees.   (Exhibit 7: tr. 111:6-22).

(b) Because Alan could not remember the name of Anthony Glenn, an African American employee, Alan would just refer to him as "the black guy."   He did this on more than one occasion.   (Exhibit 7: tr. 112:3-17).

(c) Alan signed a card that was being circulated for a female employee named Morgan, but Alan's note showed he thought this employee was a male.   "Morgan was offended by that.   She worked in the same building, she worked in the finance department, so was in city hall so he could have - -should have known her."   (Exhibit 7: tr. 112:17-113:3).

(d) Overall, Alan showed very poor attention to detail.   (Exhibit 7: tr. 113:4-11, 114:4-14).

(e) Alan is very sloppy – leaving chocolate smudges and sticky candy on documents.   "It was really very disgusting."   His desk and office were "just a total disaster.   It's a mess.   His desk is a mess.   He would have to fumble through things to find documents."   (Exhibit 7: tr. 113:4-3)

(f) Alan would have to be told again and again about the existence of certain forms.   (Exhibit 7: tr. 114:15-115:22).

**144.**    Based on her observations and her working closely with both persons, Lisa

Wilms testified that Mary Bush was a much better performing Human Resource Manager than Alan Abramovitz.   Even outside the city, others were viewing Alan as not very capable in Human Resources.   (Exhibit 7: tr. 115:23-116:8).

145.   Former Parks and Recreations Director testified that there was <u>not</u> a perception amongst the City of Gardner workforce that the operation of the Human Resources Department was better under Alan Abramovitz than it was under Mary Bush.   (Exhibit 10: tr. 66:13-22).

## H.   <u>Additional Facts Regarding Favoritism By City Administrator</u>

**146.**   Despite there being many more qualified Caucasian applicants, the City Administrator Cheryl Harrison-Lee had wanted to hire a much less qualified African-American candidate for an executive assistant position.   This was despite that applicant scoring well below other Caucasian applications on the objective job test.   (Exhibit 7: tr. 28:14-29:20, 93:25-95:7). Although the City Administrator backed away from hiring this less qualified African-American candidate, she did so only after Mary Bush and Lisa Wilms objected and stated that such hiring would be an unlawful hiring practice.   (Exhibit 6: tr. 182:7-183:15).

147.   The City of Gardner and City Administrator Cheryl Harrison-Lee also hired an African-American candidate for a position, straying from City of Gardner policies and practices and paying this person tens of thousands more than she was previously making and well into the salary range for the position.   (Exhibit 6: tr. 183:16-21).

148.   The City of Gardner and City Administrator Cheryl Harrison-Lee also

brought in young African-American engineering technicians at higher wages that other employees and contrary to other prevailing hiring and pay practices at the City.   (Exhibit 6: tr. 183:22-184:2).

## IV.    ARGUMENT AND AUTHORITIES

### A.  Summary Judgment Standard

In deciding a motion for summary judgment, this Court must determine whether there is a genuine issue as to any material fact, and whether the moving party is entitled to judgement as a matter of law.  *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).   In considering whether there are genuine issues of material fact, "the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party."  *Gullickson v. Southwest Airlines Pilots' Ass'n*, 87 F.3d 1176, 1183 (10th Cir. 1996)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); see also *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011).   In analyzing a summary judgment motion, the court "may not make credibility determinations or weigh the evidence," and "must disregard all evidence favorable to the moving party that a jury is not required to believe."  *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 150 (2000).   The nonmoving party must be given "wide berth to prove a factual controversy exists."  *Jeffries v. State of Kan.*, 147 F.3d 1220, 1229 (10th Cir. 1998).

The standard for summary judgment is stringent for good reason.   Summary judgment extinguishes a claim without affording a party his/her actual day in court, a fundamental right that should be cut off in only the clearest of cases.   Accordingly, the Court must credit to plaintiff's advantage every disputed factual point. *Piercy v. Maketa*, 480 F.3d 1192, 1197 (10th Cir. 2007); *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1310 (10th Cir. 2006); *Plotke v. White,* 405 F.3d 1092, 1093-94 (10th Cir. 2005). Moreover, the nonmoving party must receive the benefit of

any reasonable inference that might be drawn from the record evidence. *Piercy*, 480 F.3d at 1197; *Mickelson,* 460 F.3d at 1310; *Plotke,* 405 F.3d at 1093-94.

In *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (U.S. 2014), the Supreme Court recently reinforced the standard that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.   The Court stated as follows:

> Considered together, these facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion.
>
> *          *          *          *          *          *
>
> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases.   It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system.   By weighing the evidence . . . , the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Id.* at 1867-68.

Therefore, at the summary judgment stage the court may not entertain or decide credibility issues.   Those determinations must be left for the jury in its role as the ultimate finder of fact. *Plotke*, 405 F.3d at 1094.   In *Pinkerton v. Colo. DOT*, the Tenth Circuit noted as follows:

> Certainly, it is not the purpose of a motion for summary judgment to force the judge to conduct a `mini-trial' to determine the defendant's state of mind . . . .   For summary judgment purposes, as long as the plaintiff has presented evidence . . . upon which a jury could infer discriminatory motive, the case should go to trial.

563 F.3d 1052, 1066 (10th Cir. 2009).   If a favorable rendition of the evidence coupled with all reasonable inferences found in the record would support a jury finding for the nonmoving party on a material fact, summary judgment must be denied in deference to a trial. *Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). Further, cases that turn on issues of intent or state-of-mind are especially inappropriate for summary judgment. *Plotke*, 405 F.3d at 1102

65

("Judgments about intent are best left for trial and are within the province of the jury."); *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995).

As further discussed below, this case involves the evaluation of evidence as to whether the City Administrator made the decision to eliminate Mary Bush's Administrative Services Manager position based on retaliation, age, and/or race discrimination.   The case involves determinations as to the credibility and believability of the City Administrator, Mayor, and other City witnesses whose accounts are inconsistent and contradictory with regard to the timing and basis of the decision to eliminate the ASM position.   A reasonable jury, when faced with the evidence presented here, could return a verdict in favor of Mary Bush on each of her claims.   As a result, summary judgment is an inappropriate mechanism to resolve Plaintiff's claims of illegal termination, and the City of Gardner's motion should be denied.

### B.   Plaintiff's Retaliation Claims Are Appropriate For Jury Consideration

Because Mary Bush complained of age, race, and gender discrimination prior to the elimination of her ASM position, Plaintiff's retaliation claims are brought pursuant to ADEA, Title VII, and 42 U.S.C. §1981.   Under each of these laws, retaliation claims are analyzed under a three-stage, burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012); *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009).

At the first stage of this analysis, the plaintiff must establish a prima facie case of retaliation, consisting of the following elements:   (1) she engaged in protected activity; (2) she suffered an adverse employment action; and, (3) a causal connection exists between the protected activity and the adverse employment action.   *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009); *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006); *O'Neal v.*

*Ferguson Construction Co.*, 237 F.3d 1248 (10th Cir. 2001).

In its Motion for Summary Judgment, Defendant City of Gardner claims that Plaintiff fails to meet the first element of having engaged in protected activity and that Plaintiff cannot meet the causation element.   For the reasons discussed below, a reasonable jury could return a verdict in favor of Mary Bush on her retaliation claims.   Accordingly, Defendant's Motion should be denied.

## 1.  <u>Mary Bush Engaged In Protected Activity</u>

A person engages in a protected activity under the ADEA, Title VII, or 42 U.S.C. §1981 "when they either (1) opposed any practice made an unlawful employment practice or (2) make a charge, testify, assist, or participate in any manner in an investigation or proceeding."   *Murdock v. City of Wichita,* 2011 WL 1230325 at *4 (D. Kan. March 30, 2011).

On January 26, 2015, Mary Bush sent an email and attachment to Mayor Chris Morrow and Council President Kristina Harrison.   (Plaintiff's Facts, ¶ 40; Exhibit 25).   The cover email referenced a "hostile working environment," and the attachment referenced the hostile working environment as violating "federal discrimination laws," as well as "Title VII of the Civil Rights Act of 1964," and "Age Discrimination of Employment Act of 1967."   (Exhibit 25).   The attachment also references terms-and-conditions discriminatory issues such as non-substantive performance comments and evaluations and a refusal to work constructively with employees regarding any job improvements the City Administrator had deemed necessary.   (Exhibit 25). One of the recurring themes of Mary Bush's complaint was that the City Administrator changed directions on decisions and would not respond on things necessary to do her job.   (Plaintiff's Facts, ¶ 50).   Mary Bush addressed a false and non-substantive threat of demotion made to her by the City Administrator and other non-substantive and generalized performance criticisms that

were not made in accordance with the City of Gardner's policies and procedures.  (Plaintiff's Facts, ¶ 40).   She addressed the City Administrator's inconsistent directions and standards, failure to respond and provide necessary access to do her job, taking away job responsibilities, and overall intimidating conduct.  (Plaintiff's Facts, ¶ 40).   She also raised a gender discrimination issue regarding her pay.   (Plaintiff's Facts, ¶ 40).

In a separate document provided to the City's Investigator, Mary Bush identified several of the older, Caucasian employees who Mary Bush believed to be subjected to a similar pattern of discrimination by the City Administrator.   (Exhibit 33; Plaintiff's Facts, ¶¶ 56-66).   Mary Bush also provided other information to the investigator regarding comments that Mrs. Bush perceived to show age bias and race bias.   (Plaintiff's Facts, ¶¶ 40, 51-52).

In this regard, the City's Investigator acknowledged that Mary Bush alleged, in the meeting during the investigation of her complaint, that City Administrator Harrison-Lee had made the comment, "As people get older, they don't think as clearly."   The City's Investigator agreed that such comment is inappropriate to make in the workplace, and the Investigator also agreed that such comment is on its face age-related.   The City's Investigator specifically noted, "It would be quite an inappropriate age-based comment to make."   (Plaintiff's Facts, ¶ 51).   The City's Investigator also acknowledged that Mary Bush alleged, in the meeting during the investigation of her complaint, that City Administrator Harrison-Lee had made the comment, "I am from the South.   I have to be tough.   I'm used to working with white men."   (Plaintiff's Facts, ¶ 52).

Mary Bush's complaint was understood by Mayor Morrow, the Council, and the City's Investigator to assert that there were issues occurring in the workplace that were age, gender, and/or racially discriminatory.   (Plaintiff's Facts, ¶¶ 41-42, 45-46).   The City acknowledged Mary Bush's complaint with a letter to her which cited the City's anti-discrimination, equal

opportunity, anti-harassment, and anti-retaliation policies.   (Plaintiff's Facts, ¶43).

Plaintiff's written and oral complaints meet the standard set by the Tenth Circuit for protected activity.   In *Garcia-Paz v. Swift Textiles, Inc.*, Judge Vratil addressed the specificity required for statements or complaints to qualify as protected activity:

> While some courts have indicated that vague references to unspecified discrimination are not protected, no clear rule has emerged as to the level of specificity required, and the standard employed by most courts is not exacting.
>
> Employees often do not speak with the clarity or precision of lawyers . . . .   But the thrust of inartful, subtle, or circumspect remarks nevertheless may be perfectly clear to the employer, and the Court discerns no evidence that Congress intended to protect only the impudent or articulate.   The relevant question, then, is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.

873. F.Supp. 547, 560 (D. Kan. 1995)(internal citations omitted).

Moreover, Plaintiff does not have to prove the validity of the complaints she was allegedly punished for making; opposition activity is protected even when it is based on a mistaken good faith belief that the discrimination laws have been violated. *Zinn v. McKune*, 143 F.3d 1353, 1362 (10th Cir. 1998); *Rettiger v. IBP, Inc.*, 980 F.Supp. 1182, 1190 (D. Kan. 1997) ("plaintiff's opposition is protected even if the plaintiff was not successful in prosecuting her original discrimination charge, and even if defendant's practice did not actually violate Title VII.")(citing *Archuleta v. Colorado Dept. of Institutions*, 936 F.2d 483, 487 (10th Cir. 1991) and *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994)).   Thus, opposition is protected if the employee reasonably believes that an employment practice is unlawful.   It does not mean that the employee must be correct in believing that such employment practice was unlawful.   *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015-16 (10th Cir. 2004).   Further, protected opposition includes expressing support of co-workers who have been subjected to discriminatory

69

employment practices. *Lyman v. Nabil's Inc.,* 903 F.Supp. 1443, 1448 (D. Kan. 1995). The facts of this case support that Mary Bush reasonably believed that she and other employees were being subjected to age, gender, and/or racial discrimination in the treatment they were receiving from the City Administrator. (Plaintiff's Facts, ¶¶ 40-46, 50-54, 56-66).

Defendant contends Plaintiff's complaints that there existed a hostile environment based on age or race were not reasonable (Defendant's Memorandum, pp. 36-38), that the treatment toward others cited by Mary Bush does not support her claim that actions were based on age or race (Defendant's Memorandum, pp. 38-40), that the "farm league" comment could not be reasonably viewed as a race or age based comment, and that Mary Bush admitted that the City Administrator did not discriminate based on age or race (Defendant's Memorandum, pp. 41-42). None of these arguments are valid.

First, Defendant's alleged facts cited in these sections have been controverted by Plaintiff. Mary Bush has not and does not admit that she was not discriminated against based on age or race. Next, as noted above, Mrs. Bush complained of much more than that which is addressed by Defendant on pages 36-42 of Defendant's Memorandum. Defendant does not address the terms and conditions discrimination related to unsubstantiated and negative performance criticisms, false threat of demotion, and other terms and conditions discrimination which Mary Bush alleged she was experiencing (and that had also been experienced by other former employees). Defendant does not acknowledge that Mary Bush cited to admittedly ageist and potentially racial comments which were supportive of her complaint that the City Administrator's conduct was motivated by age or race. Indeed, further support that Mary Bush's complaint was objectively reasonable is found in the acknowledgement that the City of Gardner had experienced turnover at every Director level position under the new City Administrator

70

(Plaintiff's Facts ¶¶ 56-63), that those Directors were each over the age of 50 and Caucasian (Plaintiff's Facts ¶¶ 59-62), and that the City Administrator had made admittedly ageist and potentially racial comments.   (Plaintiff's Facts, ¶¶ 51-54).   Finally, Defendant also does not acknowledge Mrs. Bush's complaint of gender discrimination in pay.   (Plaintiff's Facts, ¶ 40).

In *Pruitt v. State of Kansas*, the employer claimed the employee did not have a good faith belief that she was being subjected to sexual harassment.   Judge Robinson determined that as follows:

> The State argues that plaintiff's act of filing a sexual harassment complaint is not sufficient to qualify as protected opposition to discrimination because plaintiff did not have a reasonable good faith belief that she was complaining of a violation of Title VII.   Instead, the State maintains that plaintiff only complained about conduct that consisted of hearsay and gossip.   The Court recognizes that plaintiff does not submit a sexual harassment claim; however, it is not necessary for plaintiff to succeed on or even assert that underlying claim in order to prove a case of retaliation if she had a reasonable, but mistaken good faith belief that Title VII had been violated.
>
> \*   \*   \*   \*   \*   \*   \*   \*
>
> The Court finds that plaintiff has produced sufficient evidence that would allow a reasonable jury to conclude that she had a reasonable, good faith belief that she had been subjected to sexual harassment due to a hostile work environment, as prohibited by Title VII.   Although the incidents cited by plaintiff, taken in isolation, may not suffice, when taken in context, they could demonstrate a pattern of severe and pervasive behavior that created an abusive working environment. The State is unable to show that there is no genuine issue of material fact with regard to this element of the prima face case.   A jury could find that plaintiff had a reasonable, good faith belief that she was being subjected to actionable sexual harassment under Title VII when she filed her complaint. . . .

364 F. Supp. 2d 1264, 1270-1271 (D. Kan. 2005).

The Court should similarly rule in this case that the 10th Circuit Standards and United States District Court of Kansas standards for protected activity are met such that there are, at the very least, factual issues as to whether Mary Bush's protected activity was reasonable. Defendant's Memorandum seeks to have the Court try the underlying merits of Mary Bush's

complaints and deny them protected activity status if those complaints are deemed not to be meritorious.    Such an evaluation and standard are directly contradictory to the Tenth Circuit and District Court of Kansas case law cited above.    See, e.g. *Zinn v. McKune*, 143 F.3d 1353, 1362 (10th Cir. 1998); *Rettiger v. IBP, Inc.*, 980 F.Supp. 1182, 1190 (D. Kan. 1997).

Giving all reasonable inferences and viewing all evidence in light most favorable to Plaintiff, Mary Bush's January 26th written complaint and subsequent oral statements to the City Investigator were objectively reasonable complaints of potentially discriminatory conduct. Accordingly, Defendant's Motion for Summary Judgment on this ground should be denied.

## 2.  **Mary Bush's Retaliation Claim Meets The Causation Element**

With regard to the causation element of Mary Bush's prima facie retaliation case, Plaintiff has come forward with nine categories of circumstantial evidence from which a reasonable jury could draw an inference of a causal connection between her protected activity and the City of Gardner's adverse employment action.    These categories of evidence satisfy both the prima facie causation element as well as the evidence of pretext.    *Proctor v. UPS*, 502 F.3d 1200, 1209 (10th Cir. 2007); *Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003).

Plaintiff's categories of evidence which meet the causation element include the following: (1) temporal proximity of Mary's protected activity to the City's adverse employment actions and decisions; (2) disclosure to Mary that her job was to be eliminated in the meeting called by the City to report back to her on her protected activity; (3) the failure of the City to follow normal policies and procedures for elimination of positions and for offering of new position; (4) there having been no discussions with Mary regarding the elimination of her position prior to her protected activity; (5) there existing no documented discussions between anyone at the City of Gardner regarding the elimination of her position prior to her protected activity; (6) inconsistencies in the City's

contentions; (7) the City having alleged varying and different reasons for the elimination of Mary's position; (8) the falseness of the alleged performance issues; and, (9) no contemporaneous documentation of alleged performance issues.

With these categories of evidence, it is not surprising that Gardner City Councilman Steve Shute testified that the actions taken by the City of Gardner against Mary Bush after her January 26, 2015 complaint could be seen as retaliatory, although he did not see them that way at that time. (Plaintiff's Facts, ¶ 87).

### (a) Close Temporal Proximity

A reasonable jury could find a causal connection consists from the close six-week temporal proximity between Mary Bush's protected activity on January 26, 2015, and the City of Gardner's elimination of Mrs. Bush's position as Administrative Services Manager on March 6, 2015.

The Tenth Circuit has recognized that "protected conduct closely followed by adverse action may justify an inference of a retaliatory motive." *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996). See also, *Annett v. Univ. of Kan.*, 371 F.3d at 1240; *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982).

The Tenth Circuit has also "held that a one and one-half-month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation." *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997); see also, *Fugett v. Security Transport Services, Inc.*, 147 F.Supp.3d 1216, 1237 (D. Kan. 2015); *Murdock v. City of Wichita, Kansas*, 2011 WL 1230325 at *4 (D. Kan. 2011)("Plaintiff alleges that as recently as approximately six weeks before her termination she complained to the City Manager about the treatment African Americans in the

transit division were receiving. This proximity is sufficient to establish a plausible claim of retaliation"); *Daneshvar v. Graphic Technology, Inc.*, 18 F.Supp. 2d 1277 (D. Kan. 1998)(termination six weeks from date of protected activity -- lawsuit's filing --  was sufficient proximity for jury to infer causation); *Newell v. Kmart Corp.*, No. CIV.A.97-2258-KHV, 1998 WL 230866, at *4 (D. Kan. Apr. 6, 1998)(four-week period between protected activity and termination sufficient to support causation element); *Rettiger v. IBP, Inc.*, 980 F.Supp. 1182, 1191 (D. Kan. 1997)(temporal proximity between protected activity and discharge close enough that reasonable jury could infer causal connection where employer discharged plaintiff less than six weeks after plaintiff lodged complaint of sexual harassment); *Bowers v. Bethany Medical Center*, 959 F.Supp. 1385, 1392 (D. Kan. 1997)(plaintiff's discharge within three weeks of her return from disability leave sufficient to satisfy causal connection element of prima facie case).

In this instance, Mary Bush engaged in protected activity when she forwarded her complaint letter to Mayor Morrow and Council President Kristina Harrison on January 26th , and when she further discussed those complaints with the City's Investigator in early February. (Plaintiff's Facts, ¶¶ 40-66).  She was informed on March 6th that her position as Administrative Services Manager was being eliminated.   (Plaintiff's Facts, ¶ 115).  This period of less than six weeks is alone sufficient under Tenth Circuit law for the jury to infer causation such that plaintiff meets her burden of showing causing in her prima facie case and of showing pretext.

In *Murdock v. City of Wichita, Kansas*, 2011 WL 1230325 (D. Kan. March 30, 2011), Judge Melgren ruled the plaintiff had sufficiently alleged a retaliation claim noting as follows:

> Among other things, plaintiff alleges that as recently as approximately six weeks before her termination she complained to the City Manager about the treatment African Americans in the transit division were receiving.  This proximity is sufficient to establish a plausible claim of retaliation.

*Id.* at *4.

While the City claims to have been discussing and to have made the decision to eliminate the ASM position prior to Mary Bush's late January and early February protected activity, those facts are strongly and adequately disputed by Plaintiff.   There had been no discussions with Mary Bush related to elimination of the ASM position prior to January 26th.   (Plaintiff's Facts, ¶ 74). In August of 2014, Mary Bush's ASM position was budgeted for the entire year of 2015, and that budget and organizational charts provided that the new Human Resources Supervisor position was to report to Mary Bush.   (Plaintiff's Facts, ¶¶ 33-37).   There was no mention by anyone during the budget process that the new Human Resources Supervisor position would render Mary Bush's ASM position unnecessary or redundant.    (Plaintiff's Facts, ¶ 38).    The City has no documentation of any discussions regarding elimination of the ASM position prior to January 26th, with the first written document concerning elimination of the ASM position dated March of 2015. (Plaintiff's Facts, ¶ 75).    Further, Defendant's witnesses have given inconsistent and contradictory testimony regarding any alleged discussions related to elimination of the ASM position.   (Plaintiff's Facts, ¶¶ 88-100, 104-107).   Finally, the final decision on elimination of the ASM position had not been made as of the date of Mary Bush's protected activity.   (Plaintiff's Facts, ¶¶ 77-78, 108).   City Administrator Cheryl Harrison-Lee knew of Mary Bush's complaints about her, and it is the City Administrator who thereafter made the recommendation to eliminate the ASM position.   (Plaintiff's Facts, ¶¶ 48, 73, 108).

One specific claim of the City Administrator that is implausible based on the evidence is her claim to have decided to eliminate the ASM position in June of 2014.   The City Administrator is claiming that the decision had been made before the ASM position was budgeted for the full year of 2015, even though the possibility of eliminating the ASM position was never discussed with anyone during the budget process.   In addition, this supposed June of 2014 decision date

begs the question as to why it was so urgent to eliminate the position after Mary Bush's complaints, when the City Administrator had already waited more than six months to do so. Council members noted that the decision was a hasty one and that they were not provided any reason by the City Administrator for the urgency in eliminating the position in March of 2015. (Plaintiff's Facts, ¶¶ 82-83, 102-103).

Giving Plaintiff all inferences in favor of this evidence and looking at all the facts in the light most favorable to her, it is for the jury to decide whether Defendant had discussed and/or decided on eliminating the ASM position prior to January 26, 2015.   This situation is similar to that addressed in *Dyer v. City of Gastonia*, where the Court noted as follows:

> The court finds that considering the evidence at this stage in the proceedings, the timing of events here does create an issue for defendant.   Even though it has stated plausibly that it was eliminating plaintiff's position for budgetary and reorganizational reasons, the fact remains that it only did so after plaintiff made complaints about Pasour's allegedly sexist and hostile behavior.   The court finds that a fact-finder could find such explanations `unworthy of credence' in these circumstances.

164 F.Supp. 3d 777, 786 (W.D.N.C. 2016).   Similarly, in *Gaetano v. Bayer, Inc.*, the Court held that the timing and other evidence presented by the former employee was sufficient to raise a fact issue with regard to whether the elimination of the employee's position was pretext for gender discrimination and retaliation for her complaints regarding gender discrimination.   The *Gaetano* Court noted as follows:

> As stated above, to survive summary judgment, a plaintiff need only present evidence from which a reasonable factfinder could conclude *either* that the defendant's proffered justifications are not worthy of credence or that the real reason was discrimination.   While there is ample support in the record for defendant's explanation of plaintiff's job elimination and termination, that is not the point.   Looking at the facts in the light most favorable to plaintiff and drawing all reasonable inferences in her favor, the evidence proffered by plaintiff could persuade a reasonable jury that defendant's real reason for terminating her employment was discrimination.

*Gaetano v. Bayer, Inc.*, CA No. 04-1812, 2007 WL 3334985 at *8 (W.D. Pa. Nov. 8, 2007)

In *Downs v. Jostens, Inc.*, 23 F.Supp. 3d 1332 (D. Kan. 2014), the Court restated the 10th Circuit standard that "a time period of three months between protected activity and adverse action is not enough to establish causation, but a period of one and a half months has been held to be enough." *Id.* at 1338.   The Court also noted that causation was supported by additional evidence beyond the temporal proximity, including the failure of the employer to follow its own policies and procedures and the employer providing false explanations.   *Id.* at 1339.

In addition to the temporal proximity, Mary Bush has come forward with several other categories of evidence that further support a finding that she has met the causation element of her prima facie case and also her burden of showing fact issues as to pretext.   There are genuine issues of factual dispute which result in the existence of jury questions on each of these issues.

### (b) <u>Disclosure to Mary Bush of Job Elimination In Meeting<br>Called To Discuss Results of Discrimination Investigation</u>

Mary Bush was told that her position as ASM was being eliminated in the meeting she was told to attend for a report on the results of the investigation into her complaints of discrimination. (Plaintiff's Facts, ¶ 71).   The fact is not disputed by the City, and it allows the jury to infer that the elimination of the ASM position was directly related to Mary Bush's complaints of discrimination.

### (c) <u>Procedural Irregularities and the City's<br>Failure to Follow Policies & Procedures</u>

Mary Bush's evidence of procedural irregularities and the City's failure to follow its normal policies and procedures also supports the existence of jury issues on causation and pretext. Plaintiff's facts show that, in August of 2014, Mary Bush's ASM position was budgeted for the entire 2015 year after the City of Gardner's lengthy budgetary process, with no hint that the position might at some point be eliminated.   (Plaintiff's Facts, ¶¶ 33-38).   Plaintiff's facts further

show there to have been no other similar reduction in force situation in which the City of Gardner has departed from its normal budgetary timeline and process.  (Plaintiff's Facts, ¶¶ 79-80).  Plaintiff's facts further show that Mary Bush had never been written up or subjected to the progressive discipline policy that the City of Gardner is required to follow.  (Plaintiff's Facts, ¶¶ 16-24, 85).  Plaintiff's facts further show the salary offered to Mary Bush for the Special Events Coordinator position was $51,395 (Plaintiff's Facts, ¶¶ 122-125). These facts show the City failed to follow its normal policies, procedures, and practices in the decision to eliminate Mary Bush's ASM position.

The causation element as well as pretext showing can be met through "evidence that the defendant acted contrary to a written policy prescribing the action to be taken by the defendant under the circumstances."  *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).   See also *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1119-20 (10th Cir. 2007); *Mohammed v. Calloway*, 698 F.2d 395, 400 (10th Cir. 1983).   Causation and pretext evidence has also been found where there are "disturbing procedural irregularities, including deviations from normal company procedure."  *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1138 (10th Cir. 2003), quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d at 1219-20.   See also *Trujillo v. Pacificorp*, 524 F.3d 1149, 1158 (10th Cir. 2008).

This Court denied summary judgment in *Daneshvar v. Graphic Technology, Inc.*, with part of the pretext evidence the employer's departure from its standard practice in investigation of complaints against employee, which investigation the employer then used as a basis for termination.  18 F.Supp. 2d 1277 (D. Kan. 1998).

Similarly in this instance, Plaintiff Mary Bush's evidence of the City's failure to follow policies and procedures support a finding a causation on her prima facie case.

**(d) Lack of Any Discussions with Mary Bush**
**Concerning Job Elimination Prior to Protected Activity**

The causation element of Mary Bush's prima facie case is further supported by the undisputed fact that the City of Gardner did not mention to Mary Bush even the potential elimination of her ASM position prior to her January 26, 2015 complaint.   (Plaintiff's Facts, ¶ 74). Although the City now attempts to have the Court infer that Mary Bush had some indication that her ASM position was going to be eliminated, there is no evidence to support this.   In addition, it is Plaintiff, not Defendant, who receives the benefit of every inference at this summary judgment stage.

**(e) No Documented Discussions By City Regarding Elimination**
**Of ASM Position Prior to Mary Bush's Protected Activity**

The causation element of Mary Bush's prima facie case is further supported by the City having had no documented discussions regarding elimination of the ASM position prior to Mary Bush's complaint.   The first document to indicate that the ASM position might be eliminated was created in March of 2015.   (Plaintiff's Facts, ¶ 75, 104).   Further, witnesses testified as to the City Administrator taking notes in meetings which the City Administrator now alleges to have included discussions regarding elimination of the ASM position prior to January 26, 2015. However, none of those documents have been produced.   (Plaintiff's Facts, ¶ 88-90, 104).

**(f) Inconsistencies In Testimony Regarding City's Alleged Oral**
**Discussions Regarding Elimination of the ASM Position**

The Tenth Circuit "has held that a rational fact-finder can infer pretext from such weaknesses, inconsistencies, or contradictions."   *O'Neal v. Ferguson Construction Co.*, 237 F.3d 1248, 1254 (10th Cir. 2001); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

As noted above, Plaintiff has shown Defendant's witnesses to have made inconsistent and contradictory explanations as to timing, content, and documentation of discussions regarding

elimination of ASM position.  (Plaintiff's Facts, ¶¶ 88-100, 104-107).  For example, Council President Harrison testified that she could not recall whether or not a decision had been made to eliminate the ASM position at the January 23rd meeting with the Mayor and the City Administrator.  (Plaintiff's Facts, ¶ 91).    Mayor Morrow could not recall exactly what was said by the City Administrator during this alleged January 23, 2015 discussion, but testified "We were going to be looking to eliminate the position and take other action."  (Plaintiff's Facts, ¶ 92). Mayor Morrow did not recall any timetable being placed on elimination of the position at this alleged meeting, but he did acknowledge that the position had been budgeted for the entire year of 2015.  (Plaintiff's Facts, ¶ 93).  Further, Mayor Morrow's account of the alleged January 23rd meeting was inconsistent and contradictory.  At one point, Mayor Morrow claimed they had reviewed the City's organizational chart in that meeting as part of the discussion of "positions that would be impacted beyond just the position that was being eliminated."  Mayor Morrow then had to admit, "I don't believe we had those in there with us."  (Plaintiff's Facts, ¶ 93).

Next, while the City Administrator claimed to have had conversations with the Mayor regarding elimination of the ASM position prior to the August 2014, budget approval for 2015, Mayor Morrow testified that such discussions did not occur.  (Plaintiff's Facts, ¶¶ 94-95, 105). Mayor Morrow claimed to have had conversations with Councilman Steve Shute, prior to Mary Bush's complaint, regarding the elimination of the ASM position, but Councilman Shute testified those discussions were not about eliminating the ASM position. (Plaintiff's Facts, ¶¶ 96-100).

There are further contradictions between the City Administrator's testimony and that of Council President Kristina Harrison as well as Councilman Shute regarding criticisms of Mary Bush's work performance.   This testimony was not supported by either Council President Kristina Harrison or Councilman Steve Shute.   (Plaintiff's Facts, ¶¶ 106-107).

With all of these contradictions and inconsistencies, the jury could believe that any discussions that actually did occur prior to Mary Bush's complaint were simply about the need to bolster Human Resources as was approved in August of 2014 for the 2015 budget year.   The jury could infer from all these inconsistencies that any such discussions were not at all about eliminating ASM position or negative toward Mary Bush, but instead about the need for additional Human Resources personnel.   Such an understanding would be consistent with what the City had done and documented during the normal budgetary process.

As set forth in *Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 908 (10th Cir. 2011), "inconsistencies that allow a reasonable factfinder [to] rationally find [the defendant's proffered reason] unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons are probative of pretext."   In *Gomez v.Metropolitan District*, summary judgment was denied on the former employee's retaliation claim with the Court noting that part of Plaintiff's pretext evidence included "inconsistencies in defendant's explanations about the reduction of Gomez's responsibilities and the process used to select him for elimination."   10 F.Supp. 3d 224, 241 (D. Conn. 2014).

Summary judgment should be denied so that a jury can assess the credibility of Defendant's inconsistent and shifting testimony regarding alleged meetings and discussions about elimination of the ASM position.

**(g)  The City's Varying and Different Alleged Reasons
for the Elimination of ASM Position**

False and inconsistent explanations given by an employer for its actions also support a determination that the causation element is met in this case.   The sufficiency of this type of circumstantial evidence in employment cases was upheld by the Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), explaining:

> In appropriate circumstances, ***the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.***   Such an inference is consistent with the general principle of evidence law that the fact finder is entitled to consider ***a party's dishonesty about a material fact as `affirmative evidence of guilt.'*** [Citations omitted].   Moreover, once the employer's justification had been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

530 U.S. at 147. (Emphasis added.).

The stated reason in the March 16, 2015 documentation provided to the Gardner City Council noted that the reason for the restructuring proposal was "operational efficiency." (Plaintiff's Facts, ¶ 84).   The City told Mary Bush on March 6, 2015 that the elimination of her position was a restructuring and not performance related.   (Plaintiff's Facts, ¶72).   Indeed, Mayor Morrow acknowledged that a performance plan would have been issued prior to the elimination of the position if it was based on performance.   (Plaintiff's Facts, ¶ 85).

The City first began to cite alleged performance issues as a basis after Mary Bush filed a Charge of Discrimination with the Equal Employment Opportunity Commission.   During the course of this case, Defendant has both acknowledged that the decision was not performance related while also attempting to claim Mary Bush's performance was inadequate.   From such changing explanations of the City for its conduct, a jury can infer the existence of causation and pretext.   See, *Berkemeier v. Standard Beverage Corp.*, 171 F.Supp. 3d 1122 (D. Kan. 2016) (denying summary judgment on gender discrimination claim and noting that the first time Defendant articulated performance-based reasons for Plaintiff's termination was in its EEOC position statement).

Defendant's shifting reasons here both support causation and constitute very strong evidence of pretext.   *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1311 (10th Cir.

2005)(changes in an employer's rationale for termination may constitute pretext).

### (h) Falseness of the Alleged Performance Issues

Plaintiff has provided evidence controverting the alleged performance issue, showing in several instances that the criticisms were manufactured by the City Administrator's conduct. (Plaintiff's Facts, ¶¶ 136-140).   Plaintiff has also shown that in November of 2014 the City Administrator praised Mary Bush's job performance in a meeting of many city employees. (Plaintiff's Facts, ¶ 15).   The jury can infer from Plaintiff's evidence that each of the City Administrator's criticisms were unjust and pretextual.

### (i) Lack of Any Documentation of Alleged Performance Issues

Prior to her January 26th complaint, Mary Bush did not expect that her position was going to be eliminated.   She also should not have had to worry about immediate termination, as she had not been placed on any step of the City's required progressive discipline policy.   (Plaintiff's Facts, ¶¶ 16-24, 85).

### 3. City of Gardner's Alleged Legitimate Business Reason

At the second stage of the burden shifting analysis, the employer must proffer a legitimate business reason for its adverse actions.   *Conroy v. Vilsak*, 707 F.3d 1163, 1171 (10th Cir. 2013). Defendant now contends it eliminated Mary Bush's ASM position based on budgetary considerations as well as considerations regarding Mary Bush's ability to handle the human resources functions.

### 4. Genuine Issues of Disputed Fact Exist Regarding Pretext

At the third stage of the burden shifting analysis, the plaintiff bears the ultimate burden of demonstrating that the employer's proffered explanation is pretextual.   *Conroy*, 707 F.3d at 1171. Here, Mary Bush has come forward with sufficient evidence to raise a genuine factual issue as to

pretext, by presenting nine categories of circumstantial evidence from which a reasonable jury could find that the City of Gardner and its City Administrator were actually motivated by a retaliatory animus.   Those nine categories of evidence are addressed above in the context of Mrs. Bush's prima face case causation element.   Evidence used at one stage of the burden shifting analysis may be used at another stage.   *Proctor*, 502 F.3d at 1209; *Wells*, 325 F.3d at 1218.

In summary, what the Tenth Circuit said in *Randle v. City of Aurora*, 69 F.3d 1441 (10th Cir. 1995) applies with equal force here:

> It is not the purpose of a motion for summary judgment to force the judge to conduct a `mini trial' to determine the defendant's state of mind.   So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered nondiscriminatory reason is unworthy of belief) upon which a jury could infer a [retaliatory] motive, the case should go to trial. Judgments about intent are best left for trial and are within the province of the jury.

69 F.3d at 453.

Plaintiff's retaliation claim presents disputed issues of material fact such that it is not appropriate for summary judgment.   Accordingly Defendant's Motion should be denied.

### C.  Plaintiff's Age Discrimination Claim Is Appropriate For Jury Consideration

Plaintiff Mary Bush also meets all of the prima facie and pretext showing requirements on her claim that the City's elimination of her ASM position was based on age.

Some of the facts supporting Plaintiff's claim that the elimination of her position was based on age include (1) false and non-substantive nature of the City Administrator's criticisms (Plaintiff's Facts, ¶¶ 136-140); (2) failure of City Administrator to follow City's policies and procedures with regard to any alleged performance criticisms (Plaintiff's Facts, ¶¶ 16-24); (3) the false statement of the City Administrator that the Council was going to demote her (Plaintiff's Response to Defendant's Alleged Facts, ¶ 26); (4) manufacturing of situations and criticisms, such as with regard to the police chief interview scenarios, compensation study, and other criticisms

(Plaintiff's Facts, ¶¶ 138-140); (5) other similarly situated older persons such as Mike Hall treated similarly (Plaintiff's Facts, ¶¶ 40, 59-63); (6) younger persons such as Matt Wolf treated better (Plaintiff's Response to Defendant's Alleged Facts, ¶100); and (7) age-biased comment showing potential motive of City Administrator in all of these actions and in the ultimate elimination of Mary Bush's ASM position (Plaintiff's Facts, ¶ 51).   In addition, each of the categories of causation and pretext evidence discussed above with regard to the retaliation claim also supports Plaintiff's prima facie case and her showing of pretext on her age discrimination claim.

The City notes that City Administrator Chery Harrison-Lee is over the age of 40, but that fact cannot be dispositive of whether an employer has engaged in age discrimination.   The City also notes that Mary Bush complained that some employees younger than age 40 were also mistreated by the City Administrator, but that also cannot be dispositive of whether an employer has engaged in age discrimination.   Finally, Defendant references the age of the new HR Supervisor, but that person was not a replacement for Mary Bush, whose position was eliminated.

There are genuine issues for the jury to consider on Plaintiff's claim that the elimination of her ASM position was based on her age, and Defendant's Motion should be denied.

### D.   Plaintiff's Race Discrimination Claim Is Appropriate For Jury Consideration

For each of the same reasons as discussed above with regard to Plaintiff's age claim, the Court should also deny Defendant's Motion for Summary Judgment of Plaintiff's claim that the elimination of her ASM position was based on her Caucasian race.   In addition to that evidence, Plaintiff's claim is supported by evidence that the City Administrator has favored African-American employees and potential hires who are African American even contrary to the City's policies and practices and even when the objective facts do not support such favoritism. (Plaintiff's Facts, ¶¶ 146-148).   Further, Plaintiff's claim is supported by a potentially

85

racially-biased comment.   (Plaintiff's Facts, ¶¶ 52, 54).

## V.   CONCLUSION

Based on the above-stated evidence and argument, Mary Bush has made a prima facie case of retaliation, age discrimination, and race discrimination with regard to the City of Gardner's elimination of the Administrative Services Manager position.   Accordingly, Defendant's Motion for Summary Judgment should be denied.

Date:   <u>September 18, 2017</u>                Respectfully Submitted,

WALTERS BENDER STROHBEHN
  & VAUGHAN, P.C.


_____*/s/ Dirk Hubbard*_____
Dirk Hubbard, KS Bar #15130
2500 City Center Square
1100 Main
P.O. Box 26188
Kansas City, MO 64196
(816) 421-6620
(816) 421-4747 (Facsimile)
dhubbard@wbsvlaw.com

-and-

WHITE, GRAHAM, BUCKLEY & CARR LLC
Gene Graham, Jr.
Deborah Blakely, KS Bar #19010
19049 East Valley View Parkway, Ste. C
Independence, Missouri 64055
(816) 373-9080
Fax: (816)373-9319

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of September, 2017, I electronically filed the above and foregoing document with the Clerk of Court using the Court's ECF system, which will send notification of said filing to all counsel of record who are registered ECF participants.   The undersigned further certifies that I have mailed by United States Postal Service the above and foregoing document to the following non-ECF participants:   None.


_____ */s/ Dirk Hubbard* _____